UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

       -v.-                      :
                             06 Cr. 1138 (CM)
JAMES G. MARQUEZ                  :

                     :
        Defendant.
                     :
- - - - - - - - - - - - - - - x


GOVERNMENT'S MEMORANDUM IN CONNECTION WITH SENTENCING


                                       MICHAEL J. GARCIA
                                         United States Attorney for the
                                         Southern District of New York
                                         Attorney for the United States
                                             of America.


Margery B. Feinzig
Assistant United States Attorney
    - Of Counsel -

TABLE OF CONTENTS

Preliminary Statement ................................. 2

I.   FACTUAL BACKGROUND ............................... 3

     A.   The Formation of the Bayou Hedge Fund ....... 3

     B.   The Scheme To Defraud ....................... 8

     C.   Marquez's Move and His Negotiations
          For Payment For His Interest In Bayou ...... 10

     D.   The Payments To Marquez and Marquez's
          Profit From The KFX Transactions ........... 17

     E.   The Collapse of the Bayou Hedge Funds ...... 21

     F.   Marquez's Guilty Plea ...................... 22

     G.   Marquez's Presentence Report ............... 24

     H.   Marquez's Psychiatric Examinations ......... 24

II.  MARQUEZ SHOULD RECEIVE A SENTENCE
     WITHIN THE STIPULATED GUIDELINES RANGE .......... 28

     A.   The Guidelines Calculation ................. 30

          1.   Marquez Should Receive A Two-Level
               Enhancement for Abuse of Trust ........ 30

     B.   The Court Should Not Impose A
          Sentence Below the Stipulated
          Guidelines Range of 51-60 Months
          Either Pursuant to 18 U.S.C. Section
          3553(a) or Based On Marquez's Downward
          Departure Motions........................... 41

          1.   Nature And Circumstances
               of the Offense ........................ 41

          2.   History And Characteristics
               of the Defendant ...................... 49

               a.   The Court Should Not Impose
                    A Reduced Sentence Based
                    on Diminished Capacity ........... 54

          b.    The Court Should Not Impose
                a Lower Sentence Based on
                Aberrant Conduct ................. 60

CONCLUSION......................................... 63

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

            -v.-                  :
                                        06 Cr. 1138 (CM)
JAMES G. MARQUEZ,                 :

            Defendant             :

- - - - - - - - - - - - - - - - x

### GOVERNMENT'S MEMORANDUM IN CONNECTION WITH SENTENCING

#### Preliminary Statement

The sentencing of the defendant, James G. Marquez, is scheduled for October 25, 2007.  The Government submits that, for the reasons described below, a sentence within the stipulated guidelines range of 51-60 months, is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a), given (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (B) to afford adequate deterrence to criminal conduct.  *See* 18 U.S.C. § 3553(a)(1), (2)(A)-(B).

The Government also submits that, for the reasons described below, the Court should reject the defendant's arguments in favor of a shorter sentence, asserted in his September 12, 2007 Sentencing Memorandum ("Sentencing Memo" or

"Sent. Memo").  Briefly, the defense argues that Marquez should not receive a Guidelines sentence because of his role in the offense, his history of mental illness, his devotion to his family, his charitable work, and the aberrant nature of his criminal conduct.  It further argues for downward departures based on aberrant conduct and diminished capacity.

## I.  FACTUAL BACKGROUND

### A.  The Formation of the Bayou Hedge Fund

James Marquez met Samuel Israel in or about the mid-1980's at a securities trading concern where Israel was employed. Marquez was trading his own money under the entity JGM Management Inc. and renting an office that he shared with Israel.  They became friends, seeing each other socially and commuting into New York together from the suburbs.  In or about the early 1990's, Marquez started his own hedge fund, HMR (Half Moon Rising) Investors L.P. and Israel went to work there as a Limited Partner.  Israel was there for less than a year when Marquez, who had been trading very successfully, took a gamble and lost a lot of money.  Israel left and found another job and Marquez closed the fund.  Thereafter, Israel had been talking to another colleague about opening a hedge fund, the Bayou Fund.  He began planning and taking steps to open the fund when his colleague went off to pursue another opportunity.  Israel still wanted to go out on his own and he turned to his friend, Jim Marquez, nine

years his senior, who, as the defense details, had much more investment experience than he had, and who had run his own hedge fund (albeit unsuccessfully).

In 1995, Marquez agreed to start the Bayou Fund LLC with Israel (hereafter the "Bayou Fund" or the "Fund") and it opened in or about 1996, with a little over $1 million and an office in the basement of Israel's newly built home in Harrison, New York.  Two other companies were also formed to facilitate the operation of the business.  Bayou Securities was created to act as a broker/dealer through which Bayou Fund's trades were executed and commissions on the trades were earned; and, Bayou Management became the so-called "Manager" of the Fund. (Collectively, the three will be referred to as "Bayou.") Prior to the formation of Bayou Management, Concorde Asset Management was the Manager of the Fund.  Marquez and Israel were partners in all these businesses.  From the basement office in Harrison, they both worked every day.  They brought on Daniel E. Marino, a certified public accountant, who was Marquez's friend and personal accountant, to keep Bayou's books.  Marino had a long commute from the Staten Island home where he lived with his mother and he did not come to the Harrison office every day. Marquez's wife, Mariella, worked for Bayou.  Marquez's brother-in-law, Italo Passante, came to work for Bayou, started as a clerk and rose to head trader.  According to a representative of

4

Citibank and Citibank records, Marquez, Israel and Marino were all signators on the Bayou and Concorde bank accounts. (Exh. A).[1] According to bank records and Bayou records, Israel contributed $150,000 to Bayou Fund LLC.[2] Marquez, through a charitable foundation of which he was an officer and sole source of contributions, the Marquez Family Foundation, invested $120,000.[3] Marino did not contribute any money. Marquez's wife, Mariella, put up approximately $30,000 to be used to satisfy NASD capital requirements pertaining to Bayou Securities. According to bank records and Bayou records, during the entire time they worked together at Bayou, Marquez and Israel, as partners, drew generally the same cash distributions.[4]

In the early days, Israel and Marquez both recruited investors. As do most people starting a new business, they both

---

[1] Citations to the defendant's sentencing memorandum are in the form "Sent. Memo at [page number]"; the defendant's exhibits are in the form "Def. Exh. [tab number]"; and the Government's exhibits are in the form "Exh. [tab number]". A compendium containing the Government's exhibits is being submitted with this letter.

[2] Israel also invested another $90,000 on behalf of his children.

[3] Later in the year, Marquez redeemed this contribution and profits. In 1997, he invested $100,000 in Bayou through the J.G. Marquez Family Trust.

[4] From the inception of the Fund through the end of December 2000, Marquez and Israel took monthly distributions, usually, on the same day and in the same amount, for a total, over the years, of approximately $500,000 each (excluding other miscellaneous payments). Marquez also had consulting agreements with Bayou, during that time period, in which he was paid additional sums of money. As will be described below, throughout 2001, Bayou paid him, among other things, $12,500 per month. Mariella Marquez also appears to have received distribution payments, from in or about October 1997 through in or about March 1999, for a total of approximately $145,000. Israel also took roughly the same distributions as Mariella Marquez.

reached out to friends, former clients and former employers, hoping to attract investors and to get the business running. (Exh. B at 1-28). In addition, in at least one instance, they both participated in the recruitment of two representatives of an investment advisor, Redstone Capital, and signed an agreement with Redstone Capital, to procure investment funds for the Bayou Fund. (Exh. B at 29-34). Between 1996 and the end of 1999, there were approximately twenty-three non-family investors in Bayou. Of approximately thirteen that were contacted by the Government, six reported that they met with Marquez (as well as Israel) prior to investing in the Fund.[5]

Bayou's marketing materials, which Israel and Marquez wrote together, confirm that they were equal partners. Indeed, one brochure states: "In late 1996, Sam Israel III and James G. Marquez formed an investment partnership and created Bayou Fund LLC. Both principals have extensive experience in the management of Hedge Funds and Partnerships with large investment organizations. Together, they bring to the fund over 40 years of analysis, trading experience and portfolio management." (Exh. C at 2).

The marketing materials, obviously, were created to sell the Fund and its principals – Marquez and Israel. They

_____

[5] Of those six, two invested individually and as principals of their own investment company. Two other investors invested on their own behalf and on behalf of two others.

stressed the individual skills, knowledge and experience each partner – Marquez and Israel – brought to the Fund and the reasons why investors should entrust their money to the pair. Marquez's and Israel's trading experience was touted; their resumes were included; and detailed descriptions of their roles in the Fund's trading were delineated. According to marketing materials and investor notes, they each brought different skills to the process of choosing which securities to trade and when to trade them. Their pitch was that together, their combined talent would earn money for investors. According to a brochure entitled "Profile of Fund," Bayou Fund combined "both fundamental and technical analysis disciplines to all investment decisions. James G. Marquez employs his considerable experience in fundamental analysis to identify economic trends, group and industry dynamics, then specific undervalued as well as overvalued equities in these groups or industries. Sam Israel III then applies the technical analysis contained in our proprietary trading program as a timing tool for buy and sell decisions." (Exh. D at 2). Marquez was focused on research based trading and watching trends and Israel was using a computer program he had developed to ascertain when the timing was right to execute trades. No other Bayou personnel were included in the marketing materials while Marquez was at the Fund.

        For the first full year of the Bayou Fund's existence,

7

1997, Grant Thornton, the accounting firm, audited Bayou's books. Although the fund lost money, a portion of the commissions Bayou Securities earned from trading for the Fund were put back in the Fund's account and used to buttress the performance numbers that were disseminated.  The audit was late, however, and the annual report was sent to investors in April 1998, rather than the promised March.  (Def. Exh. 1 at 1).  This delay caused tension with the investors and Marquez and Israel apparently blamed Marino.  (Def. Exh. 1 at 1).  Thus, the three agreed that Marino was going to leave by the end of the year and Israel's wife, who was a CPA, was going to take over his responsibilities.  (Def. Exh. 1 at 1).

