# EXHIBIT
# E

Bagan —
    Sam Israel, Jim Marquez    HMR      10/8/99

Daily — Jim scans all news services
       Sam — scans Internet — Silicon Valley — fly on the wall
           etc.

Trading — Proprietary model
Buy best & worst
       to industry play   operating leverage
       Seagate   Western Digit
       10%         5%      ≈ 15% position
Jim fundamentalist but had timing problem —
     needed to correct that problem.
Leads to a more phased approach.
Charts are early warning signal to take money away.
Now — great fundamentals in oil & gas
       stocks have done well
       but always seasonal 4th Qtr problem.
     Had 30-40% exposure in summer & have
     cut back to 10%
Half Moon Rising — 1) got divorced, 2) wanted to be long short
       & didn't recognize shift in market. Micron & US Surgical.
       was short but way too early; 3) ego, forgot basics.
       got under $5 mil & a few other accts — CAXTON, RAMSEY
     folded, end of '94 — did nothing for 6 mos.

HMR — Half Moon Rising
Jim Marquez                          10/30/91

B'fast - Hyatt

Citibank — Personal Trust to Greenwich
6 yrs.   Sr. port mgr of commingled fund

IOS — 1980 Progressive Fund (from NYC)
early to use options of puts + calls —
second largest options user in country.

Soros 1/83 & Otayal 1983 + 1984
Own Money 4½ years - 1985 mid ~~87~~
w/ Fred Graber, Khigal, Ackly
Steinhart Feb 1989 to Sum 1990

Fund 4/91 $26 mil
now $53 mil

{ Change, Trends, Themes
{ ~~Sector~~ Secular — long term
{        value, industrial
{ Mn - Agriculture, Precious Metals, Energy

75%

See — Bayou Fund LLC — HMR didn't work —

2

**HMR INVESTORS, L.P.**
405 Park Avenue
ew York, NY  10022



HMR Investors, L.P. is a Delaware limited partnership that will operate as a classic hedge fund. The Fund intends to make long and short investments in stocks, bonds and the full range of derivative products, including listed put and call options, index options, stock market futures, currency futures and commodity futures. The sole general partner of the Fund is James G. Marquez, an investment professional who has had an extensive and distinguished career as the senior investment manager for several of the most prestigious investment firms in the world.

**New Business Contact**
Parkway Capital Corporation
111 Dunnell Road
ʼaplewood, NJ  07040

| contact | Scott Franzblau |
| | Douglas Jensen |
| | Paul Maguire |
| telephone | (201) 762-8555 |
| telefax | (201) 762-7927 |

## FUND CAPITALIZATION

HMR Investors, L.P. is a newly formed investment partnership that commenced operations on April 1, 1991.

### Assets Under Management
The General Partner began operations with approximately $35 million under management.

### Minimum Investment
ˋ00,000

**Mr. Marquez's Investment in HMR Investors**

Mr. Marquez has invested $1,750,000 in the Partnership.

## ORGANIZATION AND PERSONNEL

The partnership's sole general partner is Mr. Marquez. Edward McCarthy, John Barker and Sam Israel III will be special limited partners of the fund, bringing to the organization a combination of research, trading, accounting and operations experience necessary for execution of the fund's duties and responsibilities.

### Personnel Profiles
James G. Marquez, age 41, was raised in New Orleans, Louisiana. He began his career in July 1974 as a trainee and assistant portfolio manager at Citibank, N.A., New York. In January 1976, he assumed management responsibility for two of Citibank's commingled trusts, one of which was ranked the number one bank-managed trust account over the 1977 to 1979 period. On April 1, 1980, Mr. Marquez joined Investors Diversified Services (IDS), where he became the portfolio manager of The Progressive Fund, an aggressively-managed capital appreciation fund. The Progressive Fund was ranked the number one mutual fund in the country for most of 1982. In January 1983, Mr. Marquez joined George Soros as Executive Vice President and chief portfolio manager of the Quantum Fund, a $425 million offshore hedge fund. In addition to solely managing the U.S. equity portfolio and co-managing the foreign equity portfolio, he was responsible for the risk management of the entire fund. From 1985 through 1988, Mr. Marquez

**HMR Investors, L.P.**

2

managed his own private capital in the public markets. Until recently, he was a general partner and portfolio manager for Steinhardt Partners, a $1.6 billion hedge fund. There he was responsible for managing approximately 25% of the assets, or $400 million. During 1989, he achieved the highest rate of return of any Steinhardt manager.

# INVESTMENT PHILOSOPHY

## Goals and Objectives
The primary goal of the Partnership is to provide superior relative and absolute rates of return with reduced risk or variability of return year over year. Recognizing the inherent risks in the financial markets, the risk profile of the investment pool will be actively managed so as to preserve capital in downswings and seek maximum participation on the upside.

## Method of Operation
The Fund will be managed as a classic hedge fund. This does not imply that risky investment techniques will be used. On the contrary, as a true hedge fund, the Partnership will attempt to construct the elusive "hedge ratio", where all effects of the market are stripped away and neutralized so that the non-systematic return of the individual long and short positions are working free of outside influence. Market timing is an essential element of the investment methodology. Stock market futures, options and index options, as well as conventional short and long positions, are the tools which will be used to manage overall portfolio risk. High turnover of securities is also likely to occur, but only insofar as it supports the goal of preserving capital and holding on to gains.

## Investment Style
The overall investment style combines a macro-economic approach with concentrated exposure to relatively few industries or sectors that best reflect the expected economic environment. Hence, the Fund will identify and formulate central or dominant investment themes that form the foundation for the construction of the whole portfolio. The key to producing superior investment results is the ability to identify early on substantive change in industries or companies, change that has not been sufficiently grasped in terms of its depth, magnitude or duration and has not yet been built into stock prices.

*Example*

In the spring of 1989, several key changes occurred in the energy industry that called for investing in that sector after seven years of decline. First, revenues for oil service and exploration companies had fallen over 74% from their peak in 1981 to their trough in 1988. In spite of this massive depression, the companies that survived had cut costs sufficiently to produce operating profits, even at the bottom of the cycle. More importantly, those profits were starting to improve quarter over quarter on flat revenue growth. Second, the United States was beginning to experience an accelerating rate of decline in the production of crude oil which would ultimately benefit the price of oil. Third, the combination of environmental concerns with the large domestic availability of natural gas argued for a secular improvement in the natural gas industry, broadly defined, including exploration, production, pipelines and energy capital goods manufacturers. At the close of 1989, oil service and domestic production

**HMR Investors, L.P.**

3

companies were the number one and number two industries in terms of investment performance.

The year also produced a number of short sale candidates based on two macro-economic trends: the decline in the value of real estate (and its implications for financial institutions and consumers) and the probability of rising interest rates and inflation rates in the global economy. Short sale candidates were identified generally among banking, insurance, saving and loan companies and quasi-government enterprises such as Fannie Mae and Freddie Mac. The combination of these long and short strategies worked well in 1989, producing attractive absolute rates of return in both the long and short portfolios.

## INVESTMENT PERFORMANCE

Annual Total Returns (%)

| | 1978 | 1979 | |
|---|---|---|---|
| Citibank Equity Trust | 9.9 | 53.7 | |
| S & P 500 | 6.5 | 18.5 | |
| | 1980 | 1981 | 1982 |
| I D S Progressive Fund[a] | 50.5 | (13.5) | 66.9 |
| S & P 500 | 38.1 | (4.9) | 21.5 |
| | 1983 | 1984 | |
| Soros | 26.5 | 3.3[b] | |
| S & P 500 | 22.5 | (2.4) | |

| | 1985 - 1988 |
|---|---|
| Self Employment | 55% compound annual rate of return |

| | 1989 | 1990 |
|---|---|---|
| Steinhardt Partners | 43.2 | (5.1)[c] |
| S & P 500 | 31.6 | 3.1 |

a   Mr. Marquez assumed management of this fund on April 1, 1980.

b   Through March 31, 1984. Full discretion was not retained beyond first quarter, 1984. The results subsequent do not reflect substantially Mr. Marquez's efforts alone and on a continuous basis.

c   Through June 30, 1990.

**HMR Investors, L.P.**                                                    4

## METHOD OF COMPENSATION

At the end of each year, the General Partner will be paid a performance-based fee of 20 percent of the net capital appreciation, if any, in each Limited Partner's capital account after payment of up to 2% of assets to recover the cost of managing the Partnership. However, no fee will be paid unless the net asset value of a Limited Partner's capital account appreciates first beyond its initial net asset value at the time of purchase, and thereafter beyond the highest previous level on which a fee was paid with respect to such capital account. In other words, a "high water mark" will be employed in computing the General Partner's appropriate level of compensation. The General Partner expects that the annual fee charged to Limited Partners to recover the cost of managing the Fund will average less than 2% of assets over the course of the Fund's lifetime.

## WITHDRAWALS

A Limited Partner may withdraw up to half of his capital account from the Partnership on any withdrawal date (June 30 and September 30 of each year) provided that 30 days' prior written notice of the withdrawal is given. Moreover, on December 31st of each year, a Limited Partner may withdraw all or any portion of his capital account from the Partnership provided that 60 days' prior written notice of the withdrawal is given. A withdrawing Limited Partner may be charged reasonable legal, accounting and administrative costs associated with his withdrawal up to 0.5% of the amount withdrawn.

## PARKWAY CAPITAL CORPORATION

Parkway Capital Corporation is an independent marketing organization dedicated to bringing institutions and high net worth individuals together with superior money managers. The firm works exclusively with managers who practice non-traditional investment strategies, such as bankruptcy investing, merger arbitrage and classic arbitrage. Parkway Capital Corporation is compensated by the managers for the development and retention of new business. The advisory fees charged by the managers are the same regardless of whether the business is developed by Parkway Capital Corporation or some other source.

## PURPOSE OF DOCUMENT

This document has been prepared solely for the information of individuals and institutions considering an investment in HMR Investors, L.P. The contents of this document should not be considered legal or tax advice, and each prospective investor should consult with its own counsel and advisors as to all matters concerning an investment with the firm. Prospective investors in HMR Investors, L.P. should carefully read the confidential offering memorandum and Partnership agreement before making an investment in the Partnership.