   **B.    The Scheme To Defraud**

        At Marquez's behest, in mid-1998, Bayou moved out of Israel's basement and into a spacious office, by the water, on Signal Road in Stamford, Connecticut, right next to the Greenwich neighborhood where Marquez was living with his family. Thereafter, Israel continued to work from home and from the Signal Road office.  Marquez worked from the Signal Road office and Marino initially worked at the Signal Road office and then had a separate office across the street from Bayou.  Marquez focused on trading strategy, investment research, and issuing opinions and recommendations regarding stocks.  These stock tips were distributed to investors and potential investors and/or

other potential clients who might read the recommendations and purchase the recommended stocks through Bayou Securities. That way, Marquez and Israel could generate additional commissions and more profits. Marquez also maintained a reputation on Wall Street by providing quotes about various stocks to business news reporters and publicizing his stock recommendations. In one article, which was a year end round-up focused exclusively on Marquez's stock picks, he was quoted as the "head" of Bayou Securities. (Exh. E at 12). After the initial recruiting of investors, which involved the participation of both Israel and Marquez, probably owing to Israel's gregarious personality, Israel became primarily responsible for recruiting potential investors and maintaining Bayou's relationships with its investors. Israel also concentrated on stock trading and implementing his computer program.

Meanwhile, as is well known now, by the end of 1998, Bayou had accumulated substantial losses and had not reported those losses to investors. Indeed, Marquez, Israel and Marino had been misrepresenting the Fund's performance to investors for some time, in communications to investors. (Def. Exh. 1 at 1). By taking into account actual market conditions, Marquez and Israel made up fictitious rates of return on the Fund's investments. By the last trading day in December 1998, they recognized that they had not made up for their losses and if

Grant Thornton continued to act as the Fund's accountant, and actually audited the records for the 1998 annual financial report, the fraud would likely be detected. Consequently, in early 1999, the three co-conspirators decided to stop having Grant Thornton audit Bayou's books. Instead, they embarked on a plan in which Marquez and Israel had Marino set up a bogus accounting firm named Richmond-Fairfield Associates (hereafter "RFA"), with supposed offices in Manhattan. (Def. Exh. 1 at 2). In early 1999, they sent out the first annual financial report that contained, among other misrepresentations: (i) inflated rates of return on trading; (ii) inflated net asset values, and (iii) certifications that Bayou had been audited by RFA, which, they represented, was an independent accounting firm. Also in early 1999, they were providing to prospective investors a brochure entitled "Synopsis of Fund" which described the operation of the Fund, the credentials and input of its principals and the phony rates of return. (Def. Exh. 1 at 1-3). Given the fact that Israel, Marquez and Marino were perpetrating a fraud together, Marino stayed on.

### C. Marquez's Move and His Negotiations For Payment For His Interest In Bayou

In or about June 1999, Marino was diagnosed with cancer and began receiving chemotherapy. At or around the same time, Marino's mother, who he lived with, was also diagnosed with cancer and he was her primary caretaker. As a result, he was

only periodically going to work at Bayou.  Marino's mother passed
away on January 1, 2000 and during the early part of the year,
Marino was continuing to receive cancer treatments and went to
work sporadically.  Some time in early 2000, Marino came back to
work and Marquez and Israel were still losing money.  Tensions
were running high and Marquez, Israel and Marino argued
constantly.  (Def. Exh. 1 at 3).  Moreover, by then, Israel was
blaming Marquez for Bayou's losses, thought that investors did
not trust Marquez with their money, and suspected that he could
raise more money from investors without Marquez.  He wanted
Marquez out of the Fund and, over time, forced him out.  In or
about early January 2001, Marquez was forced to move across the
street to the office space that Marino had been occupying.  (Def.
Exh. 1 at 3).

Soon after moving out, Marquez began trying to
negotiate a deal with Israel – the terms of which Marquez set out
in three letters –  in which he would be paid for his
"partnership interest" in Bayou.[6]  In or about February 2001, he
wrote the first letter, indicating that "[h]aving spent six weeks
'across the street,' it is clear that we have very little, if
anything, in common anymore.  None of what has happened has been
of my own choosing, but the following is my recommended

---

[6] The defense included copies of the second and third letters in its
appendix.  For the convenience of the Court, we have included all three in the
Government's Appendix, in tabs F through H.

solution."  Marquez proposed that Bayou Securities retain his firm, HMR LLC (which, at that point, was a new company created by Marquez and being operated by Marquez and his wife, called Highly Motivated Research), for consulting services "on a wide variety of activities including brokerage execution, fundamental and technical research, and customer relations.  For those services, HMR will be paid a minimum of $150,000 annually."  (Exh. F at 1).[7]  Marquez also laid out how HMR, as a "sub-advisor to Bayou Fund(s) and Bayou Management" would provide investment advisory services and earn commissions (the amount of which he painstakingly described) on trades, covered how Bayou and Marquez would divide up Bayou clients; addressed how to "redefine" Bayou's relationship with a company associated with Marquez's brother; and provided for Marquez's use of Bayou's offices for his own research/marketing functions.  The letter left open "ownership issues" for later discussion.

Thereafter, Marquez wrote a second letter, entitled "Ownership/Carried Interest of James Marquez in Bayou Entities." (Exh. G at 1).  Marquez complained that it was clear, based on recent events, that they should work toward a "complete separation of our business activities, so that ultimately I retain no ownership or equivalent in any Bayou entities."  He based that assessment on the following factors:

---

[7] Marquez's salary at Bayou, since 1999, had been $12,500 per month.

1) deterioration of personal working relationships

2) physical separation provides me no ability whatsoever to monitor ongoing enterprise activities, participate in decision-making, affect performance, control expenditures or revenue-sharing joint ventures with non-Bayou entities

3) Multitude of commitments to outside parties, i.e. finder's fees, profit-sharing, fee splitting that have nothing to do with my activities on behalf of Bayou

4) My desire to engage in business activities completely unrelated to Bayou and where Bayou has no strategic interests or commitments

5) Recognition and acceptance that our paths are diverging and that we no longer share common goals, objectives, philosophy or method of implementation.

(Exh. G at 1).

Marquez went on to propose how to "value my carried interest" in the Bayou entities. In doing so, he described the nature of his ownership interest in Bayou and his role. Although Marquez is now attempting to depict himself as a "portfolio manager" with no ownership interest and little or no input into the running of the Fund, back then, Marquez did not view himself that way at all. To the contrary, in his second letter, he recounted that when he was "invited to form new business enterprises under the collective Bayou banner, <u>it was stipulated that Sam Israel and I would be equal partners,</u> save the carried interest attributable to Dan Marino. Adjusting for the carried ownership interest for the benefit of Mariella Marquez for

13

putting up the NASD required capital to fund Bayou Securities LLC., <u>my intrinsic interest was approximately 40%.</u>" (emphasis added) (Exh. G at 2).

Moreover, in Marquez's own estimation, from the very beginning, he did everything he could to make Bayou a successful business. He "<u>participated in the evolution of the firm(s) since late 1995, doing whatever was necessary to try to make the Bayou business become successful and self-nurturing</u>. Sometimes those efforts met with good success, other times my efforts were great failures. Now my activities on behalf of Bayou are further evolving into contractual/consulting/agency functions that by definition do not constitute partnership interest so an accounting is necessary to commence the formal separation." (Exh. G at 2-3) (emphasis added).

Back then, Marquez also acknowledged his contribution to the Bayou "problem" but still believed he had a right to be bought out of his share of Bayou. In a section entitled "Payment For Past Sins," Marquez wrote that "a great deal has been said in the past 9 months concerning 'how much of the problem Jim Marquez created.' Leaving rhetoric aside – let's make it simple – for my transgressions, I will relinquish ½ of my carried interest, bringing me down to 20%." Marquez suggested that, through the management of a sub-account, he would "endeavor to create through commissions and/or capital gains as much income as possible to

contribute to the Problem." (Exh. G at 3). Marquez proposed that he would not "receive a penny of carried interest payment until the Problem has been dealt with in its entirety." He further proposed that the cut-off date for the total number could not be a "moving target" and he suggested that it be December 31, 2000. He also stated that it was his "goal that the beginning of the pay-out" would commence "early in 2002, with the Problem being completely dealt with over the balance of 2001. So, in summary for my past mistakes I voluntarily will give up ½ of my interest in the Bayou Entities" and I further commit myself to generating the income necessary to fill more than ½ the hole. I can't do more and I should not do less." (Exh. G at 4-5). Marquez went on to try to ascertain what 20% of Bayou was worth and concluded that, once payments were all complete, they could either "part company completely or re-negotiate a new agreement going forward that satisfies the interests of all parties." (Exh. G at 6).

While Marquez now contends that he did not want to participate in the fraud and proposed that Israel close the Fund in 1998 and 2000 (Sent. Memo at 11, 13, 46), he offers no evidence of this and, in fact, the evidence is to the contrary. By the time he wrote his last letter to Israel in 2001, Marquez had decided that a "complete break of our business activities is necessary for both of us to go on with our lives. You need to

make money for the Fund, I need to make money for my family."
(Exh. H at 1)(emphasis added).  Marquez again emphasized his five
year effort to build Bayou, complaining, "[y]ou don't want to pay
me anything for the 5 years I spent building the Bayou companies;
I do not intend to be cheated out of it with nothing." Moreover,
he made it quite clear that it was in everyone's interest to
continue to conceal the on-going fraud, warning, "[y]ou have
certain revelations better left unsaid, I don't need any
obstructions/interference in building out my business
activities..." and "[w]e can both win or both lose depending on
how matters are dealt with from this day forward.  I have a
proposal that may handle most if not all of each of our mutual
needs."  (Exh. H at 1) (emphasis added).  Marquez offered to
"sign a general release on Bayou Fund and Bayou Mgt., past,
present and future in exchange for the same from you in addition
to a published release of my leaving Bayou to pursue other
activities and acknowledging my non-involvement for the past 9-10
months."  (Exh. H at 1).