# References for

# James G. Marquez

Mr. Leon Cooperman
Chairman and Chief Executive Officer
Goldman, Sachs and Company
32 Old Slip, 34th Floor
New York, NY 10005
(212) 902-6716

Mr. Bruce Kovner
Caxton Corporation
667 Madison Avenue, 9th Floor
New York, NY 10022
(212) 752-7933

Mr. Robert S. Salomon, Jr.
Managing Director
Salomon Brothers, Inc.
1 New York Plaza, 39th Floor
New York, NY 10004
(212) 747-7246

Mr. William T. Spitz
Office of the Treasurer
Vanderbilt University
102 Alumni Hall
Nashville, TN 37240
(615) 322-7311

Mr. Peter Vermilye
Chairman
Baring America Asset Management Company, Inc.
77 Franklin Street
Boston, MA 02110-1588
(617) 951-0052

James G. Marquez

| | |
|---|---|
| **EDUCATION** | Private day school through High School. New Orleans, Louisiana |
| 1971 | University of Texas at Austin<br>B.A.: English Major; Advertising Minor |
| 1974 | Tulane University<br>M.B.A.: Finance Major; Accounting Minor |

**EXPERIENCE**

**July 1974 - March 1980**  CitiBank, N.A., New York
                            Private banking Division

7/74 - 12/76    Trainee and Asst. Portfolio Manager
1/76 - 9/77     Co-Manager Citibank Balance D Trust
7/78 - 3/80     Sole Manager Citibank Keogh Trust
9/79 - 3/80     Sole Manager Citibank Equity Trust

Committee Chairman, Member of Special Equity Review Committee for P.B.D., Member of Investment Management Group (I.M.G.) Policy Committee, Secretary of I.M.G. Strategy Committee.

**April 1980 - December 1982**  Investors Diversified Services
                               Portfolio Manager

Sole manager of $125mm capital appreciation oriented mutual fund; offsite management administered from New York.

**January 1983 - September 1984**  Soros Fund Management
                                  Executive Vice President

Sole domestic equity manager, co-international equity manager, Global portfolio risk manager for the Quantum Fund, a $425mm offshore mutual fund designed to seek investment opportunities on a global basis for non-U.S. client base in all forms of investment assets: stocks, fixed income, currencies, futures, arbitrage, etc. Historically, as a single fund pool, the Quantum fund is believed to have the best investment record in the global asset management business for the period of 1969-1983. The average annual rate of appreciation was 32.45% for the full fifteen years of its existence (including a predecessor entity).

**1985 - 1988**  Self Employed
                Private Investor working through Graber & Co. A New York Stock Exchange member associated with Weiss, Peck & Greer. New York.

**February 1989 - June 1990**  Steinhardt Partners
                              General Partner

Responsible for the sole management of initially $250mm, ultimatel $400mm or 25% of the consolidated $1.6 billion investment partnerships. Managed as a hedge fund utilizing long and short equity positions, bonds, commodities and currencies.

8



# *Bayou Management  LLC*

40 Signal Road  Stamford, CT 06902

(T) 203-324-0333 (F) 203-316-8820
E Mail – Bayou35243@AOL.com

## *WHO WE ARE:*

Bayou Fund LLC was founded in June of 1996 by James G. Marquez and Sam Israel III. The goal of the fund is to provide members with steady, above average market returns while maintaining a lower risk profile than is normally associated with similar strategies. Both principals have had extensive experience in the management of Hedge Funds and Partnerships  with both small and large investment organizations.  Together they bring to Bayou Fund LLC. over 40 years of fundamental analysis, trading skills and portfolio management.

Mr. James G. Marquez, 51, is a native of New Orleans, Louisiana.  He is a graduate of the University of Texas, and received his M.B.A. from Tulane University.  Mr. Marquez has been a chartered Financial Analyst since 1977.

James began his career in the Trust Division of Citibank, N.A. as an assistant Vice President from 1974 to 1980 where he distinguished himself by managing the Citibank Equity Trust which in 1979 was the top performing bank-managed portfolio in the US with a total return of 57%.  In 1980 James took over the responsibility of managing the I.D.S. Progressive Fund, a capital appreciation growth mutual fund, which he guided for two years at which time he was recognized as having the best performing public equity mutual fund in 1982 with a total return of 76%.  James next served as Executive Vice President to George Soros in the management of the Quantum Fund, the most successful hedge fund in existence over the past 30 years.  James invested his own funds out of the offices of F. J. Graber and Company from 1985 to 1989 at which time he accepted the position as one of the top four General Partners of Steinhardt Management Co., a two billion dollar hedge fund. In 1991, James left Steinhardt Management Co. to form H.M.R. Investors L.P. that he owned and operated until early 1996, at which time he formed Bayou Fund LLC. with Mr. Israel.

Mr. Sam Israel III, 40, is also a native of New Orleans, Louisiana where he attended Tulane University.  He holds seven NASD licenses and serves as a director on the Introducing Broker Board of the National Futures Association.

Sam began his Wall Street career in 1981 at F. J. Graber and Company a N.Y.S.E. member firm engaged in hedge fund management as well as broker/dealer services.  Sam was involved in all phases of the business, from the trading of futures, options and securities to the full compliment of trade processing, record keeping and clearing functions.  In 1987 Sam was made a limited partner of the firm.  From 1989 to 1990 Sam served as a Vice President at Gerard Klauer Mattison as a Registered Representative at which time he accepted a position as equity trader at A.R.A. L.P. a New York based hedge fund with assets of 90 million dollars until the fund liquidated in late 1990.

*Page Two*

Sam then joined Mr. Marquez at H.M.R. Investors L.P. as partner responsible for short term trading for the fund until 1992 at which time he took the position of head trader at Omega Advisors, managed by Leon Cooperman with assets exceeding two billion dollars. Sam was responsible for all equity and financial futures execution, as well as sharing responsibility for hedging the portfolio through the use of futures and options. In 1994, Sam was made a General Partner of the fund. In 1996 Sam formed Bayou Fund LLC. with Mr. Marquez.

## *WHAT WE DO:*

Bayou Fund LLC. combines both the fundamental and technical analysis disciplines to all investment decisions. James G. Marquez employs his considerable experience in fundamental analysis to identify economic trends, group and industry dynamics, then more specifically undervalued as well as overvalued equities in these groups or industries. James Israel III then applies the technical analysis contained in our proprietary trading program as a timing tool for buy and sell decisions. The General Members believe that size will be an inhibiting factor in producing above average returns with commensurate risk control due to the volatility and liquidity profiles of the US equity market going forward. Therefore, it is the intention of the General Members to limit further subscription to the fund once the desired level of 25 million dollars is attained. The General Members anticipates opening an offshore fund for non-U.S. citizens with a similar funding profile. In order to achieve maximum capital appreciation with essential control of risk, Bayou Fund LLC. is not managed for tax consideration. Turnover in the fund tends to be quite heavy in order to take advantage of the volatility which the market experiences on a daily basis. The profiles of the market dictate that in order to properly control risk, short term trading has become a necessity. The General Members does not employ the use of leverage to augment returns. We are desirous of a hedged portfolio each night. The General Members seek above average market returns in an advancing market, and anticipate vast out performance in a declining market through the use of short selling.

Bayou Fund LLC. charges no management fee. All expenses incurred in the maintenance and operation of the fund are absorbed through Bayou Securities LLC. with the exception of legal and accounting fees which cannot by law be paid through any other entity. Bayou Fund LLC. pays 20% of earned profits annually to the Management Company as an incentive fee, which is assessed upon completion of the annual audit. All incentive fees are subject to high water mark accounting. The funds net asset value must exceed the previous years closing market value, adjusted for expenses and incentive payouts, before any further incentive fee is earned.

Bayou Securities LLC. which is owned and operated by the General Members of Bayou Fund LLC serves as executing broker for other institutional investors, as well as the Introducing Broker for Bayou Fund LLC. Mr. Marquez and Mr. Israel provide internally generated fundamental and technical research to outside institutional investors, and are paid for their services through the execution of equity orders. It is anticipated that in the near future Bayou Securities LLC will provide the above mentioned services to in house independent money managers as well. Both Mr. Marquez and Mr. Israel feel that the services provided by Bayou Securities LLC. and the additional commissions generated, benefit Bayou Fund LLC. by way of reduced clearing costs, shared expenses, and validation of ideas internally generated. All trading for Bayou Fund LLC. and

*10*

*Page Three*

outside entities are subject to the rules and regulations of the N.Y.S.E. and are allocated by account in strict accordance with exchange rules.

## HOW WE DO IT:

The General Members of Bayou Fund LLC. have implemented a strictly adhered to investment process in order to achieve maximum return on capital with commensurate risk control. Although the stock market profiles change almost daily, our disciplined approach does not. Each day we assess the market conditions through the use of both our fundamental and technical approach. Well before the market opens, we have scripted and discussed what we believe will be the correct approach to trading that day. Precisely because of our smaller size we are able to take advantage of the volatile rotation in the marketplace experienced on a daily basis, and are able to adjust accordingly.

As previously stated, Mr. Marquez provides fundamental research by way of economic overview, group and industry dynamics, as well as a bottom up and top down analysis of specific companies. Mr. Marquez specializes in Oil and Gas, Industrial Cyclicals, and Technology. We also employ a full time Research Analyst who lives and works in East Texas providing real time in country research analysis in the natural resource area. This analyst is a Ph.D trained geologist with 30 years of experience in this area. His expertise is invaluable as it provides us with the ability to monitor the natural resources industry using a hands on approach. Through the use of printed news and five different news services online, we are able to scan for any news event which can potentially provide us with a trading advantage. We also check daily for any insider activity, SEC filings, industry reports, material changes in filed holdings, and changes in brokerage recommendations on any companies we follow. We, next use our proprietary software program to apply our technical analysis in order to fine tune specific buy and sell points for the stocks we choose to trade. This discipline is applied on both a long and short term basis to identify inflection points on a stock by stock basis as well as to identify larger market trends which impact the trading of securities each day. We screen hundreds of stocks daily also in order to identify any unusual activity which can signal an upcoming news which may positively or negatively affect a specific stock or group.