In exchange for this "general release" and "in an
attempt to create an earn-out for the Fund and for" himself,
Marquez indicated that he had been retained to recruit investors
by an energy company called KFX.  He proposed that Bayou buy one
million units of KFX at $3.65 per unit.  The units included one
million shares of stock and 500,000 warrants struck at $3.65 with

16

a duration of 3 years.  He proposed that Bayou Fund would be the
owner of the units, but would sign a management contract with HMR
for "strategic advice and consulting."  Marquez laid out
additional details, including that the increase in the value of
the one million shares would be Bayou Funds' exclusively but the
warrants would have vesting capability to H.M.R. if the stock
rose to prices he specified.  (Exh. H at 1-4).

### D.    The Payments To Marquez and Marquez's Profit From The KFX Transactions

Ultimately, Israel agreed, in large part, to the terms
of Marquez's proposal.  Bayou set up Marquez's new business in
the office across the street and paid for, among other things,
Marquez's office equipment, his computer equipment, and his BMW
payments through June 2001. (Exh. I).  They also paid him a
$12,500 monthly "consulting" fee through December 2001; a $35,000
consulting fee on or about August 2, 2001, relating to the KFX
transaction; another $21,000 for "advice given" regarding KFX on
February 1, 2002; and commissions on trades.  (Exh. J).  Between
the consulting fees and the car payments alone, Bayou paid
Marquez over $150,000 from January 2001 through October 10, 2001.
They also allowed him to redeem the investment of the Marquez
Family Trust plus fake profits, amounting to approximately
$202,000.  And, in late 2001, they paid Marquez a $125,000
separation payment.  (Exh. K).  Marquez continued to trade,
sporadically, on behalf of the Bayou Fund, until October 10,

2001, under their commission arrangement, which returned a minimal amount in commissions to Bayou to repay the losses.

They also made the investment in KFX that Marquez was advocating. In July 2001, Bayou purchased one unit, consisting of one million shares of KFX stock and 500,000 warrants to purchase 500,000 additional shares of KFX stock, for approximately $3.6 million. The warrants, which were identified as Common Stock Purchase Warrant #BF-1 and Common Stock Purchase Warrant #BF-2, were for 250,000 shares each, had an exercise price of $3.65 per share, and had a three year term that was set to expire on July 15, 2004. (Exh. L at 1-9).

Marquez succeeded in working things out so that he was compensated by both Bayou and KFX for his role in this transaction. On the Bayou side of the transaction, Bayou paid HMR $35,000 as a consulting fee for KFX analysis on August 2, 2001. (Exh. J at 16). In addition, at the time Bayou purchased the KFX stock and warrants, Marquez and Bayou entered into an agreement (which Marquez had also sought in his earn-out letter) pursuant to which he was to receive 250,000 of the warrants, if or when KFX's stock price rose to $6.65 per share or higher, and the second 250,000 warrants, if or when the stock price rose to $9.95 per share or higher, in exchange for providing advice and consultation to Bayou on the KFX holding. (Exh. L at 1). On the

other side of the transaction, KFX paid HMR $150,000[8] and issued to HMR 100,000 warrants of KFX stock in return for "advisory services" relating to the Bayou/KFX deal.  (Exh. L at 4, 10). These warrants had the same terms and conditions as the Bayou warrants, an exercise price of $3.65 per share and a three year term expiring on July 27, 2004.  (Exh. L at 4, 10).

On December 31, 2001, HMR paid the Bayou Fund $25,000 for the 500,000 KFX Warrants.  (Exh. L at 13).  KFX stock was trading at approximately $2.99 per share on this date. According to the Black-Scholes option-pricing model (Exh. M), the fair market value of these warrants at the time was estimated at $405,870.  Approximately one month later, on February 1, 2002, Bayou assigned and transferred the 500,000 warrants to HMR. (Exh. L at 7, 9).  On the same day, HMR/Marquez issued an invoice to Bayou in the amount of $21,000 for "advice given regarding KFX" and Bayou paid the $21,000.  (Exh. J at 13-15).

Four months later, on June 3, 2002, KFX issued new Common Stock Purchase Warrants for both sets of the 250,000 warrants that Bayou transferred to HMR and relabeled them BF-1A and BF-2A.  (Exh. L at 14, 15).  KFX modified the warrants by reducing the exercise price from $3.65 to $3.00 per share and

---

[8] Initially, the payment of $150,000 and the issuance of 100,000 warrants to HMR/Marquez was "in return for advisory services relating to the Bayou/KFX deal."  Three weeks later, Marquez wrote to KFX and recharacterized the payment and issuance of the warrants as compensation for consulting and financial advisory services to KFX that were unrelated to Bayou and covered a period of one year. (Exh. L at 11-12).

extending the expiration date for two years, from July 15, 2004 to July 15, 2006. (Exh. L at 14, 15). The result was that Marquez obtained a better deal on the warrants than Bayou did because he could exercise the warrants at a lower stock trading price and he had more time to wait for the stock to reach a price higher than the strike price before the warrants expired. According to the Black-Scholes option-pricing model, the fair market value of these modified warrants was estimated at $805,316. (Exh. M).

In December 2004, Bayou sold its one million shares of KFX stock for approximately $15 million, representing a profit of about $12 million.

On four occasions in April and July of 2004, Marquez exercised the warrants he got directly from KFX as compensation for having Bayou invest in KFX, and sold the stock. He earned a total profit of $485,924, after execution costs. In December 2003, and then in numerous transactions between January 2005 and May 2005, he also exercised and sold 360,000 of the 500,000 warrants that HMR acquired from Bayou. (Exh. N). Marquez sold the stock and earned a profit of approximately $2,740,000 after execution costs.[9]

In sum, Marquez/HMR made at least $3.4 million from the Bayou/KFX deal. In addition, thereafter, Marquez received

---

[9] Pursuant to his plea agreement, Marquez agreed to forfeit to the United States the remaining 100,000 KFX warrants that he got from Bayou.

additional stock options and payments from KFX, pursuant to consulting agreements, which netted him another appproximately $1.475 million.

### E.    The Collapse of the Bayou Hedge Funds

After Marquez moved across the street, Marino moved his office into Bayou's space, became Israel's partner and went by the title Chief Financial Officer.  From then on, he and Israel were the sole principals of Bayou and Bayou grew exponentially as Israel and Marino used the false performance record they had created with Marquez to persuade potential investors that the funds had a profitable track record.  Marino and Israel closed Bayou Fund LLC and opened four domestic hedge funds, including Bayou Accredited Fund, LLC, Bayou Affiliates Fund, LLC, Bayou No Leverage Fund, LLC, and Bayou Superfund, LLC  as well as offshore funds in the Cayman Islands.  The Bayou funds fared no better with Israel solely in control of investment strategy and Israel and Marino continued to disseminate false performance numbers and reports certifying that Bayou's books had been audited by an independent accounting firm.

In or about the Spring and Summer of 2004, Israel and Marino attempted to recoup Bayou's mounting losses by investing Bayou investor money in private placement transactions that involved the transfer of Bayou investor money through bank accounts in Europe and the United States.  The private placement

21

transactions turned out to be frauds and over $100 million was frozen in a bank account in New Jersey.  On August 16, 2005, with over $100,000,000 tied up in the frozen bank account, Bayou could not redeem the investment of a substantial investor, the investor went to Bayou's office in Stamford to meet with Marino and, instead of finding Marino, discovered a suicide/confession note written by Marino. (Def. Exh. 1).  The investor alerted local police, who found Marino and confirmed he had not killed himself. By then, investors had been fraudulently induced to contribute over $400 million into the funds.

On September 29, 2005, Israel and Marino each pled guilty to multiple count Informations charging them with one count of conspiring to commit mail fraud and investment adviser fraud, from in or about 1996 through in or about August 2005, in violation of Title 18, United States Code, Section 371; one count of investment adviser fraud, in violation of 15 U.S.C. §§ 80b-6 and 80b-17; and one count of mail fraud, in violation of Title 18, United States Code, Section 1341.  Marino also pled guilty to one count of wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, respectively.

**F.    Marquez's Guilty Plea**

On December 14, 2006, Marquez pled guilty, before the Honorable George A. Yanthis, United States Magistrate Judge, to an Information charging him, in one count, with conspiring to

22

commit mail fraud and investment adviser fraud, from in or about
July 1996 through on or about October 10, 2001, in violation of
Title 18, United States Code, Section 371.  Marquez pled guilty
pursuant to a plea agreement in which he stipulated that the
November 1, 2000 Sentencing Guidelines were applicable to
Marquez's offense; his base offense level was six; there was a
fifteen level increase because the loss exceeded $10 million; a
two level increase was warranted because there was more than
minimal planning; and another two level increase was warranted
because of the use of sophisticated means.  The parties agreed to
disagree as to whether a two level enhancement was warranted
based on abuse of trust.  Thus, the parties stipulated that
Marquez's applicable Guidelines offense level was either 24 or 22
and that his guidelines range, given a Criminal History Category
of I, was either 51 to 60 months (level 24 and a statutory 60
month cap) or 41 to 51 months (level 22).  (PSR, ¶¶3-3(o)).

        At his guilty plea hearing, Marquez allocuted that he
"acted in the position of a portfolio manager for Bayou Fund
where I helped formulate the trading strategy for the fund."
(Def. Exh. 16 at 20).  He further admitted that he had "general
knowledge of the financial status of the fund and became aware,
after a period of time, that the fund was sustaining losses.
Together with others, I caused documents to be sent via U.S. mail
to investors that contained inaccurate financial information

about the Bayou fund.  Specifically, such mailings contained false financial information that made it appear that the fund was more successful than it actually was.  I was also aware that Richmond-Fairfield was formed to handle the audits for the Fund with the intent that the true financial status of the fund not be disclosed to investors." (Def. Exh. 16 at 20).