Each day we try to identify both long and short opportunities in the market in order to keep a balance in our portfolio. During the day we may be up to 100% long or short, but each night we aim to be as balanced as possible which is a primary tool to control risk. We also employ the use of stop loss orders on any securities we trade. Often we will establish an option position as well as a common stock position with the goal of taking a profit in the common shares which offsets the cost of our option positions. This allows us to stay involved in emerging situations, control risk, and maximize our profits. We employ the use of stops in all option positions as well and adjust our risk profiles in any duplicate stock and option positions. The General Members believe that this measured approach will serve us well in the times ahead, as market volatility continues to migrate to higher levels. Trading and / or exiting positions is the risk management technique employed in order to keep tight control over the risk in the portfolio, which is necessary in the environment in which we operate on a daily basis.

## BusinessWeek Investor | *Inside Wall Street*

# BIG CABLETRON BUZZ



BY GENE G. MARCIAL

A telecom giant is said to be eyeing Cabletron. Net ad shop 24/7 Media may be a target for rivals. And Manpower sees greener grass in Europe and Japan

The low-priced stock of Cabletron Systems (CS) is finally getting attention on the Street: It's up 49% so far this year, to 12⅛. In early June, it hit nearly 17—a 52-week high.

Two things are behind the new awareness of Cabletron, a provider of intelligent hubs and switching products for networking and Ethernet systems. Some players note that the sum of Cabletron's parts is greater than the current price. More tantalizing: Takeover buzz is running high.

There have been takeover rumors before. But this time, a global telecom giant is considering buying Cabletron, say several pros who claim to be in the know. "There are several potential buyers" intently looking at Cabletron, says Jim Marquez, who heads Bayou Securities in Stamford, Conn. Among them: Italy's Alcatel, Germany's Siemens, and Canada's Northern Telecom, according to Marquez, who has been accumulating Cabletron shares.



THE STREET IS TAKING NOTE

Analyst Chris Stix of SG Cowen, who has a buy rating on the stock, says that "as one of the last large free-standing enterprise networking players," Cabletron could be attractive to a telecom-equipment supplier. Based on breakup value, he says, the stock is worth at least 20 a share.

Among Cabletron's assets is the Layer 3 switch business, which could be worth up to $25 a share, figures Stix. Cabletron's cash hoard totals $500 million, or $2 a share. Another division, SPECTRUM, maker of network software products, may be worth a further $3, says Stix. Cabletron says it may make SPECTRUM a stand-alone company. The betting: Cabletron will take it public.

Analyst Al Tobia of Bank of America Securities, who rates Cabletron a buy, expects the company will earn 25¢ a share in calendar 1999 and 79¢ in 2000. Cabletron declined comment as a matter of policy.

## ROUND-THE-CLOCK INTEREST IN 24/7?



ON THE UPSWING AGAIN LATELY

Online advertising is hot, and so are the stocks of companies that bring them to the Internet. One that delivers ads to more than 2,500 Web sites is 24/7 Media (TFSM), whose stock has been as volatile as any mercurial Internet outfit. Of late, 24/7, which dropped from nearly 70 a share in mid-April to 24 in mid-June, is again on the upswing: It went above 40 in early July. Some pros think the stock is headed past 70: They believe 24/7 is

bound to be acquired by DoubleClick, the in advertising Internet solutions.

DoubleClick recently agreed to acquire Direct—to broaden its product line and data on consumer purchasing. And recently bleClick has been rumored to be after In ad-software vendor NetGravity. "But for bleClick to have the expertise in providing lutions to all forms of media—cable, TV, a dio—it would need the deep experience resources of 24/7," says one Internet inv Among 24/7's key clients: Amazon.com, Net Disney, and Dell Computer.

Analyst Rudy Hokanson of CIBC Oppenh says 24/7's competitive advantage stems fro having management with wide media exper its ability to reach large number of Internet u and its proprietary database that could "rev tionize Internet marketing and advertising. figures that 24/7's estimated 1999 revenue of $ million will jump to $127 million in 2000, c pared with $19.9 million in 1998. His target for stock: 80. David Moore, CEO of 24/7, says wouldn't be surprised if DoubleClick were in ested, but insists 24/7 intends to be a pree nent online ad-solutions company.

## MANPOWER IS ON THE MARCH OVERSEA

Investment manager Tony Spare thinks he h found a "cheap way" to play the prospectiv rebound in the economies of Britain, Franc and Japan. No, he isn't buying into the banks financial services. He has been accumulati shares of Manpower (MAN), the world's large temporary employment company.

Spare, who heads the San Francisco inves ment firm Spare, Kaplan, Bischel & Associates, convinced that, starting next year, thos economies are coming back strongly—and w provide the key to renewed growth for Manpower, which derives 73% of its revenues overseas.



READY FOR A PEP TALK

Its stock has been on the ropes this year, falling to 22 a share, down from 30 last summer. The company, which provides employment annually to about 1.6 million people in 43 countries, has soured the Street with disappointing earnings in the past three quarters. But a new management recently installed, led b new CEO Jeff Joerres, has encouraged analysts. "I gives us more confidence that Manpower is o the way back," says Jeffrey Silber of investmen firm Gerard Klauer Mattison.

Spare says "neglected" Manpower is the "ideal stock to buy" into the recovery in Eu rope and Japan. Manpower will beat consensus earnings estimates of $1.85 a share for 2000, h says. He thinks it can make $2 to $2.50 a share. The stock, he says, should hit 40 this year.

PHOTOGRAPH BY JAMES KEYSER; CHARTS BY ERIC HOFFMANN/BW

12


Investing in the
**Telecom Services Industry: A Primer**
-- CLICK HERE --
A Sponsored Report

# TheStreet.com

Subscribe to TheStreet.com
SITE MAP | CUSTOMER SERVICE 1-800-562-9571

COMMENTARY >> HERB ON THESTREET



## More Winners Than Losers in This Column's Report Card for the First Half
**By Herb Greenberg**
**Senior Columnist**
7/1/99 6:30 AM ET


GET STOCK QUOTES

○ symbol ○ name


PRINT THIS STORY

Six months down. Six to go. This column historically grades itself and its sources at year-end. But, hey, do you *really* care that far from the fact? Do you care at all? I dunno, but for accountability's sake I care.

Not only does it keep me and my sources honest, but there's a moral to some of these stories, especially this year, thanks to tougher year-end audits and/or the inability of companies to hide from bloated inventories or botched business plans.

Classic examples, since January, include **Party City** (PCTY:Nasdaq) ( no celebration -- delisted), **Family Golf Centers** (FGCI:Nasdaq) (playing golf isn't as popular as watching it -- earnings disappointment), **Just For Feet** (FEET:NYSE) (earnings got trampled, lousy inventory controls), **Safeskin** (SFSK:Nasdaq) (apparently not enough caution in the amount of surgical gloves -- its specialty -- put into the distribution channel), **Guitar Center** (GTRC:Nasdaq) (sad song -- surprising slowdown in earnings growth) and **Select Comfort** (AIRB:Nasdaq) (deflated -- didn't sell as many airbeds as expected). Each one was a favorite of short-sellers, and each came apart with surprising speed. (A-pluses, all of them!)

This column also gets high marks for raising questions, starting last year, about **CHS Electronics** (HS:NYSE), a distributor of electronics products overseas. It received an incomplete in my last year-end report card. Funny what a difference a disclosure about missed earnings coupled with an admission of forged documents can make. (Moral: Never pick a public fight with short-sellers, which is just what CHS' CEO did.)

Also at the head of the class: **Piper Jaffray's**

BROWSE THE ARCHIVE

**Markets**

**Stock News**

**Funds**

**Commentary**

*TSC TECHNICAL FORUM*

ANDY KESSLER

BOB GABELE

BUILDING BLOCKS

COMMENTARY FEATURES

DRINKS & DIVERSIONS

EASY MONEY

EDITOR'S LETTER

EMAIL TO THE EDITORS

EURO CURRENTS

EYE TO THE KEYHOLE

FUNDAMENTAL QUESTIONS

GREED & FEAR

HERB ON THESTREET

HOW WE DID

INVESTORS' BOOKSHELF

JIM GRIFFIN

MARC CHANDLER

MARRIN'S CHRONICLES

MONEMAILBAG

POWER LINES

SILICON BABYLON

SILICONSTREET.COM

SPORTS SCOOP

TSC MALL RAT

TECH SAVVY

TECHNICIAN'S TAKE

THE BUYSIDER

THE CHARTIST

THE INVISIBLE MOUTH

THE NIGHTSTAND

SEARCH TSC

Ashok Kumar, who correctly warned that **Dell's** (DELL:Nasdaq) revenue growth would slow, and money manager Jim Marquez, of **Bayou Capital** in Greenwich, for his A-plus prediction in April that **Fluor** (FLR:NYSE) was ripe to rise (it has roughly doubled). Also high on his list at the time: **SGI** (SGI:NYSE) (up 27%); **Cabletron Systems** (CS:NYSE) (up 61%); **Network Equipment** (NWK:NYSE) (up 26%). Also: **R&B Falcon** (FLC:NYSE) (up 11%); **Pioneer Natural Resources** (PXD:NYSE) (up 31%); **Ingram Micro** (IM:NYSE) (up 20%) and **PennzEnergy** (PZE:NYSE), which he said would eventually get a takeover bid. It did, and now it's about 50% higher than when he first mentioned it. (Which goes to show that if you have passion about something, it can pay to go on the record.)

Speaking of which: Short-seller Marc Cohodes of **Rocker Partners**, no stranger to this column, finally gets an A-plus for predicting that **HMT Technology** (HMTT:Nasdaq), a maker of PC hard disks, would get flattened. (It did, stockwise and earningswise.) Ditto for Cohodes with **Iomega** (IOM:NYSE), which is roughly half of where it was six months ago, **Engineering Animation** (EAII:Nasdaq) and **Network Associates** (NETA:Nasdaq).

Other columns worthy of the honor roll: **Pillowtex** (PTX:NYSE), which makes towels, and **NCS Healthcare** (NCSS:Nasdaq), which distributes drugs to nursing homes. Both became very ill *after* they had already fallen in earlier plunges, proving that just because a company has already been hit by bad news doesn't mean it can't get hit even harder with worse news.