### G.  Marquez's Presentence Report

The Probation Office issued a Presentence Report ("PSR") in which its guidelines calculation is in accord with the plea agreement.  In addition, the Probation Office concluded that an enhancement for abuse of trust was appropriate and that Marquez's guidelines range was 51 to 60 months.  (PSR, ¶¶ 36-51), The Probation Office recommended a 51 month term of imprisonment. (PSR at 30).

### H.  Marquez's Psychiatric Examinations

In January 2006, Marquez was examined by a psychiatrist he retained, Justin O. Schechter, M.D..  Dr. Schechter reviewed medical records provided by Marquez, interviewed his family members, read newspaper articles regarding the Bayou fraud and spoke with Marquez, although, apparently, not about his criminal conduct.  Marquez admitted that he was a "principal fund manager from approximately 1996 though 1998." (Def. Exh. 4 at 2).  Dr. Schechter concluded that "[d]uring the period of late 2000-2001, and possibly prior, Mr. Marquez was experiencing severe mood

cycles not stabilized by medication, although Mr. Marquez never lost the capacity to discern right from wrong, his condition impaired his ability to express the power of reason and to control his behavior at that time." (Def. Exh. 4 at 7). Dr. Schechter provides no specific details about Marquez's moods and how they were connected to his criminal conduct.

Marquez was also examined, upon the request of the Government, by Lawrence A. Siegel, M.D. Dr. Siegel reviewed medical records provided by Marquez, and spoke at length with Marquez about his mental health history and his criminal conduct. During a consultation with Dr. Siegel, Marquez stated that he, Israel and Marino worked together at the Fund and they were alleged to have sent out false monthly or quarterly performance numbers. He claimed that his role was principally as a portfolio manager but conceded that "on rare occasions he wrote a monthly or quarterly letter to investors." (Def. Exh. 21 at 9). He admitted that "persons received false reports about the performance of the fund." (Def. Exh. 21 at 9). While claiming that the false numbers were created by Israel and Marino, he admitted that he was "asked what I thought of them from time to time." (Def. Exh. 21 at 9). When Dr. Siegel asked him in what context he was asked about the false numbers, Marquez responded "'[w]hether they were representative rates of return given the stock market and interest rates.'" He further admitted that the

false numbers were sent out "to keep the investors in the fund
and so investors would not seek to redeem their investments due
to poor performance and losses." (Def. Exh. 21 at 10). Marquez
also admitted that he was "present at meetings with investors 'as
backup'." (Def. Exh. 21 at 10). As to the false reports,
Marquez admitted that the inaccuracies in the statements began
around 1997 and the "statements really became false in 1998."
(Def. Exh. 21 at 10)

Dr. Siegel also diagnosed Marquez with Bipolar I
Disorder. Marquez told Dr. Siegel that he was in a "down phase
in the Summer of 1998 and did not have the energy to fight his
partners to stop them from the path down which they were
heading." (Def. Exh. 21 at 13). There are no medical records
from that time period and Dr. Siegel therefore was unable to
determine when Marquez was in a down period. Dr. Siegel observed
that:

> In light of the defendant's history of mood swings, it
> is not implausible that his having been in a down phase
> made him less able to actively object to and intervene
> in a scheme that his two partners generated on their
> own. One can also envision the defendant being more
> optimistic about recouping the losses through his
> investing during periods when his mood was elevated.
> It is likely that when he was in a manic phase, he
> assessed the shortfall in the fund as being less of a
> problem."

However, Dr. Siegel pointed out that:

> In speaking with the defendant, he does not describe
> having been constantly in either a manic or depressive

episode.  In reviewing the progress notes from
treatment providers, he had periods of time during
which his mood was neither depressed nor elevated.
Progress notes generated . . . from 1999 through 2001,
document that the defendant, while often emotional and
distorted in his viewpoints, was able to reason about
issues he as facing in a productive manner.  One does
not glean from the progress notes that the defendant
was constantly in a disordered mood state.

The defendant describes his participation in the
conspiracy as having been limited.  He says he cannot
specifically recall his mood state when inaccurate
statements were first sent out . . . He says he was
called on as backup at meetings with investors during
which others disseminated information that he knew was
inaccurate.  He says he wrote a newsletter.  To the
extent that the need for him to appear as backup at
meetings occurred over the course of the year and the
newsletters he wrote were at different times of the
year (and times that he was neither in an up or down
state), it becomes less probable that his participation
in the conspiracy was related to his underlying mental
disorder. . . .

While there may have been times that his mood was
elevated and, in part due to his illness he foresaw
overcoming the shortfall and minimized the significance
of the problem, his mood was not elevated all the time
that the conspiracy was extant.  Similarly, while there
may have been times that his mood was down and he
lacked energy to confront his partners and intervene to
thwart the conspiratorial conduct, he was not depressed
all the time that the conspiracy was extant.

(Def. Exh. 21 at 14).

       Thus, Dr. Siegel concluded that although Marquez

suffers from a serious mental disorder, he did not have a

significantly reduced mental capacity.  Specifically, Dr. Siegel

determined that while Marquez has a serious mental disorder that

"at times significantly impairs his ability to reason, his

offending behaviors occurred over a period of years.  While aspects of his behavior appear to have been influenced by his mental disorder, the pattern of ongoing behaviors as part of the conspiracy are not consistent with his having acted while suffering from a significantly reduced mental capacity."  (Def. Exh. 21 at 14).

## II.  MARQUEZ SHOULD RECEIVE A SENTENCE WITHIN THE STIPULATED GUIDELINES RANGE

In *United* States v. *Booker*, 125 S. Ct. 2531 (2005), the Supreme Court held that the system of enhancements established by the Sentencing Guidelines violated the Sixth Amendment.  *United States* v. *Booker*, 125 S. Ct. 738, 749-50.  To solve this problem, the Supreme Court excised the provisions of the Sentencing Reform Act that had made the Guidelines mandatory, rendering the Guidelines advisory.  *Booker*, 125 S. Ct. at 756-57.  In *United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005), the Second Circuit explained that in light of *Booker*, sentencing judges now must: (a)  consider the Guidelines and all of the other factors listed in 18 U.S.C. § 3553(a); (b) normally, determine the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consider the applicable policy statements; and (c) decide, after considering the Guidelines and all the other factors set forth in § 3553(a) whether to impose a sentence within the Guidelines range or within permissible departure authority, or a non-Guidelines sentence.  Sentencing

judges are entitled to find all the facts appropriate for
determining either a Guidelines sentence or a non-Guidelines
sentence.  *United States* v. *Crosby*, 397 F.3d at 113.

In addition to taking into consideration guidelines and
policy statements issued by the Sentencing Commission and bearing
in mind the need to avoid unwarranted sentencing disparities
among similarly situated defendants (*see* 18 U.S.C. § 3553(a)(4)A,
(5) and (6)), some of the factors that the Court should take into
consideration, pursuant to 18 U.S.C. § 3553(a), include, among
other things, "(1) the nature and circumstances of the offense
and the history and characteristics of the defendant; (2) the
need for the sentence imposed (A) to reflect the seriousness of
the offense, to promote respect for the law, and to provide just
punishment for the offense; and (B) to afford adequate deterrence
to criminal conduct."  18 U.S.C. § 3553(a)(1), (2)(A)-(B).

As the Second Circuit has instructed, District Court
judges must consider the Guidelines "faithfully" when sentencing.
*Crosby*, 397 F.3d at 114.  "*Booker* did not signal a return to
wholly discretionary sentencing."  *United States* v. *Rattoballi*,
452 F.3d 127, 132 (2d Cir. 2006) citing *Crosby*, 397 F.3d at 113).
Indeed, this Court has held that the Guidelines range for a
particular defendant is "a benchmark or a point of reference or
departure" when considering a particular sentence to impose.
*United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir.), *cert.*

*denied*, 126 S. Ct. 388 (2005).

Recently, the Second Circuit observed that the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'" *United States* v. *Rattoballi,* 452 F.3d at 133 (quoting *United States* v. *Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (*en banc*)). "[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States* v. *Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006), *cert. denied*, 127 S. Ct. 192 (2006). *See also United States* v. *Rita*, 127 S. Ct. 2456 (2007)(holding that a federal appellate court may apply a presumption of reasonableness to a district court sentencing that is within a properly calculated Sentencing Guidelines range).

For the reasons discussed below, the Court should impose a sentence within the stipulated Sentencing Guidelines range of 51-60 months.

**A.    The Guidelines Calculation**

   **1.    Marquez Should Receive A Two-Level Enhancement for Abuse of Trust**

The parties stipulated that Marquez's base offense level was six; there was a fifteen level increase because the

30

loss exceeded $10 million; a two level increase was warranted because there was more than minimal planning; and another two level increase was warranted because of the use of sophisticated means.  The parties agreed to disagree as to whether a two level enhancement was warranted based on abuse of trust.  Thus, the parties stipulated that Marquez's applicable Guidelines offense level was either 24 or 22 and that his guidelines range, given a Criminal History Category of I, was either 51 to 60 months (level 24 and a statutory 60 month cap) or 41 to 51 months (level 22).

Under the 2000 Guidelines, § 3B1.3 mandates a two-level enhancement in the offense level if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G.  § 3B1.3. Application Note 1 to § 3B1.3 provides:

> 'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (i.e. substantial discretionary judgment that is ordinarily given considerable deference).  Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.  For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g. by making the detection of the offense or the defendant's responsibility for the offense more difficult.)

U.S.S.G. § 3B1.3, Application Note 1.