And this column deserves to be on the dean's list for mentioning **Delia's** (DLIA:Nasdaq) and its Internet spinoff, **iTurf** (TURF:Nasdaq). Both are lower than where they were.

But this column gets failing marks, at least right now, for questioning **Microchip Technology** (MCHP:Nasdaq), which continues to defy the skeptics. And **Hibbett Sporting Goods** (HIBB:Nasdaq). (We could call both incompletes considering that short-sellers continue to whisper that they've got plenty of trouble.) And how about **Bebe Stores** (BEBE:Nasdaq), a fast-growing retailer of clothes for teenage girls? Hasn't budged since I mentioned it. (Incomplete.) Other incompletes include **Lernout & Hauspie** (LHSP:Nasdaq) (hello you unlovable Lernahooligans!); **Stewart Enterprises** (STEI:Nasdaq) (the stock is down but there's certainly been no funeral procession); **Sabratek** (SBTK:Nasdaq); and **Pre-Paid Legal Services**

THE TASKMASTER
THIS WEEK IN IPOS
TRAVELING WITH WINGS
WING TIPS
WRONG!
DISPATCHES FROM THE FRONT
WRONG! REAR ECHELON REVELATIONS
WRONG! TACTICS AND STRATEGIES
WRONG! TAKE TWO
**Basics**
**International**
**Tech Stocks**
**Community**

(PPD:NYSE) (jury's still out on *that* one).

Quite frankly, this is the lowest number of failures since I started this report card a decade ago. I had planned to give myself the worst possible failing marks for having the gall, earlier this year, to question whether **Starbucks** (SBUX:Nasdaq) was finally starting to lose its perk.

But Wednesday, after the market closed, the company did something very un-Starbucks-like: It reported that its fiscal 1999 earnings will miss analysts' estimates. Oops! Says one longtime Starbucks short, who was *not* short last night: "It's just a coffee company."

On that note, I'm sure there are plenty of others, especially failures, that I missed. If so, let me know and I'll be more than happy to take the public humiliation.

## TV Talk

Memo to the many readers who wonder when I'll be back on *CNBC*: I won't, and thanks for watching. But you will get a chance to see me, **Brenda B., JJC** and a cast of (OK, not thousands, but quite a few) *TSCers* on *TheStreet's* new weekly show on the *Fox News Channel* starting July 17. (So, if your cable carrier doesn't carry *Fox*, tell 'em to get it and get it NOW!)

After all, the Fox is faster and slier than the Peacock. ●

*Herb Greenberg writes daily for TheStreet.com. In keeping with TSC's editorial policy, he doesn't own or short individual stocks, though he owns stock in TheStreet.com. He also doesn't invest in hedge funds or other private investment partnerships. He welcomes your feedback at herb@thestreet.com. Greenberg also writes a monthly column for Fortune.*

*As originally published this story contained an error. Please see Corrections and Clarifications.*

Send feedback to letters@thestreet.com.          Top
Read our conflicts and disclosure policy.

© 1999 TheStreet.com, All Rights Reserved.



# TheStreet.com

## One Money Manager's Favorite Stocks for a Dow 10,000 or 2000 World

**By Herb Greenberg**
**Senior Columnist**
4/12/99 6:30 AM ET



When we left Jim Marquez of the Bayou Fund, a private hedge fund in Stamford, Conn., last week, he was singing the praises of Fluor (FLR:NYSE), an out-of-favor, $13 billion engineering and construction firm that was loaded with assets but was trading at a sharp discount to its revenues. Here's a guy who spends much of his day aggressively trading stocks, yet he saddles himself with a dud like Fluor and, as it turns out, a whole list of what he likes to call "extreme value" stocks.

These are stocks that have assets or cash and a trigger, such as a restructuring or the possibility of a takeover, that can cause the stock price to rise. But not immediately. For these investments, momentum and growth are irrelevant.

"We will readily buy a company with a heavy debt load if that company has assets sufficient to pay off the debt and gives stockholders a premium, even on a complete liquidation," Marquez says.

He adds, "For this type of investment it doesn't matter if the market is at 10,000 or 2000."

Examples of his long positions include:

**Silicon Graphics (SGI:NYSE):** You gotta be kidding? No, he isn't. This company can't seem to be able to get out of its own way thanks to a series of missteps and losses. Its stock closed at 12 1/2 on Friday but rose as high as the mid-40s in 1998. However, Marquez is attracted by $3 per share in gross cash.

The company also owns roughly 85% of **MIPS Technologies** (MIPS:Nasdaq), a former division, part of which was spun off last June. Silicon Graphics has said it plans to sell the rest by September of 2000. In addition, privately-held **Alias/Wavefront**, another subsidiary, is valued by some analysts at roughly $3 per share. "Even with capital gains tax taken out, the [workstation] manufacturing business is valued at zero by the stock market, so I'll take my chances it will be worth something more than nothing soon."

of 4

16

:Street.com: One Money Manager's...cks for a Dow 10,000 or 2000 World   http://www.thestreet.com/comment/herbonthestreet/734987.html

He adds that the company's new products have been getting good reviews. But what about execution? Jim Cramer took the company to task last week for not being able to execute. Maybe, but that's what they said about Digital Equipment, Marquez says, "and Compaq (CPQ:NYSE) bought it at twice the price it was trading for. And in its worse days Digital never got as cheap as this."

"You're paid to wait, because when a balance sheet is as rich as this you can't get in any more trouble."

**Cabletron (CS:NYSE):** The same Cabletron that has never quite been able to get out from under ever since stuffing the channel with way too much merchandise a year or so ago? One in the same. It trades at one-times revenues, "which is unusually cheap for a tech stock," Marquez says. What's more, it has no debt, $500 million in cash "which should rise to $600 million in the next six months." That translates to $3.50 per share, or 43% of its market value; the stock closed Friday at 7 15/16. Not bad, Marquez says, for a stock whose new product line has been getting good reviews. A new alliance with Alcatel (ALA:NYSE ADR), announced Friday, can't hurt, either.

**Network Equipment Technologies (NWK:NYSE):** Can we get any closer to the bottom of the barrel among tech stocks? (Sure, but Marquez doesn't want to go there!) "This is another tarnished tech company," he says. It specializes in wide-area networking. The stock is down more than 80% from its all-time high. Its international business fell off a cliff last fall but is starting to recover. And it's on the radar of Joseph Harrosh, a private investor known for agitating companies to maximize shareholder value. He recently picked up a 6% stake.

The stock trades at around 8, but has $5 per share of working capital. "This stock is selling like it's at the bottom of a long bear market," Marquez says. "It'll probably be taken over sooner rather than later if its stock stays low."

**R&B Falcon (FLC:NYSE):** This oil services company recently raised cash through a debt offering. "Turns out they have ample liquidity to get through the next 12 to 18 months," Marquez says. "And even with issuing high coupon debt, they'll have positive cash flow and earnings per share in 1999 and 2000.

"The point I want to make is that high debt levels, while not desirable, are okay if the assets underlying the debt are sound. In this case, they most certainly are. And if the stock remains under 10 for very long [it closed Friday at 8 1/16] it will attract a takeover offer of at least $14 per share," He hopes!

**Pioneer Natural Resources (PXD:NYSE):** "This is Richard Rainwater's biggest company goof in his whole illustrious career." The stock, at 8 7/16, is down 85% from its high. "They overleveraged the balance sheet at exactly the wrong point in the

8/30/99 4:01 PM

cycle, and now their bankers are breathing heavy down their corporate neck to reduce bank loans outstanding by the end of the year.

"Again, debt is only a problem if your assets aren't good and therefore are not readily salable. In this case, their core assets have some of the finest long-lived natural gas reserves in the United States. The company has a goal of reducing debt by $500 million to $600 million this year, which should be attainable. And they have interesting drilling prospects offshore in the Gulf of Mexico, off West Africa and in South Africa."

**PennzEnergy** (PZE:NYSE): Marquez and I were talking about this very company Friday when a headline popped up that an investment group headed by value investor **Mario Gabelli** had bought more than 5% of the company, which was the exploration and production side of the old Pennzoil before Pennzoil merged with Quaker State Oil a year ago to form Pennzoil Quaker State Oil (PZL:NYSE).

Even before Gabelli showed up, Marquez told me he believed Pennz was "a cheap energy stock" that trades at a steep discount to its underlying reserve net asset value. Prior to its split-up, the company received a takeover offer from Union Pacific Resources (UPR:NYSE) "at three times over its present price" of 10 9/16. Last week, it so happens, Union Pacific closed a debt deal that bolsters its cash coffers to $1.3 billion. Will it make another run for Pennz Energy? If not, Marquez believes somebody eventually will — unless the stock rises.

**Finally, Ingram Micro** (IM:NYSE), the world's largest electronics distributor: "Its stock was a rocket the last two years, rising from the 20s to the 50s."

Then an earnings warning several months ago caused the stock to collapse to a recent low of 16: it closed Friday at 21 5/16.

"Even on the reduced EPS estimates, it sells for only 15-times 1999 earnings estimates of $1.30. It was never as good as the price indicated when it was 50, but it's not nearly as bad as the market assesses its value at 16.

"It's another casualty of the growth stock vigilantes who can be counted upon to punish unmercifully any stock or company that dares to disappoint."

Thanks, Jim. We'll check back in a year.

## Compaq Capers

**In the wake of Compaq's earnings warning Friday:** Wish I followed up on a very good tip I received last week that Compaq had offered extremely attractive incentives during the last week of the last quarter to get distributors to take extra product. (Also known as channel-stuffing.) If it's true, the incentives must not have been good enough!

18

Sticking with the theme: Heard from **Mike Kelly**, who runs **Techtel**, an Emeryville, Calif. market-research firm that has been tracking PC purchasing data for 14 years. He says Compaq isn't alone with sluggish sales. His data, from business purchasers, shows that sales of Dell (DELL:Nasdaq) PCs and low-end servers are also down. Ditto for Gateway (GTW:NYSE). "It looks to me like [Gateway] should have preannounced a shortfall, unless they made it up on the consumer side." (The results of Techtel's consumer data should be available in about a week.)