Whether Marquez occupied a position of trust within the meaning of § 3B1.3 is considered from the victim's viewpoint and is a legal question subject to *de novo* review. *United States* v. *Thorn*, 446 F.3d 378, 388 (2d Cir. 2006), citing *United States* v. *Hirsh*, 239 F. 3d 221, 227 (2d Cir. 2001); *see also United States* v. *Barrett*, 178 F.3d 643, 646 (2d Cir. 1999); *United States* v. *Jolly*, 102 F.3d 46, 48 (2d Cir. 1996); *United States* v. *Broderson*, 67 F.3d 452, 455 (2d Cir. 1995); *United States* v. *Booth*, 996 F.2d 1395, 1396 (2d Cir. 1993) (per curiam). The determination of whether a defendant utilized a position of trust or special skill in a manner that significantly facilitated the commission or concealment of the offense is a question of fact reviewed for clear error. *United States* v. *Thorn*, 446 F.3d at 388. The enhancement is warranted if the victim entrusted the defendant with discretionary authority that enabled the defendant either to commit a crime or evade detection. *Thorn*, 446 F.3d at 388, citing *United States* v. *Santoro*, 302 F.3d 76, 79 (2d Cir. 2002). One who engages in arms-length dealings in a commercial transaction does not occupy a position of trust. *Thorn*, 446 F.3d at 388, citing *United States* v. *Hirsh*, 239 F.3d at 227 ("An abuse of trust enhancement may not be imposed on a defendant convicted of fraud solely because of a violation of a legal obligation to be truthful and a victim's reliance on a misrepresentation.") For example, in connection with a fraud offense, a defendant who

procured loans to his company did not hold a position of trust vis-a-vis the lenders. *See United States* v. *Jolly*, 102 F. 3d at 48-50. Nor did a corporate officer who negotiated a procurement contract with the government. *See United States* v. *Broderson*, 67 F.3d at 455. On the other hand, a defendant who is a fiduciary or one who is responsible for the well-being of a victim of his crime, and as such is given discretion over spending and is thereby afforded an opportunity, not generally available, to embezzle moneys, does occupy such a position [of trust]." *Wright*, 160 F.3d at 910-11; *United States* v. *Barrett*, 178 F.3d at 646 (noting that enhancement had been applied to police officers, security guards, custodians, and truck drivers); *see also United States* v. *Morris*, 350 F.3d 32, 37 (2d Cir. 2003) (upholding adjustment for home health care aid who had "unsupervised discretion" over care of elderly clients, enabling conversion of personal information and ability to cover up crime); *United States* v. *Corrozzolla*, 105 F.3d 796, 800-01 (2d Cir. 1997) (enhancement proper for attorney who filed false accounts while serving as trustee in probate court; attorney had discretion and lack of direct supervision that were the "key feature[s] of a position of trust"); *United States* v. *Castagnet*, 936 F.2d 57, 61-62 (2d Cir.1991) (enhancement appropriate for former airline agent who misused access codes to issue free tickets).

In *United States* v. *Hirsch*, the Second Circuit held

33

that because the defendant, who was a broker and investment advisor entrusted with investment discretion by his investors and had a fiduciary and personal relationship (rather than an arms-length relationship) with his investors, held a position of trust. *Hirsch*, 239 F.3d at 228, *citing United States* v. *Moskowitz*, 215 F.3d 265, 272 (2d Cir. 2000)(distinguishing *Jolly* and affirming imposition of enhancement for abuse of trust where defendant executive fraudulently inflated corporation's stock prices, breaching fiduciary duty to shareholders); *United States* v. *Queen*, 4 F.3d 925, 929 (10th Cir. 1993) ("An investment advisor/broker is . . . entrusted with the discretionary authority to manage the assets of his or her clients...Such a person is well positioned to commit a difficult-to-detect wrong"); and, *United States* v. *Paneras*, 222 F.3d 406, 412-13 (7th Cir. 2000)(defendant who represented himself as a licensed broker abused a position of trust when he misappropriated victim's funds).

In another securities case, *United States* v. *Santoro*, the Second Circuit held that even in the absence of a fiduciary relationship, the defendant, a stock broker, affirmatively established a trust relationship by recommending a stock and abused that relationship where he failed to disclose that he was receiving a substantial commission for that recommendation. *Santoro*, 302 F.3d at 80; *see also United* States v. *Bollin*, 264

34

F.3d 391, 416 (4th Cir. 2001)(finding position of trust existed where victims provided defendant with discretion to invest and expected defendant "to make trades in their best interest, which he did not do"); *United States* v. *Iannone*, 184 F.3d 214, 224 (3rd Cir. 1999)(holding that position of trust existed where defendant's "position as head of a company in which the victims invested made his fraud difficult to detect, vested him with significant authority over the victim's investment monies, and encouraged his victims to rely on his perceived integrity"); *United States* v. *Lowder*, 5 F.3d 467, 473 (10th Cir. 1993)(finding that the president of a bogus financial company who was entrusted with the ability to spend the investors' money without any oversight held a position of trust); *United States* v. *Tardiff*, 969 F.2d 1283, 1289 (1st Cir. 1992)("Virtually by definition, a money manager or financial adviser who is entrusted with, and who proceeds fully to exercise, broad discretionary power in respect of other people' money occupies a position of private trust"); *but see*, *United States v. Mullens*, 65 F.3d 1560, 1562 (11th Cir. 1995)(defendant who represented himself as an investment advisor and induced people to invest in a Ponzi Scheme did not occupy a position of trust with his victims; more than control or discretion is required to justify the § 3B1.3 enhancement).

As a founder and manager of the Bayou Fund, Marquez held a position of trust with the Bayou investors that gave him

discretionary authority over their money and "'provide[d] the freedom to commit a difficult-to-detect wrong.'" *United States* v. *Hirsch*, 239 F.3d at 227, *citing United States* v. *Barrett*, 178 F.3d 643, 646 (2d Cir. 1999); *United States* v. *Laljie*, 184 F.2d 180, 194 (2d Cir. 1999).  Marquez started the Bayou Fund together with Israel, and Marquez, nine years older than Israel and vastly more experienced, was an equal partner and manager of the Fund. Marquez and Israel ran the business.  They, along with Marino, were signators on Bayou's bank accounts; they were responsible for making all the decisions regarding the trading of the investors' money and the disclosures that would be made to investors; they both recruited investors and Marquez had a personal relationship with several.  Notwithstanding Marquez's claims to the contrary (Sent. Memo at 37), through the marketing materials, Marquez's public recommendations of stock tips, and his position at the firm, he personally used his stature and credentials to entice investors to invest in Bayou and to make the false numbers more believable.  Moreover, Marquez's position gave him the freedom to decide to have Grant Thornton fired and RFA created and to have the false financial statements and false certifications disseminated.

Significantly, one of the reasons the enhancement is even more appropriate here is that, as a hedge fund, Bayou was not regulated.  Thus, Marquez and Israel had even greater leeway

36

to perpetrate and conceal the fraud.  They had unfettered discretion to keep taking the investors' money by false means, making up performance numbers, and issuing false reports.  The only people who might have been able to detect the fraud were the Fund's accountants at Grant Thornton who were fired to prevent that from happening.  Thus, because Marquez's position at Bayou "'provide[d] the freedom to commit a difficult-to-detect wrong,'" *United States* v. *Hirsch*, 239 F.3d at 227, it was a position of trust with the victims.

Marquez contends that the enhancement should not apply because, although the investors may have entrusted them with their money, he did not abuse that trust because he invested it properly; did not steal it; and, making poor investment decisions does not constitute criminal conduct.  He contends that, in legitimately investing client funds, his conduct is distinguishable from the typical investment fraud exhibited in *Santoro* and *Hirsch*, and does not qualify for the enhancement, because he did what he told investors he would do and the subsequent deception cannot be the basis for the enhancement. (Sent. Mem. 35-36).  This argument must fail, however, because Marquez's crime involved fraudulently inducing people to invest in Bayou on the basis of false information.  The fact that the funds were invested in securities, is immaterial.  Like the defendant in *Hirsch*, Marquez gained the trust of the investors in

37

order to take their money through fraud and he did that by using his position and touting his credentials. Then, like Hirsch, among other things, he abused that trust again, by having the fake accounting firm created to legitimize the numbers and give investors a false sense of security that someone other than the Fund managers were certifying the Fund's performance. *See Hirsch*, 239 F.3d at 228; *see also Thorn*, 446 F.2d at 390 (defendant asbestos remover's abuse of trust aided in the concealment of the crime because Thorn's assurances led the victim to forego independent testing to ensure the asbestos had been properly removed). Thus, the *Hirsch* case supports the application of the enhancement. The same goes for *Santoro*. There, the broker, who was acting under the direction of others, recommended the stock of a particular company without disclosing to his clients that he was taking a commission. The Second Circuit found that when a broker makes a recommendation about a security, that broker assumes a position of trust with the client, and by failing to disclose the commission, abuses that trust. *Santoro*, 302 F.3d at 80. Marquez's crime went far beyond failing to disclose an excessive commission – he pitched an entire fund by affirmatively lying about its performance and lying about the independence of the auditors who were supposed to be confirming that performance.

      Marquez next argues that "apart from acting as Bayou's

portfolio manager," he had "no other personal relationship with
Bayou investors that could qualify as a position of trust" and he
had little interaction with investors.  (Sent. Memo at 36-37).
As described above, Marquez used his position at Bayou, his
credentials and his reputation to entice people to invest in
Bayou.  He did that by writing to potential investors and meeting
with them.  One investor with whom he met was a representative of
Custom Strategy.  Information provided by Custom Strategy
indicates that Marquez held a position of trust at Bayou and
abused that position of trust.