*Herb Greenberg writes daily for TheStreet.com. In keeping with TSC's editorial policy, he doesn't own or short individual stocks. He also doesn't invest in hedge funds or other private investment partnerships. He welcomes your feedback at herb@thestreet.com. Greenberg writes a monthly column for Fortune and provides commentary for CNBC. As originally published, this column contained an error. Please see Corrections and Clarifications.*

TOP

Send your feedback to letters@thestreet.com

© 1999 TheStreet.com, All Rights Reserved.

HOME   TSC   MARKETS   STOCK   TECH   FUNDS/TAXES COMMENTARY INTERNATIONAL BASICS COMMUNITY
         NEW        NEWS   STOCKS

8/30/99 4:01 PM



*Bayou Fund LLC*

40 Signal Road  Stamford, CT 06902                    (T) 203-324-0333 ( F ) 203-316-8820

April 14, 1999

The first quarter of 1999 was multi-faceted for us.  January started out slowly as our systems were down for 10 days in order to switch over to the latest high speed data feeds which are necessary in today's fast paced environment.  We were able to post a 1% gain for the month.  February was a return to the glory days of yore as the market posted record after record.  As all of you know, this is not the ideal environment for us as we are desirous of a two way market.  However, we were able to take advantage of the markets' intraday volatility to an extent, as we posted a 1.8% gain for the month.  March turned out to be much better suited to our methodology where we posted a gain of 3.4%, bringing the total return for the first quarter to 6.314%.

As the focus on Dow 10,000 captivated America, the internal profile of the markets changed dramatically.   Liquidity dried up during the market's advance. Statistically the market rally is not at all healthy, although we were able to detect a distinct shift towards the cyclical side of the market.  Since the rate cuts of last summer brought on by the global liquidity crisis, the least likely economic scenario was for the outcome which now seems most likely.  Strong domestic growth, with Asia and Europe recovering somewhat.  The Cyclical side of our market is very institutionally under-owned.   There are not a lot of Paper or Steel or Aluminum stocks to choose from. Therefore, we are finding value in the above mentioned cyclical stocks tied to world economic recovery , and at the same time trying to identify excessive valuation situations in the Financial, Consumer growth and Technology areas to trade on the short side.

What we believe to be the most important aspect of the markets for us is the continuing increase in volatility.  To date over 85% of the trading days this year have resulted in at least a 1% move, 45 % of the days moved over 2%.  Many stocks are experiencing 5-8% moves each day which is quite astounding.  There are really two markets trading today.  First the stocks most heavily weighted in the averages, and second "the rest".  In 1998, 15 stocks accounted for a full 50% of the gain in the S&P 500.  So, as the averages continue to soar to new records, it is not at all reflective of the true marketplace.  The trend accelerated further in the 1st quarter where just two stocks have accounted for 35% of the total S&P gain for the 1st quarter!.  This happens for a reason.  Mutual fund managers, particularly index funds buy the top tier most heavily weighted stocks often by mandate.  According to the Mutual Fund Institute 80% of all new investment during the 1st quarter went into some form of index fund.  This naturally causes the averages to ascend.  The rest of the money managers are measured by these same indexes.  Therefore, it does not pay to take the risk of buying small or medium cap "second tier" companies because if they do not rise as fast as the market in general, one will under perform.  We all know the rest of the story.

This scenario has created one of the most bifurcated markets in history. True bull markets, like everything else in life, need a strong base in order to be sustained. Precisely because so few stocks have accounted for so large a percentage of the gains, one should envision this market as a pyramid. We are now at the apex if only two stocks account for one third of all S&P gains. The part which should be disturbing (not so far apparently) is after the apex is reached mathematically what follows is the complete inversion of the pyramid. In other words, picture an upside down pyramid on top of the one just completed. This presents a very tough market environment ahead in our opinion.

There are, as mentioned, both great values and gross overvaluation simultaneously in the US markets. Jim and I are very excited about this situation. We are suited to be able to take advantage of the volatility and the extremes reached on either side of the market. There is no better advertisement for our trading strategy than the intraday moves alone. The freedom to remain flexible and nimble enough to reverse course when appropriate on a moments notice is imperative to maximize returns. We do not believe the volatility will abate any time soon, as the proliferation of day traders online shows no sign of reversing course. On the contrary, we are of the opinion that things are going to get quite wild. Most importantly, for us and for you is that we ARE able to control our risk by being as flat as possible each day. This is always important, but will become more so as time goes on. What we sacrifice in not always being fully invested is more than made up for in the ability to provide stable, steady, respectable returns with minimal drawdowns. We continue to strive toward providing above average returns with as little risk as possible, and are working quite diligently to do so. Lastly, we are pushing hard to raise more money, any referrals provided would be most welcome at this time. Thank you for your continued support.

Sincerely,


Samuel Israel III
James G. Marquez

SIII/si



**Bayou Fund LLC**

40 Signal Road  Stamford, CT 06902

( T ) 203-324-0333  ( F ) 203-316-8820
E Mail – samisrael@bayougroup.com

Dear Member,                                                                July 10,1999

The second quarter of 1999 for us can best be described as the thrill of victory, then the same old story. We had a very good April, as the trading became what is ideal for us, great two-way action with group rotation and volatility. We were able to be short some of the larger names and long some stocks, which had been pummeled at the end of the first quarter. We also had success in the Oil Service area, which as most of you know is Jim's favorite. May was a bit more quiet as the rotation continued, and rate fears started to be the dominant theme of the markets. As summer settled in trading in June started off slowly, and the market showed signs of trying to find a bottom. June certainly went out with a bang however. Mr. Greenspan decided to raise rates by ¼ point. This in itself seems no reason to celebrate, however the Fed changed its stance to a neutral bias which gave the all clear for stocks to resume the up trend.

At this writing, most averages have made new highs. Inflation is absolutely dead as plunging commodity prices are showing, the only exceptions being Crude Oil, and Copper which are functions of the global economic recovery. The signs of global recovery are obviously helpful to the cyclical stocks, which are heavily weighted in the broad averages. Earnings also should be strong in the next quarter, as many companies will benefit from any worldwide pickup in demand. In other words, everything is perfect again—or maybe not.

We believe that extreme caution is warranted at this time. We do not believe the Fed's neutral stance is cause for celebration. The Fed implemented the last six rate hikes from a neutral bias. Also, good barometers of mania, the Internet stocks, have declined by fifty percent in many cases. How can this be a warning signal? Margin debt that was at historic levels before the decline has actually INCREASED during this period of decline. There can be extraordinary factors such as the assumption of debt on higher rate credit cards which factors in, but we think the buy and hold mentality which has been so successful over these past few years is so ingrained in the mentality of investors that this is viewed yet again as another buying opportunity. Another barometer, the Put – Call ratio is also at dangerously low levels. The next focus of the market will be on earnings which as stated we believe will be good. This in our opinion will not be cause for continued market gains. The valuations of many stocks, especially the higher profile stocks are so high that earnings have to catch up to stocks. In other words, stocks are currently priced for perfection, which we cannot embrace.

So, once again we find ourselves trying to find value to trade long and picking our spots to be short. The second half should be interesting and if we are correct most Funds will wish they had taken their profits in the first half. We will try as always to keep pace with the upside, and wait for our turn on the much hoped for downside. Oh yes, we were able to post a second quarter gain of 12.45% bringing our year to date to +19.56%

Sincerely,

Sam Israel III
James G. Marquez

22

# PROFILE

### OF

# FUND



*BAYOU FUND LLC*



# *BAYOU FUND LLC*

*40 Signal Road  Stamford CT, 06902  (T) 203.324.0333  (F) 203.316.8820*

# Profile of Fund

# *WHO WE ARE:*

Bayou Fund LLC was founded in June of 1996 by James G. Marquez and Sam Israel III. The goal of the fund is to provide members with steady, above average market returns while maintaining a lower risk profile than is normally associated with similar strategies. Both principals have had extensive experience in the management of Hedge Funds and Partnerships with both small and large investment organizations. Together they bring to Bayou Fund LLC. over 40 years of fundamental analysis, trading skills and portfolio management.

Mr. James G. Marquez, 51, is a native of New Orleans, Louisiana. He is a graduate of the University of Texas, and received his M.B.A. from Tulane University. Mr. Marquez has been a chartered Financial Analyst since 1977.

James began his career in the Trust Division of Citibank, N.A. as an assistant Vice President from 1974 to 1980 where he distinguished himself by managing the Citibank Equity Trust which in 1979 was the top performing bank-managed portfolio in the US with a total return of 57%. In 1980 James took over the responsibility of managing the I.D.S. Progressive Fund, a capital appreciation growth mutual fund, which he guided for two years at which time he was recognized as having the best performing public equity mutual fund in 1982 with a total return of 76%. James next served as Executive Vice President to George Soros in the management of the Quantum Fund, the most successful hedge fund in existence over the past 30 years. James invested his own funds out of the offices of F. J. Graber and Company from 1985 to 1989 at which time he accepted the position as one of the top four General Partners of Steinhardt Management Co., a two billion dollar hedge fund. In 1991, James left Steinhardt Management Co. to form H.M.R. Investors L.P. that he owned and operated until early 1996, at which time he formed Bayou Fund LLC. with Mr. Israel.

Mr. Sam Israel III, 40, is also a native of New Orleans, Louisiana where he attended Tulane University. He holds seven NASD licenses and serves as a director on the Introducing Broker Board of the National Futures Association.

Sam began his Wall Street career in 1981 at F. J. Graber and Company a N.Y.S.E. member firm engaged in hedge fund management as well as broker/dealer services. Sam was involved in all phases of the business, from the trading of futures, options and securities to the full compliment of trade processing, record keeping and clearing functions. In 1987 Sam was made a limited partner of the firm. From 1989 to 1990 Sam served as a Vice President at Gerard Klauer Mattison as a Registered Representative at which time he accepted a position as equity trader at A.R.A. L.P. a New York based hedge fund with assets of 90 million dollars until the fund liquidated in late 1990.

Sam then joined Mr. Marquez at H.M.R. Investors L.P. as partner responsible for short term trading for the fund until 1992 at which time he took the position of head trader at Omega Advisors, managed by Leon Cooperman with assets exceeding two billion dollars. Sam was responsible for all equity and financial futures execution, as well as sharing responsibility for hedging the portfolio through the use of futures and options. In 1994, Sam was made a General Partner of the fund. In 1996 Sam formed Bayou Fund LLC. with Mr. Marquez.