Marquez's relationship with the representative of
Custom Strategy went back to 1991, when the representative met
with Marquez to discuss investing in HMR, Marquez's first hedge
fund.  Marquez contacted the representative in or about 1996 or
1997 and introduced her to the Bayou Fund.  On October 8, 1999,
after RFA had been formed, the numbers faked, and the false
financial statements issued for the first time, the
representative met with Marquez and Israel.  Custom Strategy
maintained a Bayou file which contains notes of the meetings.[10]
In the 1999 meeting, the representatives notes reflect
discussions about Marquez's and Israel's roles; the fact that
Marquez was a "fundamentalist but had timing problems" and the
"need to correct that problem."  They also reflect discussion

---

[10] A copy of the documents maintained by Custom Strategy was obtained by
the Government and a portion of the file is contained in Exhibit E.

about "Half Moon Rising" and how Marquez "got divorced," and had
trading set-backs. (Exh. E at 1). Also contained in Custom
Strategy's Bayou file, in addition to the 1999 notes, were, among
other things: notes of a 1991 meeting with Marquez (Exh. E at 2);
a brochure relating to HMR and Marquez (Exh. E at 3-8); 1999
materials describing the Fund and summaries of Marquez's and
Israel's professional biographies (Exh. E at 9-11); articles
highlighting Marquez's stock picks (Exh. E at 12-19); letters
from Marquez's and Israel describing the quarterly progress of
the Fund (Exh. E at 20-22); a brochure entitled "Profile of
Fund," which again includes information about the Bayou Fund,
Marquez, Israel, and contains false performance numbers (Exh. E
at 23-39); a brochure entitled "Synopsis of Fund" which, again,
contains a description of the Fund and Israel's and Marquez's
resumes (Exh. E at 40-59); financial statements and report of
Grant Thornton dated December 31, 1997 (Exh. E at 60-74); the
false financial statements and report of RFA dated December 31,
1998 (Exh. E at 75-88); Custom Strategy's facsimile of questions
to Marquez and Israel and Israel's response; (Exh. E at 89-92)
and Bayou's false performance numbers for the years 1997 through
1999. (Exh. E at 93-95). Subsequent to the October 8, 1999
meeting with Marquez and Israel, Custom Strategy invested in the
Bayou Fund. The notes and other items in the file clearly
establish that Marquez had a personal relationship with Custom

40

Strategy.

In sum, given Marquez's role in the operation of the Fund and his personal recruiting of investors, Marquez held a position of trust with the Bayou investors and he abused that position.[11]

**B.     The Court Should Not Impose A Sentence Below the Stipulated Guidelines Range of 51-60 Months Either Pursuant to 18 U.S.C. Section 3553(a) or Based On Marquez's Downward Departure Motions**

A sentence within the stipulated guidelines range of 51-60 months, is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a), given (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (B) to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(1), (2)(A)-(B).

**1.     Nature And Circumstances of the Offense**

With respect to the nature and circumstances of the offense, the conspiracy charge to which Marquez pled guilty is a very serious crime that warrants a sentence that would provide appropriate punishment, promote respect for the law and deter

---

[11] Marquez also claims that he was "associated" with Israel and Marino and they "used" his name in their efforts to recruit.  (Sent. Memo at 37). Marquez's letters to investors, the marketing materials, newspaper articles and investor notes establish the contrary.

other people from engaging in similar criminal conduct.  The
revelations about the collapse of the Fund and the details of the
crime were the subject of intense media coverage and fueled the
debate over whether hedge funds should be regulated by the SEC.
The realization that hedge fund principals, who were entrusted
with millions of investor dollars could perpetrate a fraud on
investors, including sophisticated investment professionals, that
involved years of outright false statements about something so
fundamental as· the performance of the Fund and the independence
of its auditor, was truly shocking.

        The crime began taking root when Marquez and his
cohorts began inflating the performance numbers and tried to
conceal that by rebating commissions.[12]  It continued and became
more sophisticated.  As Marquez recounted to Dr. Siegel, the
inaccuracies in the statements began around 1997 and the
"statements really became false in 1998."  (Def. Exh. 21 at 10).
When Israel's and Marquez's trading losses continued, they did
not disclose the losses to the relatively few investors who had
money in the Fund at that time.  Rather, they created an utterly
false Fund performance record and a fictitious accounting firm to
certify the accuracy of the trumped up financials and they used
that false performance record to lull investors into leaving

---

[12] The defense asserts that this commission rebate shows that "those in
charge at Bayou were more concerned with investors' returns than personal
gains." (Sent. Memo at 11).  This rationalization for dishonest conduct,
however, was the first step towards the wholesale lying to investors.

their money in the fund and to induce additional investors to contribute even more money to the Fund.  By the time Marquez stopped acting on behalf of Bayou, investors had contributed no small amount of cash to the Fund - more than $10 million.

The defense asserts that the Court should sentence Marquez below the Guidelines range because: he played a minor role in the fraud compared to Israel and Marino; he was just a "portfolio manager" while Israel recruited investors and Marino managed the accounting part of the fraud; he was not in the conspiracy as long as Israel and Marino; the losses escalated after he left; he stopped participating in the operations of the Fund in mid-2000; and, he had good intentions in that he wanted to get the investors money back and never misappropriated it to benefit himself.  He has also attempted to create the illusion that this was all Israel's and Marino's idea and he could not stop them, and that his conduct was aberrant and due, in large part, to his mental health problems.  (Sent. Memo at 14-16). Marquez's transparent efforts to minimize his conduct should be swiftly rejected.

As described above, Marquez's adoption of the title "portfolio manager," claims that he did not have a stake in the business and efforts to minimize his culpability should not be countenanced.  During Marquez's tenure at the Fund, he and Israel were equally culpable.  As described above, records, marketing

43

materials, newspaper articles, letters Marquez wrote to investors, and letters he wrote to Israel all reflect that Marquez and Israel were the principals of Bayou. They were equal partners who contributed almost the same amount of capital to the Fund and earned generally the same cash distributions; Marquez's wife provided capital to start the business and worked at Bayou; Marquez's brother-in-law worked at Bayou; at Marquez's behest, Bayou moved from Israel's home to the Connecticut location next to Marquez's neighborhood; Marquez and Israel were both responsible for writing marketing materials; they were both in charge of trading strategy; they both recruited investors, and they, along with Marino, were responsible for planning and executing the fraud.

Marquez's contemporaneous statements also establish his position at Bayou. In letters to investors, he described his managerial role; in a newspaper article in which he was quoted, he was referred to as the "head" of Bayou Securities, in Bayou's marketing materials he was described as a principal of Bayou and in his letters to Israel after he moved across the street, he constantly referred to his partnership interest and equal partnership with Israel. In his second letter, which he entitled "Ownership/Carried Interest of James Marquez in Bayou Entities," Marquez reiterated that he was an equal partner and proposed how to "value my carried interest" in the Bayou entities. He

44

recounted how, when he was "invited to form new business
enterprises under the collective Bayou banner, it was stipulated
that Sam Israel and I would be equal partners, save the carried
interest attributable to Dan Marino.  Adjusting for the carried
ownership interest for the benefit of Mariella Marquez for
putting up the NASD required capital to fund Bayou Securities
LLC., my intrinsic interest was approximately 40%." (Exh. G at
2).  He also emphasized his extensive role in getting the
business running – he described how he "participated in the
evolution of the firm(s) since late 1995, doing whatever was
necessary to try to make the Bayou business become successful and
self-nurturing.  Sometimes those efforts met with good success,
other times my efforts were great failures. " (Exh. G at 2).
Marquez also acknowledged his contribution to the Bayou
"problem."  In a section entitled "Payment For Past Sins,"
Marquez wrote that "a great deal has been said in the past 9
months concerning 'how much of the problem Jim Marquez created.'
Leaving rhetoric aside – let's make it simple – for my
transgressions, I will relinquish ½ of my carried interest,
bringing me down to 20%."  (Exh. G. At 3).  In Marquez's third
letter, he again emphasized his five year effort to build Bayou,
and warned, "[y]ou don't want to pay me anything for the 5 years
I spent building the Bayou companies; I do not intend to be

cheated out of it with nothing." (Exh. H at 1).[13]

The defense portrayal of Marquez as someone who did not wish to participate in the fraud and who urged Israel to close the Fund (Sent. Memo at 11, 13, 46), is not supported by the record. Indeed, Marquez's letters establish the opposite. Marquez told Israel that it was in their interest that the Fund continue and that the fraud remain concealed. Specifically, he wrote: "[y]ou have certain revelations better left unsaid, I don't need any obstructions/interference in building out my business activities..." and "[w]e can both win or both lose depending on how matters are dealt with from this day forward. I have a proposal that may handle most if not all of each of our mutual needs." (Exh. H at 1).

The fact is, Marquez's financial future depended on the Fund's staying open and the fraud remaining undetected. Bayou's continued operation provided Marquez with: a salary of $12,500 per month for a year after he moved out of Bayou's offices; the ability to start his own investment business and form a lucrative business relationship with Bayou and KFX; the financial support to run the business for a year; and the opportunity to hand KFX an investor, which benefitted Marquez by over $3 million. If the Fund had closed and investors found out about the fraud, Marquez likely would not have been able to start his own business or find

_____

[13] Marquez also admitted to Dr. Schechter that he was a "principal fund manager from approximately 1996 through 1998." (Def. Exh. 4 at 21).

another job in the securities industry.

Moreover, of the three co-conspirators, Marquez had more to lose than either Marino or Israel if Bayou's trading failures and the cover-up were disclosed.  To the investing public, Marquez and Israel were the Fund's traders.  The Fund's losses were their losses.  Marquez had already closed one hedge fund – HMR – after losing investors' money.[14]  If Bayou closed for the same reason, investors were more likely to blame him over Israel because he was older than Israel and Israel had never run a fund before.  Marino was the least likely to be blamed because he was the Fund's accountant, not a principal and not responsible for investing.  Thus, of the three, Marquez was in the worst position and was facing a potentially devastating blow to his reputation.[15]

While Marquez may have been less involved in day-to-day operations starting in late 2000, he was still deeply involved in perpetuating and covering up the fraud, continued to benefit financially from the fraud and did not, as the defense claims, completely separate from Bayou by January 2001. (Sent. Memo at

---

[14] Marquez also apparently closed JGM because of trading failures but JGM traded Marquez's own money.