25

## *WHAT WE DO:*

Bayou Fund LLC. combines both the fundamental and technical analysis disciplines to all investment decisions. James G. Marquez employs his considerable experience in fundamental analysis to identify economic trends, group and industry dynamics, then more specifically undervalued as well as overvalued equities in these groups or industries. Sam Israel III then applies the technical analysis contained in our proprietary trading program as a timing tool for buy and sell decisions. The General Members believe that size will be an inhibiting factor in producing above average returns with commensurate risk control due to the volatility and liquidity profiles of the US equity market going forward. Therefore, it is the intention of the General Members to limit further subscription to the fund once the desired level of 25 million dollars is attained. The General Members anticipates opening an offshore fund for non-U.S. citizens with a similar funding profile. In order to achieve maximum capital appreciation with essential control of risk, Bayou Fund LLC. is not managed for tax consideration. Turnover in the fund tends to be quite heavy in order to take advantage of the volatility which the market experiences on a daily basis. The profiles of the market dictate that in order to properly control risk, short term trading has become a necessity. The General Members does not employ the use of leverage to augment returns. We are desirous of a hedged portfolio each night. The General Members seek above average market returns in an advancing market, and anticipate vast out performance in a declining market through the use of short selling.

Bayou Fund LLC. charges no management fee. All expenses incurred in the maintenance and operation of the fund are absorbed through Bayou Securities LLC. with the exception of legal and accounting fees which cannot by law be paid through any other entity. Bayou Fund LLC. pays 20% of earned profits annually to the Management Company as an incentive fee, which is assessed upon completion of the annual audit. All incentive fees are subject to high water mark accounting. The funds net asset value must exceed the previous years closing market value, adjusted for expenses and incentive payouts, before any further incentive fee is earned.

Bayou Securities LLC. which is owned and operated by the General Members of Bayou Fund LLC serves as executing broker for other institutional investors, as well as the Introducing Broker for Bayou Fund LLC. Mr. Marquez and Mr. Israel provide internally generated fundamental and technical research to outside institutional investors, and are paid for their services through the execution of equity orders. It is anticipated that in the near future Bayou Securities LLC will provide the above mentioned services to in house independent money managers as well. Both Mr. Marquez and Mr. Israel feel that the services provided by Bayou Securities LLC. and the additional commissions generated, benefit Bayou Fund LLC. by way of reduced clearing costs, shared expenses, and validation of ideas internally generated. All trading for Bayou Fund LLC. and outside entities are subject to the rules and regulations of the N.Y.S.E. and are allocated by account in strict accordance with exchange rules.

# *HOW WE DO IT:*

The General Members of Bayou Fund LLC. have implemented a strictly adhered to investment process in order to achieve maximum return on capital with commensurate risk control. Although the stock market profiles change almost daily, our disciplined approach does not. Each day we assess the market conditions through the use of both our fundamental and technical approach. Well before the market opens, we have scripted and discussed what we believe will be the correct approach to trading that day. Precisely because of our smaller size we are able to take advantage of the volatile rotation in the marketplace experienced on a daily basis, and are able to adjust accordingly.

As previously stated, Mr. Marquez provides fundamental research by way of economic overview, group and industry dynamics, as well as a bottom up and top down analysis of specific companies. Mr. Marquez specializes in Oil and Gas, Industrial Cyclicals, and Technology. We also employ a full time Research Analyst who lives and works in East Texas providing real time in country research analysis in the natural resource area. This analyst is a Ph.D trained geologist with 30 years of experience in this area. His expertise is invaluable as it provides us with the ability to monitor the natural resources industry using a hands on approach. Through the use of printed news and five different news services online, we are able to scan for any news event which can potentially provide us with a trading advantage. We also check daily for any insider activity, SEC filings, industry reports, material changes in filed holdings, and changes in brokerage recommendations on any companies we follow. We, next use our proprietary software program to apply our technical analysis in order to fine tune specific buy and sell points for the stocks we choose to trade. This discipline is applied on both a long and short term basis to identify inflection points on a stock by stock basis as well as to identify larger market trends which impact the trading of securities each day. We screen hundreds of stocks daily also in order to identify any unusual activity which can signal an upcoming news which may positively or negatively affect a specific stock or group.

Each day we try to identify both long and short opportunities in the market in order to keep a balance in our portfolio. During the day we may be up to 100% long or short, but each night we aim to be as balanced as possible which is a primary tool to control risk. We also employ the use of stop loss orders on any securities we trade. Often we will establish an option position as well as a common stock position with the goal of taking a profit in the common shares which offsets the cost of our option positions. This allows us to stay involved in emerging situations, control risk, and maximize our profits. We employ the use of stops in all option positions as well and adjust our risk profiles in any duplicate stock and option positions. The General Members believe that this measured approach will serve us well in the times ahead, as market volatility continues to migrate to higher levels. Trading and / or exiting positions is the risk management technique employed in order to keep tight control over the risk in the portfolio, which is necessary in the environment in which we operate on a daily basis.

3.

27

## *BAYOU FUND, L.L.C.*

### *DESCRIPTION*

### *The Fund*

Bayou Fund, L.L.C.
a New York limited liability company (the "Fund")

The Fund is not registered as an investment company under the Investment Company Act of 1940, as amended (the "1940 Act"), and therefore is not required to adhere to certain investment policies under the 1940 Act. The Manager does not presently intend to, but may in the future, register as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), or any state statute. The Manager is currently registered with the Commodities Futures Trading Commission ("CFTC") and the National Futures Association ("NFA") as a "commodity pool operator" and as a "commodity trading advisor" as those terms are defined by the Commodity Exchange Act, and acts in both such capacities with respect to the Fund currently. However, the Fund currently intends to cease its commodities activities.

### *Offering Period*

The offering of the interests began in February, 1996 and is extended until December 31, 2000 ("Offering Period").

### *The Offering*

Maximum Aggregate Capital Commitments: $25 million

Minimum Aggregate Capital Commitments: $5 million

The Fund is seeking a maximum of $25 million in Capital Commitments through the sale of Interests in the Fund. The Principals (defined below) of the Manager have made aggregate Capital Commitments of at least $200,000.

The minimum subscription to the Fund is $100,000. However, the Manager may accept subscriptions in lesser amounts (but in no event

28

less than $25,000) from Investors who the Manager believes can
provide business opportunities or other advantages to the Fund.

Subscriptions may be accepted or rejected by the Manager in its
sole and absolute discretion.

## Capital Commitments

Initial Members were required to make their Capital Contributions
in full in cash or in immediately available funds upon fourteen
(14) days prior notice of closing.  All other Members will be
required to make their Capital Contributions in full in cash or
immediately available funds upon notice of acceptance of their
subscription by the Manager.

The Manager or its Principals have  invested not less than $200,000
in the Fund initially, and intend to maintain a minimum investment
in the Fund of the lesser of $150,000 (or, if greater, one percent
(1%) of the net assets of the Fund) or fifteen percent (15%) of the
Fund's net assets.  All capital contributions received by the Fund
will be received in the Fund's name.

## Portfolio Investments

The Fund's primary investment objective is to realize capital
appreciation while seeking to control risk.   There can be no
assurance that such objective will be achieved and investment
results may vary substantially on a monthly and annual basis.

The Fund utilizes artificial intelligence through proprietary
software programs to identify technical patterns.  These patterns
are mathematically analyzed in an attempt to position the Fund on
the "correct" side of the market.  The Fund trades both long term
and short term opportunities in a global matrix using all financial
instruments, indices, securities, and all derivatives thereof.
When deemed appropriate by the Manager, the Fund also invests in
bonds or other fixed income securities.  Additionally, the Fund,
when it is deemed appropriate by the Manager, utilizes leverage,
short sales, options, and futures and forward contracts (and
options thereon) relating to stock indices, financial instruments
and other securities, both as independent profit opportunities and
to hedge existing long and short positions.  While the Fund's
trading orientation results in significant open positions on an

29

intra-day basis, the Fund will attempt, to the extent possible given market conditions, to end each trading day with a substantial portion of its portfolio hedged.

## Portfolio Valuation

The Fund's assets will be valued at least annually by the Manager. The valuations will be subject to audit by the Fund's independent auditor.

## Manager

Bayou Management LLC is the Manager of the Fund and, as such, is primarily responsible for the management of the Fund.

## Investors

Investors in the Fund must be Accredited Investors, Qualified Eligible Participants and must meet other suitability requirements. The Manager, in its discretion, may decline to admit any investor.

## Investment Decisions by the Fund

The Manager has the exclusive right to make investment decisions on behalf of the Fund, including decisions as to terms, conditions, valuation, type of security and co-investment with others. Further, the Manager has the sole right to determine when, and under what terms, the Fund will sell or realize gains or losses on an investment, including decisions as to type of sale, conversion to other securities, and exercise of warrants and/or options.

The Fund is a trader and investor, but not a dealer, in securities for U.S. income tax purposes. However, the Internal Revenue Service may challenge this position. The consequences of a successful challenge by the IRS could be substantial, depending on the facts and the nature of the Member. Each prospective Member should consult his tax advisor in that regard, as well as all other tax issues relating to an investment in the Fund.

If and when portfolio transactions for the Fund are executed by brokers (other than a broker affiliated with, or related to, the Manager or its Principals) such other brokers will be selected on the basis of best execution.

F:\1676-102\SUMMARY.025
mvk/10/07/99

6

30

In view of the fact that the Fund's investment program emphasizes achieving profits from short-term trading, the turnover of the Fund's portfolio is substantially greater than the turnover rates of other types of investment vehicles and, therefore, results in greater commission costs and lower profits or greater losses than might otherwise be the case.

The investment program of the Fund, including the use of leverage, short sales, futures, derivatives and options, involves significant risks. Moreover, the Manager may, at any time, maintain long or short positions involving substantially all of the Fund's assets in anticipation of an increase or decrease in the overall value of worldwide markets. In addition, the Fund has a limited history and the Operating Agreement contains limitations on withdrawals.