[15] In attempting to minimize his own conduct, Marquez focuses much blame on Marino, who is obviously a very culpable co-conspirator.  However, Marquez does not explain that for much of the time Marquez was involved in the Bayou Fund, Marino was not even coming to the office every day.  And, from mid-1999 through early 2000, Marino was battling cancer, taking care of his ailing mother, grieving the eventual loss of his mother, and not coming to the office on a regular basis.  Consequently, Marquez and Israel were left to run Bayou.

14).  As described above, the Bayou investors continued to support Marquez throughout 2001 by paying him $12,500 a month in consulting fees; paying his BMW car lease; and paying for his office computers and other expenses.  Moreover, Marquez concedes that he continued to make trading decisions for Bayou and earn commissions on the trades in 2001 (Sent. Memo at 15); he was allowed to redeem his entire Bayou investment and false profits; he received other cash payments; and, he never notified the authorities about the existence of the fraud.

Regarding his failure to report the fraud, Marquez claims that he thought the fraud was over and Bayou was a success because he learned that Israel and Marino closed the Bayou Fund and opened new funds, and there were limousines at Bayou's offices (Sent. Memo at 18-19; Def. Exh. 8 at 2).  That explanation does not hold water, however, because, as late as March 2003, Marquez knew that Israel and Marino were still lying to investors about RFA.  In March 2003, he got an annual "confirmation" letter from Bayou which informed him that RFA was about to do its annual audit of Bayou's books and sought his written confirmation of the status of the account of the Marquez Family Foundation.  Marquez signed that letter, confirming the account activity, and mailed it back to RFA.  (Exh. O).

Finally, the contention that Marquez's sentence should be lower than the Guidelines range to which Marquez stipulated in

his plea agreement, because Israel and Marino participated in the
fraud for a longer time and lost more money, ignores the fact
that his plea agreement and the charge to which he pled guilty
already take into account the fact that he participated in the
fraud for a shorter period of time and induced fewer investors to
invest less money in the Fund, than did Israel and Marino.
(Sent. Memo at 15-16).  Marquez pled guilty to one count of
participating in a conspiracy to commit mail and investment
adviser fraud from in or about 1996 to October 10, 2001.  In his
plea agreement, Marquez stipulated to the fraudulent inducement
of between $10 million and $20 million.  As a result, Marquez is
facing a maximum of five years' imprisonment.  In contrast,
Israel and Marino pled guilty to multiple charges that span the
time period between 1996 and August 2005 and hold them
accountable for fraudulently inducing over $400 million.  They
are facing maximum sentences of decades of imprisonment.[16]  (PSR,
¶¶ 4-5).  Thus, the charges to which all three defendants pled
guilty already take into account their degrees of culpability in
relation to one another and Marquez should not receive a further
benefit on this basis.

## 2.  History And Characteristics of the Defendant

    In connection with the history and characteristics of

---

[16] Marquez also benefitted, compared to Israel and Marino, from the fact
that the last day of the charged conspiracy is October 10, 2001 and his
sentence is therefore governed by the November 1, 2000 Guidelines.

49

the defendant, Marquez has no reported prior criminal history (although we note that he committed the crime to which he pled guilty over a period of years).  As the defense has pointed out in its sentencing memorandum and through numerous letters of support, Marquez is married, has two young children and two older children, has apparently devoted a substantial amount of time to charitable endeavors, and has been a well-liked and respected family man, businessman and member of the community. Unquestionably, where there are close family relationships, the spouses and children of defendants who must serve prison sentences endure varying degrees of hardship.  As the defense submission and the PSR make clear, however, Marquez's family is in a much better position than most families to contend with the adversities involved in not having a spouse/parent at home.  Mrs. Marquez has substantial assets of her own and is a skilled securities trader.  Moreover, it appears, given the defense submission, that Marquez and his wife have much family and community support.  Unlike many defendants who find themselves facing a likely prison sentence, as the numerous letters of support suggest, there are many people in the community who appear to be willing and able to see the Marquez family through this difficult time.

        The defense has attempted to paint a picture of Marquez as a vulnerable, passive, psychologically impaired, individual

who did not want to be part of the fraud but was brow-beaten into it by Israel and Marino; who struggled to earn a living after he was kicked out of Bayou; and whose actions were unselfish and driven by a motivation to make money for the Bayou investors. (Sent. Memo 12-15). As the record reflects, while he was at Bayou, Marquez had a reputation as a successful money manager whose stock views were sought after by business reporters and who was quoted in stock tip articles. Even after being thrown out of Bayou, Marquez succeeded in persuading Israel and Marino to pay him consulting fees that paid him the same annual distribution he was earning at Bayou, a six figure separation fee, many of his new business start-up costs and other expenses, and his car payments. He also managed to convince Israel and Marino, despite the fact that Israel thought he had poor investment judgment, to have Bayou purchase the energy stock he was recommending, KFX. That kind of record does not support the notion that Marquez was passive, vulnerable, or wracked by mental illness.

Moreover, the KFX transaction speaks volumes about Marquez's motives, which appear to have been driven more by a desire to make money and conceal the fraud, than to selflessly pay back the Bayou investors. Dubbed by Marquez as the "Solution to Recoup Investor Losses" (Sent. Memo at 17), the KFX transaction was no selfless act to compensate victims. It was a stock tip, another trading gamble with other peoples' money; it

51

represented Marquez's effort to hide the fraud; and, it provided a tremendous financial boon to the Marquez family.  This time, the trading gamble paid off, although it took three years: in December 2004, Bayou sold its one million shares of KFX stock for approximately $16 million – an approximately $12 million profit that theoretically would have covered Marquez's losses had it been realized years before; Marquez was off the hook in that he never had to pay Israel and Marino for his share of the losses out of his own pocket; it helped keep the Bayou fraud under wraps; and Marquez made millions of dollars in connection with the transaction and through his subsequent relationship with KFX.

The way Marquez came to obtain the KFX related money reflects his continued willingness to exploit the Bayou investors for his own profit.  First, as described above, he received fees on both sides of that transaction as a "consultant" to both parties.  Next, Marquez obtained the potentially valuable warrants that were attached to Bayou's stock and owned by Bayou, for next-to-nothing.  Then, once he came into possession of those warrants, KFX changed the terms by re-issuing the warrants with a longer holding period and a lower strike price.  These changes allowed Marquez, eventually, to exercise the warrants and sell the stock at a profit of approximately $2,740,000.  In addition to the profits that went into his pocket for that specific transaction, he forged a relationship with KFX that brought him

52

more stock; and provided him with annual consulting payments from KFX for years.  In all, Marquez collected approximately $4.8 million in connection with his relationship with KFX.  Thus, the KFX transaction cannot be viewed as a selfless act to benefit the Bayou investors.[17]

Finally, Marquez implies that it is unfair and that the Court should take into account the fact that Israel and Marino were "arrested first" and may get the benefit of having cooperated against him.  He further asserts that the Court also should consider that he genuinely attempted to cooperate in 2007. (Sent. Memo at 43-44).  These claims are frivolous.

First, Israel and Marino did not gain an unfair advantage over Marquez regarding the dispositions of their cases. As described above, Marino's suicide note was discovered on August 16, 2005.  (Def. Exh. 1 at 6).  Nine days later, FBI agents went to interview Marquez and followed-up with him in a telephone call.  Marquez was not forthcoming about the fraud.  On the same day, the Wall Street Journal published an article reporting that the Bayou funds had imploded and that Israel, Marino and Marquez were implicated.  (Exh. P).  Thus, Marquez

---

[17] The defense sentencing memo, including a letter submitted by Mrs. Marquez, also leaves the impression that the Marquez's have been struggling to make ends meet. (Sent. Memo at 18; Def. Exh. 8 at 2).  As previously described, however, the Marquez's made a lot of money from Bayou and KFX from January of 2001 on.  Additionally, they have been living in different neighborhoods in Greenwich for at least the last decade, their assets now include a home worth $1.9 million, a boat, cars, jewelry, securities and a trust fund, and they have been able to send their two children to an expensive private school. (PSR at 19, 23).

knew not long after Marino and Israel that the funds had imploded
and he was implicated; he was contacted by FBI agents; and, he
had the same opportunity to cooperate that they had.[18]  More
importantly, however, if Marquez had come forward at any time
prior to August 2005, he unquestionably would have been first and
he might have saved Bayou investors a great deal of money.

        Finally, Marquez should not benefit from his so-called
"offer of cooperation."  (Sent. Memo at 43).  Marquez's meeting
with the Government, after yet another year passed and his
sentencing was imminent, was, for the most part, a self-serving
exercise.  As he has disclosed, he had one meeting with the
Government during which he provided information about a failed
business transaction involving his wife and associates.

### a.  The Court Should Not Impose a Reduced Sentence Based on Diminished Capacity

        The defense argues that Marquez should receive a non-
guidelines sentence pursuant to § 3553(a) or a downward departure
based on diminished capacity, pursuant to U.S.S.G. § 5K2.13.
(Sent. Memo at 20-26, 38-40).  Specifically, in trying to make
the case that Marquez passively went along with Israel and Marino
when they decided to commit the fraud because he did not have the
will to stand up to them, Marquez recounts a family history of
psychological problems, his history of mood fluctuations, his

---

[18] None of the three defendants was arrested in connection with this
case.  Their first court appearances occurred when they pled guilty.  Israel's
and Marino's guilty pleas took place on September 29, 2005.

receipt of therapy over the years for issues surrounding his
separation and divorce from his first wife, and his receipt of
therapy due to feelings of dread, lack of self-worth and a sense
of helplessness around the time he was working at Bayou and
participating in a crime. (Sent. Memo at 20-23, 26-27). Marquez
claims that at the time of the fraud, he had bipolar disorder
that went undiagnosed and not properly treated. (Sent. Memo at
24). He also contends that both the physician he retained in
connection with his sentencing, Dr. Schechter, and the physician
the Government retained, Dr. Siegel, concluded that his mental
condition significantly impaired his "ability to reason and
correspondingly impacts his behavior and action." (Sent. Memo at
24). He further argues that Dr. Siegel conceded that "Jim's
passivity in relation to Israel and Marino can be explained by
Jim's bipolar disorder." (Sent. Memo at 24-26). Even if Marquez
was bipolar when he committed the crime, there is no evidence
that he had a significantly reduced mental capacity and that, if
he had, there is any causal link between that reduced capacity
and his commission of the crime. Thus, the Court should not
impose a reduced sentence based on a downward departure or
pursuant to § 3553(a).