## Allocation of Profit and Loss

*hi water mark?*

Income of the Fund is allocated among the Members (including the Manager and its Principals) pro-rata and credited as follows:

i)    to the Members to whom losses are allocated in the amount of losses previously allocated to them, if any; then

ii)   eighty (80%) percent of the balance to the Members and twenty (20%) percent to the Manager.

Losses are allocated and debited to all Members pro-rata in accordance with their Investment Percentages.

Each Member's "Investment Percentage" will reflect the percentage of the Fund's aggregate Capital represented by that Member's Capital.

## Distributions

All distributions of income are at the full discretion of the Manager but, if and to the extent made, will be made pro-rata. Any income not distributed will be added to capital as of the first day of the next fiscal period and used to make additional investments.

Distributions to Members may take the form of cash or securities (accounted for at fair value). For purposes of such valuations, the Manager will develop and apply valuation principles (which it

31

may amend from time to time), and which will be reflected in the Fund's audited financial statements.

## Term

The Fund has a fifteen (15) year term ("Initial Term"). The Initial Term may be extended by the Manager for up to three (3) one (1) year periods after the completion of the Initial Term, if necessary, for orderly liquidation of investments. The Fund may also be terminated earlier than the completion of the Initial Term pursuant to the terms of the Agreement.

## Redemption or Withdrawal

Any Member may give thirty (30) days' notice in advance on a semi-annual basis that it wishes to withdraw capital. Said advance notice is also required to withdraw profits (in addition to those profits, if any, which the Manager determines to distribute in its discretion). If the Manager or any of the Principals desires to make a withdrawal of either capital or profits, sixty (60) days' notice shall be given to all Members.

Ordinarily, redemptions will be effected by a payment in cash or a distribution of assets equal to ninety (90%) percent of the amount being redeemed. The remaining ten (10%) percent will be paid or distributed within thirty-one (31) days of the next Fund audit. However, if the Manager determines that, in light of the amount of redemptions at any date or other factors it deems relevant in its sole discretion, such a schedule would materially, adversely affect the Fund, it may delay either or both payments by ninety (90) days each.

## Closings

Subscriptions for Interests may be accepted by the Manager at its sole discretion.

Pursuant to the Agreement, Members admitted after the Initial Closing will participate in investments of the Fund made prior to the date of their admission (but not income or loss accrued prior to such date). The book value of such investments will be adjusted to reflect appreciation or depreciation (or such other adjustment that the Manager may deem more appropriate) up to such date and the

newly admitted Member will participate only in appreciation or depreciation and other income or loss occurring after that date from such adjusted book value.

### Fees and Expenses

The Fund does not pay any annual Management Fee to the Manager. The Fund pays customary transaction expenses, including legal, accounting, investment banking, consulting, brokerage, finder's, custody, transfer, registration, and other similar fees and expenses and the fees and expenses of monitoring major investments, including payments for such services to Affiliates (collectively, "Transaction Expenses"). The Fund is also responsible for any extraordinary expenses, such as valuation expenses, litigation expenses and indemnification payments, the expenses of this and prior offerings up to a combined maximum of $50,000, and any underwriting fees or commissions due in connection with this and prior offerings, as described below. (SEE "CONFLICTS OF INTEREST AND OTHER ACTIVITIES OF THE MANAGER" BELOW)

### Expenses

The Manager is responsible for any expenses of all offerings on a cumulative basis that exceed $50,000, except underwriting fees and commissions, as described below, which is borne by the Fund. In addition, the Manager bears all of its normal operating expenses with respect to the administration of the Fund (including costs relating to rent, utilities, office, bookkeeping, preparation of reports, normal accounting, travel and compensation to officers and employees).

### Underwriting Fees and Commissions

There are no sales commission charges on sales of interests to Members. However, the Manager may make payments to third parties for introducing prospective Limited Partners to the Fund; provided, however, that (i) any such third parties must be subject to regulation by the NASD; and (ii) if the Fund makes any such payments, such payments will be charged solely against the capital account of the Manager.

### Borrowing by the Fund

33.

The Fund is allowed to borrow funds, leverage positions and sell short and intends to do so aggressively, given the nature of its investment activities.

### Conflicts of Interest and Other Activities of the Manager

Inherent conflicts of interest arise from the fact that the Manager acts on behalf of the Fund and carries on investment activities (in which the Fund has no interest) for other clients, including individual or institutional discretionary accounts, as well as for Principals or Affiliates of the Manager. Furthermore, Principals or Affiliates of the Manager own and operate a broker/dealer which is the Fund's primary broker.

The Manager or its Principals may organize additional funds or are managing accounts with the same business objective as this Fund. Any such other activity competes with the Fund for investments as well as for the time and attention of the Manager and its Principals.

The Manager, its Principals and other affiliates and associates engage in investment activities unrelated to or apart from the activities relating to the Fund, as well as owning and operating a brokerage firm.

Furthermore, since Principals or affiliates of the Manager own and operate a brokerage firm that the Fund utilizes as its primary broker in executing trades on behalf of the Fund and said Principals are entitled to receive commissions on said trades that may not be at the best possible rates otherwise available to the Fund.

### Auditors and Accountants

Richmond-Fairfield, CPAs

### Reports to Members

The Fund has elected a calendar fiscal year. Within ninety (90) days after the end of each year during the Fund's Term, the Fund will distribute tax information to the Members. In addition, the Fund distributes unaudited summary financial information to its Members on a quarterly basis, and on an annual basis distributes

34

audited financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). In connection with the quarterly or annual reports, it is anticipated that a management letter will be sent to the Members describing important events that occurred since the last report.

## Indemnification

The Manager and its Members, directors, officers, employees, members, controlling persons, and agents are not liable to the Fund or any Member for any act or omission performed or omitted except for any liability resulting directly from such party's gross negligence or willful misfeasance. The Manager and its directors, officers, employees, members, controlling persons and agents are indemnified by the Fund (but not the Members individually) for any loss, damage, liability or expense arising from or in connection with activities of the Fund unless resulting directly from such party's gross negligence or wilful malfeasance.

## Transferability of Interests

Interests are not assignable or transferable, except by operation of law.

3S

## *Samuel Israel III*

| | |
|---|---|
| **1995 – Present** | **Bayou Fund, LLC**. - A partnership managed as a domestic hedge/trading fund. **Bayou Management, LLC** - manager of the **Bayou Fund**, and separately managed accounts |
| **1993 – 1994** | **Omega Advisors - Head Trader** <br> Managed assets exceeding 2 billion dollars for Leon Cooperman. Responsible for all equity and financial futures execution for the firm; shared responsibility for hedging the portfolio with financial futures. General Partner of Omega Advisors in January 1994. |
| **3/91 - 12/92** | **HMR Investors, L.P.** - **Special Limited Partner** <br> a $60m hedge fund managed by James G. Marquez. Responsible for the fund's short-term trading. From June 1992 to December 1992 I operated as a private investor, as well as continuing short term trading for HMR Investors, L.P. |
| **6/90 - 3/91** | **AGA Associates** <br> a money management division of Gruntal & Co., with assets of $100 million. Supervised the firm's equity division and traded both equities and financial futures. |
| **10/89 - 5/90** | **Gerard Klauer Mattison Inc. – Vice President** <br> Supervised the firm's trading accounts. |
| **1/89 - 10/89** | **Midwood Securities – Managing Director** <br> a brokerage concern. |
| **12/82 - 12/88** | **F. J. Graber & Co., Inc.** <br> a New York Stock Exchange member organization and money management firm geared toward high velocity trading employing highly leveraged techniques and significant portfolio turnover. Responsibilities included coordinating various compliance and regulatory matters related to the purchase and sale of securities and the maintenance of margin accounts. On January 1986 took on the extra sole responsibility for the firm's trading in options and futures on a risk as well as hedged basis. Became a limited partner in January 1987 and undertook the additional responsibility of trading equity securities for the firm. |
| **Education** | **B.A. Tulane University  1982** <br> **Hackley Preparatory School  1978** |

86

## *James G. Marquez*

| | |
|---|---|
| **1995 - Present** | **Bayou Fund, LLC.** – A partnership managed as a domestic hedge/trading fund. **Bayou Management, LLC.** – manager of the **Bayou Fund** and separately managed discretionary accounts. |
| **1991 – 1995** | **HMR Investors, L.P., - General Partner,** a $60m domestic hedge fund **JGM Management Co., Inc. – President,** Manager of separately managed discretionary accounts. |
| **2/89 – 6/90** | **Steinhardt Partners, General Partner** Responsible for 25% of consolidated partnership assets in a hedge fund using long and short equity positions bonds, commodities and currencies. |
| **10/84 – 2/89** | **Private Investor** courtesy of Graber & Co., a firm associated with Weiss, Peck, and Greer, New York. |
| **1/83 – 9/84** | **Soros Fund Management, Executive Vice President** Domestic Equity Manager, Co-International Equity Manager and Portfolio Risk Manager for the Quantum Fund. |
| **4/80 – 12/82** | **Investors Diversified Services, Portfolio Manager of the Progressive Fund** a capital appreciation objective mutual fund. |
| **7/74 – 3/80** | **Citibank, N.A. New York, Portfolio Manager** (Private Banking Division) Managed both growth and income funds. Duties also included policy/strategy oversight for the division as well as the entire Investment Management Group. (I.M.C.) |
| **Education** | **B.A. University of Texas 1971**    English **M.B.A. Tulane University 1974**    Finance, Accounting Chartered Financial Analyst (C.F.A.) 1977 |



## Bayou Fund  LLC  -  Performance   - 1999

| Month | Performance | Quarter To Date | Year To Date |
|---|---|---|---|
| January | 1.0% | | 1.0% |
| February | 1.8% | | 2.818% |
| March | 3.4% | 6.314% | 6.314% |
| April | 6.2% | | 12.91% |
| May | 3.5% | | 16.85% |
| June | 2.31% | 12.456% | 19.56% |
| July | 0.08% | | 20.51% |
| August | 2.81% | | 23.89% |
| September | 2.1% | 5.808% | 26.50% |
| October | | | |
| November | | | |
| December | | | |

### Prior Performance

| 1997 | 40.92% |
|---|---|
| 1998 | 22.047% |

PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS



Bayou Fund LLC
Rate of Return by Month

Monthly Returns

ROR  SP 500 Index

000114



**_BAYOU FUND LLC    40 Signal Road Stamford CT. 06902  (T) 203.324.0333  (F) 203.316.8820_**

**Samuel Israel III**
**James G. Marquez**

# Synopsis of Fund



Bayou Management LLC
Bayou Fund LLC
Bayou Securities LLC

40 Signal Road, Stamford, CT 06902       Sam Israel III
(T) 203-324-0333 (F) 203-316-8820
E-Mail - SamIsrael@bayougroup.com

40



**_BAYOU FUND LLC    40 Signal Road Stamford CT. 06902  (T) 203.324.0333  (F) 203.316.8820_**

Index:

Pages 1 to 11:      Synopsis Of Fund

Pages 12 to 15:     Resumes

Pages 16 & 17:    Performance Sheets – 1997 & 1998

## BAYOU FUND, L.L.C.

### DESCRIPTION

The Fund
: Bayou Fund, L.L.C.
a New York limited liability company
(the "Fund")

The Fund is not registered as an investment company under the Investment Company Act of 1940, as amended (the "1940 Act"), and therefore is not required to adhere to certain investment policies under the 1940 Act. The Manager does not presently intend to, but may in the future, register as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), or any state statute. The Manager is registered with the Commodities Futures Trading Commission ("CFTC") and the National Futures Association ("NFA") as a "commodity pool operator" and as a "commodity trading advisor" as those terms are defined by the Commodity Exchange Act, and acts in both such capacities with respect to the Fund.