Section 5K2.13 authorizes a downward departure "if the
defendant committed the offense while suffering from a
significantly reduced mental capacity." Significantly reduced

mental capacity is defined as "a significantly impaired ability
to (A) understand the wrongfulness of the behavior comprising the
offense or to exercise the power of reason; or (B) control
behavior that the defendant knows is wrongful." U.S.S.G.   §
5K2.13. (Application Note).  To establish diminished capacity, a
defendant must establish both "reduced mental capacity and a
causal link between that reduced capacity and the commission of
the charged offense." *United States* v. *Silleg*, 311 F.3d 557, 564
(2d Cir. 2002).  Factual conclusions with regard to these
elements are reviewable only for clear error.  *Silleg*, 311 F.3d
at 564.

   Marquez's psychiatrist, Dr. Schechter, concluded that
during the period of late 2000-2001, "and possibly prior, Mr.
Marquez was experiencing severe mood cycles not stabilized by
medication, although Mr. Marquez never lost the capacity to
discern right from wrong, his condition impaired his ability to
express the power of reason and to control his behavior at that
time." (Def. Ex. 4 at 7).  Dr. Schechter made his determination
that Marquez's condition "impaired his ability to express the
power of reason and to control his behavior" without his having
discussions with Marquez about Marquez's participation in the
crime or how his mental condition impacted on his commission of
the crime.  Dr. Schechter also provided no conclusions about
Marquez's mental health and how it related to his conduct

throughout 1997, 1998 and 1999, when much of the criminal activity was planned and executed. The time period on which Dr. Schechter focuses, late 2000-2001, is the time period during which Marquez moved out of Bayou's offices and started his own business. It was also during this time period that Marquez wrote the three letters laying out how Bayou should pay him; the contours of the "consulting" relationship between Marquez and Bayou; and his plan for fixing the "problem." In reviewing these letters, one can only conclude that Marquez was fully capable of reasoning and controlling his behavior, not to mention the behavior of his two co-conspirators. Indeed, his apparent ability to reason and to exercise persuasive power over Israel and Marino resulted in his obtaining virtually everything he requested in those letters – a year's worth of consulting payments at $12,500 a month, the financing of his business expenses and BMW car payments, and the various other cash payments Bayou made to Marquez. Additionally, in 2001, when Dr. Schechter contends Marquez's ability to reason and control his behavior was impaired, Marquez a consulting agreement with KFX that paid him a steady income, succeeded in persuading Israel and Marino to invest Bayou investor money in KFX, and laid the groundwork to reap substantial profits from the Bayou/KFX transaction.

While the defense attempts to make it appear that Dr.

Siegel concluded that Marquez's condition significantly impaired his "ability to reason and correspondingly impacts his behavior and action" and that Dr. Siegel conceded that "Jim's passivity in relation to Israel and Marino can be explained by Jim's bipolar disorder" (Sent. Memo at 24-26), these quotes were taken out of context. Dr. Siegel diagnosed Marquez with bipolar disorder and allowed the possibility that "[i]n light of the defendant's history of mood swings, it is not implausible that his having been in a down phase made him less able to actively object to and intervene in a scheme that his two partners generated on their own." (emphasis added) (Def. Exh. 21 at 14). He further allowed for the possibility that "[o]ne can also envision the defendant being more optimistic about recouping the losses through his investing during periods when his mood was elevated. It is likely that when he was in a manic phase, he assessed the shortfall in the fund as being less of a problem." (Def. Exh. 21 at 14). However, he noted that:

> In speaking with the defendant, he does not describe having been constantly in either a manic or depressive episode. In reviewing the progress notes from treatment providers, he had periods of time during which his mood was neither depressed nor elevated. Progress notes generated . . . from 1999 through 2001, document that the defendant, while often emotional and distorted in his viewpoints, was able to reason about issues he as facing in a productive manner. One does not glean from the progress notes that the defendant was constantly in a disordered mood state. . . While there may have been times that his mood was elevated and, in part due to his illness he foresaw overcoming the shortfall and minimized the significance

> of the problem, his mood was not elevated all the time
> that the conspiracy was extant.  Similarly, while there
> may have been times that his mood was down and he
> lacked energy to confront his partners and intervene to
> thwart the conspiratorial conduct, he was not depressed
> all the time that the conspiracy was extant.

(Def. Exh. 21 at 14).

After considering Marquez's account of events and reviewing Marquez's medical records, Dr. Siegel concluded that, although Marquez suffers from a serious mental disorder, he did not have a significantly reduced mental capacity.  Specifically, Dr. Siegel determined that while Marquez has a serious mental disorder that "at times significantly impairs his ability to reason, his offending behaviors occurred over a period of years. While aspects of his behavior appear to have been influenced by his mental disorder, the pattern of ongoing behaviors as part of the conspiracy are not consistent with his having acted while suffering from a significantly reduced mental capacity." (Def. Exh. 21 at 14).

In sum, whether or not Marquez was suffering from bipolar disorder at the time he committed this crime, there is no evidence whatsoever that this condition had any connection at all to his commission of the crime and abundant evidence to the contrary.  Indeed, Dr. Siegel concluded that Marquez's behavior during the pendency of the conspiracy was not consistent with his suffering from a reduced mental capacity.  Thus, the Court should not grant his downward departure motion or reduce his sentence

pursuant to § 3553(a) because of any reduced capacity.

**b.    The Court Should Not Impose a Lower Sentence Based on Aberrant Conduct**

The defense further argues that Marquez should receive either a downward departure or a non-guidelines sentence pursuant to § 3553(a) on the ground that his conduct was aberrant.  (Sent. Memo at 40-42).  These arguments should also be rejected because Marquez's criminal conduct went on too long,  was well thought out, involved a great deal of planning and, therefore, cannot be characterized as aberrant.

Section 5K2.20 of the Sentencing Guidelines, entitled "Aberrant Behavior," provides that "[a] sentence below the applicable guideline range may be warranted in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior."[19] "Aberrant behavior," in turn, is defined in Application Note 1 to § 5K2.20 as "a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life."  Application Note 1, by its plain language, therefore requires a defendant seeking an aberrant behavior departure to satisfy all three of the factual predicates defining that term.  *See* U.S.S.G. § 5K2.20, comment. (n.1).

---

[19] Section 5K2.20 also prohibits a downward departure under certain circumstances that are not present here.

The defense argues that in connection with making the determination as to whether a downward departure is appropriate, the Court may consider Marquez's mental condition, employment record, record of prior good works, motivation for committing the offense and efforts to mitigate the effects of the offense. (Sent. Memo at 42).  Application Note 2 to § 5K2.20 explains that, in considering whether "aberrant behavior" merits a departure, the sentencing court "may consider the defendant's (A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense." In enacting § 5K2.20, however, the Sentencing Commission explained that "[f]or offense conduct to be considered for departure as aberrant behavior, it must, at a minimum," have the characteristics" described in Application Note 1.  U.S.S.G., Supp. App. C, Amendment 603.  In *United States* v. *Gonzalez*, 281 F.3d 38, 47 (2d Cir. 2002), the Second Circuit confirmed that an aberrant conduct departure is appropriate where the criminal activity was a "'single transaction' committed without significant planning and of limited duration."  Thus, it is clear from the Application Notes and Amendment 603, that a district court need only consider such factors after determining that the conduct at issue is, in fact, "aberrant" pursuant to the

definition in Application Note 1.[20]

Here, the conspiracy involved significant planning and was not a single transaction.  The criminal conduct took place over and over again.  Moreover, Marquez's participation was not of limited duration – the conspiracy lasted, at a minimum, throughout 1998 and 1999, and did not come to an end until October 10, 2001.  Thus, the Court should reject Marquez's downward departure motion and § 3553(a) request on this basis without considering his mental and emotional conditions; employment record; record of prior good works; motivation for committing the offense; and efforts to mitigate the effects of the offense.

---

[20] Of course, the Court may consider these facts in connection with its analysis under 3553(a).

62

## CONCLUSION

For the above described reasons, the Government submits that a sentence within the stipulated Sentencing Guidelines range of 51-60 months is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

Dated:    October 16, 2007
          White Plains, New York


                         Respectfully submitted,

                         MICHAEL J. GARCIA
                         United States Attorney
                         Southern District of New York


              By: _____
                         Margery B. Feinzig
                         Assistant United States Attorney
                         Tel. No.: (914) 993-1912

<u>AFFIRMATION OF SERVICE</u>

      Margery B. Feinzig affirms under penalty of perjury pursuant to 28 U.S.C. § 1746 the following:

      That on the 16th day of October 2007, she caused to be delivered by hand a copy of the within Government's Memorandum In Connection With Sentencing and Exhibits to Government's Memorandum In Connection With Sentencing by enclosing the same in a Federal Express box addressed to:

Bradley D. Simon, Esq.
Simon & Partners LLP
30 Rockefeller Plaza -42nd Floor
New York, New York 10007
(212) 332-8900

and that she caused the envelope to be picked up by Federal Express at the U.S. Attorney's Office at 300 Quarropas Street, White Plains, New York 10601.

_____
Margery B. Feinzig
Assistant United States Attorney