Offering Period
: The offering of the interests began in February, 1996 and is extended until December 31, 1999 ("Offering Period").

The Offering
: Maximum Aggregate Capital Commitments

$25 million

Minimum Aggregate Capital Commitments

$5 million

The Fund is seeking a maximum of $25 million in Capital Commitments through the sale of Interests in the Fund. The

**BAYOU FUND, L.L.C.**

Principals (defined below) of the Manager have made aggregate Capital Commitments of at least $200,000.

The minimum subscription to the Fund is $100,000. However, the Manager may accept subscriptions in lesser amounts (but in no event less than $25,000) from Investors who the Manager believes can provide business opportunities or other advantages to the Fund.

Subscriptions may be accepted or rejected by the Manager in its sole and absolute discretion.

*Capital Commitments*

Initial Members were required to make their Capital Contributions in full in cash or in immediately available funds upon fourteen (14) days prior notice of closing. All other Members will be required to make their Capital Contributions in full in cash or immediately available funds upon notice of acceptance of their subscription by the Manager.



The Manager or its Principals have invested not less than $200,000 in the Fund initially, and intend to maintain a minimum investment in the Fund of the lesser of $150,000 (or, if greater, one percent (1%) of the net assets of the Fund) or fifteen percent (15%) of the Fund's net assets. All capital contributions received by the Fund will be received in the Fund's name.

*Portfolio Investments*

The Fund's primary investment objective is to realize capital appreciation while seeking to control risk. There can be no assurance that such objective will be achieved and investment results

- 2 -

**BAYOU FUND, L.L.C.**

*[handwritten: "No form of mutual fund in the early days"]*

*[handwritten: "Cut off parameters at 86% of max. gross."]*

may vary substantially on a monthly and annual basis.

The Fund utilizes artificial intelligence through proprietary software programs to identify technical patterns. These patterns are mathematically analyzed in an attempt to position the Fund on the "correct" side of the market. The Fund trades both long term and short term opportunities in a global matrix using all financial instruments, indices, securities, commodities and all derivatives thereof. When deemed appropriate by the Manager, the Fund also invests in bonds or other fixed income securities. Additionally, the Fund, when it is deemed appropriate by the Manager, utilizes leverage, short sales, options, and futures and forward contracts (and options thereon) relating to stock indices, financial instruments and other commodities and other securities, both as independent profit opportunities and to hedge existing long and short positions. While the Fund's trading orientation results in significant open positions on an intra-day basis, the Fund will attempt, to the extent possible given market conditions, to end each trading day with a substantial portion of its portfolio hedged.

*[handwritten: "N$^D$"]*

Portfolio Valuation        The Fund's assets will be valued at least annually by the Manager. The valuations will be subject to audit by the Fund's independent auditor.

*[handwritten: "1992 '93"]*

Manager        Bayou Management LLC (formerly Concorde Asset Management, Inc. is the Manager of the Fund and, as such, is primarily

*[handwritten: "SAM's initial mgmt. co. That folded into Bayou."]*

*[handwritten: "HMR used. Concord"]*

- 3 -

*[handwritten: "44-"]*

## BAYOU FUND, L.L.C.

responsible for the management of the Fund.

**Investors**

Investors in the Fund must be Accredited Investors, Qualified Eligible Participants and must meet other suitability requirements. The Manager, in its discretion, may decline to admit any investor.

**Investment Decisions by the Fund**

The Manager has the exclusive right to make investment decisions on behalf of the Fund, including decisions as to terms, conditions, valuation, type of security and co-investment with others. Further, the Manager has the sole right to determine when, and under what terms, the Fund will sell or realize gains or losses on an investment, including decisions as to type of sale, conversion to other securities, and exercise of warrants and/or options.

The Fund is a trader and investor, but not a dealer, in securities and commodities futures, for U.S. income tax purposes. However, the Internal Revenue Service may challenge this position. The consequences of a successful challenge by the IRS could be substantial, depending on the facts and the nature of the Member. Each prospective Member should consult his tax advisor in that regard, as well as all other tax issues relating to an investment in the Fund.

If and when portfolio transactions for the Fund are executed by brokers (other than a broker affiliated with, or related to, the Manager or its Principals) such other brokers will be

- 4 -

45

# BAYOU FUND, L.L.C.

selected on the basis of best execution and in consideration of such brokers' provision or payment of the costs of research and other services, including rent, which are of benefit to the Fund, the Management Company and its affiliates and the Affiliated Accounts. However, such services may not be directly related to any transactions for the benefit of the Fund.

In view of the fact that the Fund's investment program emphasizes achieving profits from short-term trading, the turnover of the Fund's portfolio is substantially greater than the turnover rates of other types of investment vehicles and, therefore, results in greater commission costs and lower profits or greater losses than might otherwise be the case.

The investment program of the Fund, including the use of leverage, short sales, futures, derivatives and options, involves significant risks. Moreover, the Manager may, at any time, maintain long or short positions involving substantially all of the Fund's assets in anticipation of an increase or decrease in the overall value of worldwide markets. In addition, the Fund has a limited history and the Operating Agreement contains limitations on withdrawals.

*Allocation of Profit and Loss*

Income of the Fund is allocated among the Members (including the Manager and its Principals) pro-rata and credited as follows:

i)    to the Members to whom losses are allocated in the amount of losses

- 5 -

46

BAYOU FUND, L.L.C.

previously allocated to them, if any; then

ii)    eighty (80%) percent of the balance to the Members and twenty (20%) percent to the Manager.

Losses are allocated and debited to all Members pro-rata in accordance with their Investment Percentages.

Each Member's "Investment Percentage" will reflect the percentage of the Fund's aggregate Capital represented by that Member's Capital.

**Distributions**

All distributions of income are at the full discretion of the Manager but, if and to the extent made, will be made pro-rata.  Any income not distributed will be added to capital as of the first day of the next fiscal period and used to make additional investments.

Distributions to Members may take the form of cash or securities (accounted for at fair value).  For purposes of such valuations, the Manager will develop and apply valuation principles (which it may amend from time to time), and which will be reflected in the Fund's audited financial statements.

**Term**

The Fund has a fifteen (15) year term ("Initial Term").  The Initial Term may be extended by the Manager for up to three (3) one (1) year periods after the completion of the Initial Term, if necessary, for orderly liquidation of investments.  The Fund may also be terminated earlier than the completion

- 6 -

47

**BAYOU FUND, L.L.C.**

|  | of the Initial Term pursuant to the terms of the Agreement. |
|---|---|
| *Redemption or Withdrawal* | Any Member may give thirty (30) days' notice in advance on a semi-annual basis that it wishes to withdraw capital. Said advance notice is also required to withdraw profits (in addition to those profits, if any, which the Manager determines to distribute in its discretion). If the Manager or any of the Principals desires to make a withdrawal of either capital or profits, sixty (60) days' notice shall be given to all Members.

Ordinarily, redemptions will be effected by a payment in cash or a distribution of assets equal to ninety (90%) percent of the amount being redeemed. The remaining ten (10%) percent will be paid or distributed within thirty-one (31) days of the next Fund audit. However, if the Manager determines that, in light of the amount of redemptions at any date or other factors it deems relevant in its sole discretion, such a schedule would materially, adversely affect the Fund, it may delay either or both payments by ninety (90) days each. |
| *Closings* | Subscriptions for Interests may be accepted by the Manager at its sole discretion.

Pursuant to the Agreement, Members admitted after the Initial Closing will participate in investments of the Fund made prior to the date of their admission (but not income or loss accrued prior to such date). The book value of such investments will be |

- 7 -

48

BAYOU FUND, L.L.C.

adjusted to reflect appreciation or depreciation (or such other adjustment that the Manager may deem more appropriate) up to such date and the newly admitted Member will participate only in appreciation or depreciation and other income or loss occurring after that date from such adjusted book value.

*Fees and Expenses*

The Fund does not pay any annual Management Fee to the Manager. The Fund pays customary transaction expenses, including legal, accounting, investment banking, consulting, brokerage, finder's, custody, transfer, registration, and other similar fees and expenses and the fees and expenses of monitoring major investments, including payments for such services to Affiliates (collectively, "Transaction Expenses"). The Fund is also responsible for any extraordinary expenses, such as valuation expenses, litigation expenses and indemnification payments, the expenses of this and prior offerings up to a combined maximum of $50,000, and any underwriting fees or commissions due in connection with this and prior offerings, as described below. (SEE "CONFLICTS OF INTEREST AND OTHER ACTIVITIES OF THE MANAGER" BELOW)

*Expenses*

The Manager is responsible for any expenses of all offerings on a cumulative basis that exceed $50,000, except underwriting fees and commissions, as described below, which is borne by the Fund. In addition, the Manager bears all of its normal operating expenses with respect to the

- 8 -

49