Bradley D. Simon (BS 3406)
Brian D. Waller (BW 7163)
Jeremy M. Weintraub (JW 4483)
SIMON & PARTNERS LLP
30 Rockefeller Plaza, 42nd Floor
New York, New York 10112
(212) 332-8900

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA          :

                          v.          :          06-cr-1138

JAMES MARQUEZ                          :          (J. McMahon)

-------------------------------------------------------X

**<u>Sentencing Memorandum on Behalf of James G. Marquez</u>**

## TABLE OF CONTENTS

Introduction ................................................................................................- 1 -

I.    The Applicable Sentencing Standard pursuant to 18 U.S.C. § 3553(a) .......- 3 -

II.    Jim's Personal and Professional History ...................................- 5 -

    Education and Career .........................................................................- 5 -

III.    Role in the Offense ...........................................................................- 8 -

    Sam Israel Founds Bayou and Recruits Jim as His Portfolio Manager .................- 8 -

    Despite Good Intentions, the Bayou Funds Suffer Substantial Losses.................- 10 -

    Jim's Separation from Israel, Marino, and Bayou ...............................- 12 -

    Though Accepting Responsibility for his Acts, Jim Played a Minor
    Role in the Bayou Fraud as Compared to Israel and Marino................- 14 -

    A Solution to Recoup Investor Losses...............................................- 17 -

    Jim's Failure to Notify the Authorities ...............................................- 18 -

    Jim's Admission of Wrongdoing and Expression of Genuine Remorse .............- 19 -

IV.    Jim's History of Serious Mental Illness ...................................- 20 -

V.    Jim's Contributions to Society:  the "Instant Volunteer"...........- 27 -

VI.    Jim's Devotion to His Family and His Faith ...........................- 32 -

VII.    The Sentencing Guidelines ........................................................- 34 -

VIII.    Applicablility of Abuse of Trust Enhancement....................- 35 -

IX.    The Court Should Grant a Downward Departure From
    the Applicable Guideline Range ...................................................- 38 -

    A.    Jim's Bipolar Disorder Warrants a Downward Departure............................- 38 -

    B.    Jim's Participation in the Bayou Fraud Was Clearly Aberrant Conduct ......- 40 -

X.    Attempts at Cooperation .............................................................- 43 -

i

Offer of Cooperation .................................................................................- 43 -

Jim Could Not Cooperate Against Israel and Marino Because They Were Arrested
First ...........................................................................................................- 43 -

**XI.  A Non-Incarceratory Sentence Would Satisfy the
      Requirements of Section 3553(a)(2)** .............................................- 44 -

A.    The Seriousness of the Offense .....................................................- 45 -

B.    A Non-Incarceratory Sentence Will Adequately Deter Future Criminal Conduct
and Promote Respect For the Law .........................................................- 47 -

C.    Jim Marquez Poses No Threat To Society ..................................- 48 -

**Conclusion** ...........................................................................................- 49 -

Defendant James Marquez, through his counsel, respectfully submits this memorandum in aid of sentencing. The objective of this memorandum is to provide additional information about Mr. Marquez's personal background, which we respectfully urge the Court to consider in imposing a just and appropriate sentence.

## Introduction

Prior to the instant offense, James ("Jim") Marquez led a law-abiding and exemplary life for more than 50 years. Despite his present misdeeds, Jim is a good and decent person, a loving father and devoted friend, and a man who has accepted responsibility and is genuinely remorseful for his actions. We beg this honorable Court to impose a fair and just sentence, one that renders justice with mercy and is based upon an evaluation of Jim's life as a whole and not just his criminal conduct.

Born and raised in New Orleans, Jim soared to the top of the Wall Street ladder, at one point becoming George Soros's right-hand man. Eventually, however, when Jim attempted to manage his own investment fund, his string of professional successes ended. Jim's fund failed and his investor clients lost money, causing Jim to shutter the fund. Personal misfortune followed. His wife divorced him and the mental illness that first struck him in college intensified. At this low point, Jim accepted an invitation from Samuel Israel, a former employee, to become the portfolio manager for Israel's new hedge fund. Lacking any demonstrated track record of successful investing, Israel wanted to use the "Jim Marquez" name to attract investors. When Israel's fund suffered losses, and as Jim struggled with divorce, mental illness, and the tarnish to his hard-earned reputation as a successful portfolio manager, Jim joined with Israel and Daniel Marino, the hedge fund's Chief Financial Officer, to hide those losses from investors.

The intent was to shift the losses from 1998 into 1999, allowing time for the losses to be recouped through profitable trading. ("Suicide" Note of Daniel Marino, attached as Ex. 1.) Trading profits in 1999 did not resolve the problem and by 2000, the losses hidden from investors amounted to about six million dollars. (Presentence Investigation Report ("PSR") at ¶ 24.) At that time, Jim separated from Bayou and proposed a solution to recoup the investors' losses. After Jim left, Israel and Marino not only continued to engage in deception but exponentially expanded its scope such that the losses multiplied from six million dollars to more than three hundred and fifty million dollars. Unlike Israel and Marino, Jim never siphoned money to line his pockets. For example, Israel paid $32,000 a month to rent a mansion in Westchester owned by Donald Trump. Marino purchased a $3 million home, where he parked his Ferrari, Bentley, and Audi. (Katherine Burton & Rob Urban, *Bayou Fraud Exposes Tale of Lies, Drugs, Violence*, Oct. 27, 2005, attached as Ex. 2; Gretchen Morgenson et al., *What Really Happened at Bayou: A 'Suicide Note' Reveals Details of a Hedge Fund Shuffle*, N.Y. Times, Sept. 17, 2005, at C1, attached as Ex. 3.) Jim, on the other hand, did not profit from the conspiracy. In fact, Jim specifically tried to make good on the investor losses by offering Israel and Marino an opportunity for the hedge fund to invest in KFx, a start-up company that Jim was familiar with and which Jim correctly forecast would become a very successful company.

The staggering losses and the misappropriation of investment funds took place after Jim had made a clean break from Israel, Marino, and their various hedge funds. Relative to Israel and Marino, Jim's participation was minimal.

Throughout the tumult in his professional life, Jim has remained devoted to his wife, their children, and community service. Jim's volunteer activities include service to his children's school, his church, and rebuilding his hometown, New Orleans, from the devastation of Hurricane Katrina. Jim continues his commitment to environmentally friendly energy resources, providing invaluable assistance to numerous start-up ventures focused upon clean energy technology.

We submit this memorandum in an attempt to show this Court a true and complete picture of Jim Marquez. Jim's involvement with Israel and Marino is an aberration in a life otherwise defined by hard work, integrity, concern for and generosity toward others, and devotion to family, friends, church, education, and the environment. To know him is to recognize that he deeply regrets his actions, is ashamed to have placed his family in a position where they are struggling financially and may lose him to prison, and poses no risk of future criminal conduct.

On the unique facts of this case and the unique contributions of this man, we believe that under 18 U.S.C. § 3553, a non-Guidelines sentence is warranted. Such a sentence would appropriately render justice with mercy.

I.    __The Applicable Sentencing Standard pursuant to 18 U.S.C. § 3553(a)__

In the wake of *United States v. Booker*, 543 U.S. 220 (2005), the Second Circuit set forth guidance in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), instructing this Court on how to proceed to sentence. Honorable Judge Newman explained that although the Guidelines are no longer mandatory, sentencing judges must still "consider"

the guidelines along with the factors listed in 18 U.S.C. § 3553(a).  *Crosby*, 397 F.3d at 107.

The statute 18 U.S.C. § 3553(a)(1) compels the broader consideration of the history and characteristics of the defendant.  (*See, e.g.*, U.S.S.G. §§ 5H1.1, 5H1.3, 5H1.5, 5H1.11.)  Pre *Booker*, these factors were severely limited to the criminal history category. Today, however, with the guidelines being advisory, consideration of the defendant's (a) age, (b) education and vocational skills, (c) mental and emotional condition, (d) physical condition including drug or alcohol dependence, (e) employment record, (f) family ties and responsibilities, (g) socioeconomic status, (h) civic contributions, and (i) reputation in the community are to be heavily weighed in imposing sentence.

In addition, 18 U.S.C. § 3661 provides that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence."

Once the applicable guideline range has been determined, the sentencing court should "consider" it along with all of the factors listed in § 3553(a).  However, no Circuit Court has given specific guidance as to what weight should be given to the advisory guideline range or the factors enumerated under § 3553(a).  It appears to be up to the court's discretion to determine what is reasonable under the circumstances of each case. More simply put, the sentencing judge is entitled to find all the facts appropriate for determining either a guideline sentence or a non-guideline sentence.

Jim worked hard to develop what was once an illustrious Wall Street career.  But Jim's career has been mostly a roller coaster of initial successes followed by

disappointing failures. These failures were particularly difficult for Jim because they were compounded by a pervasive and ever-worsening history of mental illness. Regardless of his business successes and failures, however, Jim consistently conducted himself as a man of integrity and good moral judgment who lived a law-abiding life for more than fifty years.

Numerous people have submitted letters to the Court attesting to Jim's undeniable decency, work ethic, and devotion to his family and the environment. It is undeniable that Jim is also a devoted and loving father to two young children. The letters further highlight Jim's volunteer activities ranging from teaching English to non-native speakers to traveling to New Orleans and personally participating in rebuilding homes wrecked by Hurricane Katrina. Jim has also freely shared his expertise in assisting start-up companies in the field of environmentally friendly energy sources. Those who have submitted letters comprise a comprehensive cross-section of people who know Jim well and whose lives have been touched by Jim's generosity, selflessness and kindness. We respectfully urge the Court to carefully consider these letters when formulating its sentence.

**II.**     **Jim's Personal and Professional History**

Education and Career

Jim grew up in New Orleans, Louisiana where he lived with his parents and two older brothers. The family lived a comfortable, middle-class lifestyle. Following graduation from high school, Jim planned to attend the University of Virginia but at the last minute, he impulsively enrolled at the University of Texas at Austin. (August 15,

2006 Psychiatric Evaluation by Justin O. Schechter, M.D., F.A.P.A., attached as Ex. 4, at p. 5.)  He graduated in 1971 with a B.A. in English.  (PSR at ¶ 69.)  At around this time, he was also married to his first wife Sandra, with whom he later had two sons, Russell and Webster, now grown.

After graduating, Jim initially decided to pursue a legal career and enrolled in law school at Louisiana State University.  (Ex. 4 at p. 5.)  He attended for only six weeks before switching his career focus to business.  (*Id.*)  Jim enrolled in the MBA program at Tulane University's Freeman School of Business, graduating in 1974.  (PSR at ¶ 68.)

After business school, Jim moved to Manhattan where he obtained a job as a portfolio manager in the Investment Management Group of Citibank, N.A.  His initial salary was a modest $16,000.  (PSR at ¶ 83.)  Jim stayed with Citibank until 1980, slowly earning raises, promotions and the respect of his bosses and peers.

In 1980, Jim found a new job as a mutual fund investment advisor for Investors Diversified Services, Inc. ("IDS").  (PSR at ¶ 82.)  John Burns, the President of Alleghany Corporation, which owned IDS, and whose father was the first General Counsel for the S.E.C., was immediately impressed by Jim's intelligence and integrity and writes:

> I had numerous chances to meet with Jim, having dinner, etc. and discussing investment matters of all kinds.  As COO of a large parent company, it was unusual for me to get to know an employee several layers of management below me.  I got to like and respect Jim for his openness, character and indeed brilliance . . . Jim did a great job for us, but was enticed away by a newly formed and prominent hedge fund.  We missed Jim very much and never were able to replace him.  What I respected deeply was Jim's integrity and professionalism.

(See letter of John Burns, annexed as Ex. 5.)[1]

In 1983 Jim was blessed with a new opportunity.  He was offered a job as an executive vice-president at Soros Investment Management where he later became a top aide to George Soros.  (PSR at ¶ 81.)  George Soros is uniformly regarded as one of the most successful and influential investors in the history of Wall Street and for a time, Jim managed the Quantum Fund for Soros, which was one of the very first successful hedge funds.  From his modest entry level salary of $16,000 during his early years in the finance arena, Jim had earned his way to the pinnacle of his profession as Soros's top portfolio manager.

In 1989, Jim accepted a position with Steinhardt Management where he worked directly with Michael Steinhardt, another of Wall Street's legendary investors.  (PSR at ¶ 79.)[2]

Then, in 1991, after having worked for two of Wall Street's biggest performers and having earned a considerable name in the investment industry, Jim set out on his own and established JGM Management, Inc. and HMR Investors, L.P.  (PSR at ¶ 75.)  At JGM, Jim hired both Sam Israel and Daniel Marino to work for him.  His ventures were ultimately failures, however, and his life soon began to fall apart.  Over the next few years, Jim's investment fund suffered substantial losses, some years losing 25% - 40%. Amid the losses, Israel and Marino quit.  (Ex. 2.)  In 1995 Jim shut down JGM and closed HMR to outside investors, eventually transforming HMR into a consulting business.  Jim

---

[1]  Many of Jim's family members, friends, and colleagues have submitted letters of support.  Not every letter has been excerpted or specifically referenced herein.  Additional letters of support not cited within this memorandum are attached as Exhibits 36 – 47.

[2]  In 1967, Steinhardt co-founded a hedge fund called Steinhardt, Fine, Berkowitz & Co.  In 1979, Fine and Berkowitz left and Steinhardt renamed the company Steinhardt Partners.  Over a 28-year period, Steinhardt's hedge fund averaged a spectacular 24.5% annual return.

readily acknowledged his large losses to his investors even though he knew it would

tarnish his hard-earned reputation as a successful portfolio manager.  Not once did Jim

try to hide the losses or avoid accepting responsibility for what turned out to be poor

investment decisions.  It was also during this time that Jim began to experience marital

difficulties.  He and his wife divorced in 1993.  (PSR at ¶ 55.)

A ray of hope during these dark years for Jim was Mariella Passante, who he

married in 1994.  (PSR at ¶ 56.)  They were partners both in work and marriage.  Mariella

was initially an employee of HMR but she eventually became Jim's equal partner in the

business.  (PSR at ¶ 75.)

By 1995, Jim's career had bottomed out, having gone from earning huge

investment returns for clients while working for Soros and Steinhardt to the closure of

JGM because of substantial losses and investment failures.  The personal and financial

failures in Jim's life were greatly compounded by his suffering from serious mental

illness (discussed in detail below).

## III.    Role in the Offense

### Sam Israel Founds Bayou and Recruits Jim as His Portfolio Manager

Unfortunately for Jim, the failures of JGM and HMR and his worsening mental

illness left him vulnerable and feeling that his career as a successful portfolio manager

may have come to an end.  In late 1995, Israel approached Jim concerning a new hedge

fund that Israel called the Bayou Fund.  (Ex. 4 at p. 2; Defendant's Objections to PSR

dated July 23, 2007, attached as Ex. 6, at p. 2.)  Israel founded "Bayou Fund Limited"

and "Bayou Fund, LLC," collectively the "Bayou Funds."[3]  Jim played no role in the

actual formation of the Bayou Funds and contributed no partnership capital.  Jim had no

status as an owner, partner, or member of the Bayou Funds.  Israel's name, not Jim's,

appeared on the founding documents and Israel actively recruited Jim, his former

employer, to now work for him in the role of portfolio manager for the Bayou Funds.

      Israel needed a portfolio manager with the solid credentials and reputation that he

lacked, and Jim, the former protégé of Soros and Steinhardt, fit the bill perfectly.

Although Israel came from a wealthy New Orleans family, he lacked the

accomplishments of his father and grandfather.  His grandfather and father ran a

commodities trading firm until 1981, when they sold the business for $44 million.  Sam

Israel, though, never even finished college.  Israel spent almost a decade bouncing around

between various small Wall Street firms, a run that ended at Gruntal & Co.  At Gruntal,

Israel made a trade that resulted in a sizeable loss and thereafter just stopped showing up

for work.  Israel then landed his short stint with JGM, after which he ended up at Omega

Advisors Inc., where he worked as an order taker, without any trading authority.  There,

Israel did not pick stocks or have any portfolio management responsibilities.  (Ex. 2.)  To

attract investors to the Bayou funds, Israel knew he needed a well-known and well-

respected portfolio manager – in short, someone like Jim Marquez.

      Jim accepted Israel's offer to work as a portfolio manager, but played no active

role in soliciting investors.  (Ex. 6 at p. 2.)  Israel also hired Marino as the Chief Financial

---

[3]  Although this memorandum refers to the Bayou Fund Limited and the Bayou Fund, LLC as the Bayou Funds, after Jim left Bayou, Israel and Marino closed those two funds in December 2002 and replaced them with four new funds in January 2003.  Those four new funds are also referred to herein as the Bayou Funds. Thus, prior to January 2003, Bayou Funds refers to two hedge funds founded by Israel that were closed in December 2002.  From January 2003 forward, Bayou Funds refers to four new hedge funds founded by Israel.

Officer for Bayou.  Israel opened the Bayou Funds with approximately $1.3 million in

capital.  (PSR at ¶ 18.)  Israel actively solicited additional investment funds and had no

hesitation in touting Marquez, Soros's former protégé, to potential investors.


Despite Good Intentions, the Bayou Funds Suffer Substantial Losses

The Bayou Funds were founded and initially operated as legitimate hedge funds.

Their purpose was to make money for sophisticated investors, as well as profits for

Bayou.  Believing that the Bayou Funds would be profitable, Jim invested $200,000 from

his family trust account with Bayou.

Unfortunately, the Bayou Funds began to suffer losses.  Rather than stick the

investors with these losses, however, Marino persuaded Grant Thornton, the Bayou

Funds' accounting firm, that commissions earned by Bayou Securities for trades executed

on behalf of the Bayou Funds could be rebated back to the funds.  (Ex. 1 at p. 1.)  Bayou

Securities was a separate entity from the Bayou Funds, but also operated under Israel's

command.  The Bayou Funds executed its trades through Bayou Securities, as well as

other third-party brokers.  The fees charged by Bayou Securities were fair and customary

by industry standards.  (Ex. 6 at p. 2.)  Although the Bayou Funds had authority to trade

with Bayou Securities, which was fully disclosed in documents provided to prospective

investors, Marino convinced Grant Thornton that the precise amount of rebated

commissions did not need to be disclosed in any detail.  (Ex. 1 at p. 1.)

The rebate of commissions from Bayou Securities to the Bayou Funds generated

no financial benefits for Jim.  (Ex. 6 at p. 2.)  The rebates solely benefited investors while

reducing profits at Bayou Securities.  In other words, this action was taken for the

purpose of saving the clients' investments, as well as the company. Although the rebates could have been accompanied by greater disclosure, the decision to rebate commissions demonstrates that those in charge at Bayou were more concerned with investors' returns than personal gain – at least at that point in time.

Despite the rebating of commissions, the Bayou Funds continued to suffer losses. Toward the end of 1998, Israel, Marino, and Jim discussed the problem of continuing losses. Having experience with his own failed investment fund, Jim proposed closing down Bayou. Israel's response was that there was no way that he was going to shut <u>his</u> <u>fund</u>. Instead of closing Bayou, it was decided that the losses would be hidden from investors by replacing Grant Thornton with a fictitious accounting firm. The plan was not to steal from investors, but to temporarily hide the firm's true investment performance by pushing losses from 1998 into 1999. (Ex. 1 at p. 1.) Trading profits in 1999 would then hopefully restore those losses and result in real profits to investors.

Marino used his expertise in accounting, including his experience working as an auditor for Coopers & Lybrand LLP (Ex. 2), to carry out the fraud. Marino created a fictitious accounting firm, which replaced Grant Thornton as the auditors of Bayou's books. Marino even put his personal stamp upon the fictitious accounting firm by naming it "Richmond-Fairfield Associates," a name derived from Marino's commute from Staten Island in Richmond County, New York to Stamford in Fairfield County, Connecticut. Marino then performed the audits himself and sent investors audit confirmation letters on Richmond-Fairfield stationary. He created false financial statements and reports that were also sent to investors. (Ex. 1 at p. 2.) When investors

inquired about Bayou, Marino would talk with them, both over the phone and in person. (*Id.*)  Marino kept hidden from investors that he was a principal at Bayou.

Marino and his accounting expertise were the keys to executing the fraud. Without Marino, there would not have been the fictitious Richmond-Fairfield Associates and there would not have been anyone with the requisite accounting knowledge to create misleading audit confirmation letters and false financial statements or to handle inquiries from investors.

Although not spearheading the fraud like Israel or executing the necessary steps to deceive investors like Marino, Jim knew that investors were being deceived and that Richmond-Fairfield Associates was a sham.  In one instance, Jim signed a letter sent to investors that contained inaccurate information concerning the performance of the Bayou Funds.  Jim failed to blow the whistle; if he had, he would not be in his current predicament.  Instead of turning to the authorities, Jim focused his attention on new professional projects with an eye towards separating from Israel, Marino, and Bayou.

Jim's Separation from Israel, Marino, and Bayou

Jim's relationship with Israel and Marino rapidly declined as the Bayou Funds continued to suffer losses.  Although Israel and Marino still relied on Jim for picking stocks for the investment portfolio, they shut him out of all other aspects of Bayou, calling Jim crazy to anyone who would listen.  A former Bayou employee writes how Israel and Marino had already begun to exclude and hide information from Jim by 1998:

> During November 1998 this changed – one defining event
> stands out in my mind:  That month while at Bayou I was
> speaking with Sam Israel in his work area (Jim was away
> from the office) when Dan Marino entered with a package

of financial information pertaining to Bayou.  Sam's
immediate instruction to Marino was that Jim Marquez was
not to see the information.  When I looked somewhat
perplexed, Sam explained that "Marquez is not an owner or
partner of any of the Bayou entities and this is none of his
business."  Marino made several comments concurring with
Israel's statement.  Later the same week, I was working late
at the firm and struck up a conversation with the building
manager Tom Atkinson.  Atkinson indicated that he was
working on Bayou's commission runs and had been hired
by Israel for that and other tasks.  He also indicated
"Marquez is not to know" per instructions from Israel.

(Letter from David Hayslip, attached as Ex. 7.)

The deception and lies by Israel and Marino to Jim took place because Israel and

Marino knew that Jim did not want to be part of deceiving investors.  In reaction to the

losses, Jim had proposed closing Bayou as he had done only a few years earlier with his

own investment fund.  Since Israel and Marino refused to close Bayou, they knew that

they needed to remove Jim from any involvement with Bayou.

In August 2000, the situation came to a head and Jim had a falling out with Israel

and Marino that resulted in Jim's firing, which was the final straw in Jim's emotional and

professional downward spiral.  Jim's wife, Mariella, describes the day he was fired:

I remember in August of 2000 Jimmy coming to me in
absolute panic.  He told me his ex-wife prevailed in her
lawsuit against him, we were flat broke and Sam Israel and
Dan Marino had fired him.  I asked how that could be
possible.  In disbelief, I went to see Sam Israel at his home.
He told me that Jimmy was "crazy" and "washed up."  Sam
said that he would not let Jimmy take down <u>his</u> firm the
way Jimmy had taken down his own.

(Letter from Mariella Marquez, attached as Ex. 8.)

Though he was officially fired, Jim continued to do some limited consulting for

Bayou but Jim had no involvement or connection to the day-to-day activities and

- 13 -

decisions of Bayou.  According to a former Bayou employee, in January 2001, a letter circulated internally at Bayou stating that Jim no longer had any involvement with the company.  (Letter from Paul Archinard, attached as Ex. 9.)

His ties to Bayou almost completely severed, by January 2001, Jim opened a small office at 27 Signal Road to further the development of a consulting business and his writing of institutional research.  (PSR at ¶ 23.)  Later that year, he hired two employees. Although his office was down the street from Bayou, then located at 40 Signal Road, there could have been an ocean separating Jim's one-room office from Bayou's sprawling offices overlooking the Long Island Sound.

The fact that Jim was completely separated from Bayou by this point is further confirmed by Karen Billings, who began as Bayou's bookkeeper in January 2001 and never saw Jim set foot in Bayou's offices and never even heard of him until July 2002, when she was introduced to Jim for the first time.  (Letter from Karen Billings, attached as Ex. 10.)

Documents provided by the government include a letter handwritten by Jim in the spring of 2001 where Jim describes the effect of him having moved to 27 Signal Road: "physical separation provides me no ability whatsoever to monitor ongoing enterprise activities, participate in decision-making, affect performance, [or] control expenditures." (James Marquez handwritten letter, attached as Ex. 11.)

Though Accepting Responsibility for his Acts, Jim Played a Minor Role in the Bayou Fraud as Compared to Israel and Marino

Jim has pled guilty to the Information charging him with criminal involvement in Bayou through October 10, 2001 although he had very minimal involvement with Bayou

from August 2000 through October 10, 2001.  Jim admits that for a brief period of time in 2001, he returned to the role of managing Bayou's investment portfolio in response to Marino's urgent request during a period when Israel was incapacitated due to back problems and a dependence upon painkillers.  Apart from that short stint managing the investment portfolio during Israel's absence, Jim had no substantive involvement with Bayou following his termination by Israel in August 2000.  This lack of involvement is supported by documents disclosed by the government, including a letter handwritten by Jim in the spring of 2001 that discusses his "non-involvement [in Bayou] for the past 9 – 10 months."  (James Marquez handwritten letter, attached as Ex. 12.)

Regardless of the precise date that Jim was completely separated from Israel, Marino, and the Bayou fraud, two important conclusions follow.  First, the length of time that Jim participated in the wrongdoing at Bayou was relatively brief in comparison to Marino and Israel.  The creation of Richmond-Fairfield Associates did not occur until 1999.  By August of 2000, Jim no longer actively participated as Bayou's portfolio manager or in any other aspect of Bayou's management.  Not later than October 10, 2001, Jim had completely cut ties between himself and Bayou.  In stark contrast to Jim, Israel and Marino continued to perpetuate and greatly expand the fraud for many more years until Bayou's collapse in 2005.  In evaluating Jim's role in the offense, and determining an appropriate sentence, this fact cannot be overemphasized.

Second, although the size of investors' losses when Jim left Bayou were substantial (approximately $6 million), total investor losses of $350 - $450 million when the fraud was ultimately exposed resulted from the conduct of Israel and Marino in Jim's absence.  As of October 10, 2001, the latest date that Jim is alleged to have been involved

with Bayou, investors had contributed approximately $10 million to the Bayou Funds.

(PSR at ¶ 24.)  Earlier in the year, Jim, Israel, and Marino had estimated investor losses

from trading at $6 million.  (PSR at ¶ 24.)  After Jim separated from Israel, Marino, and

Bayou, the amount of investor contributions increased exponentially, from $10 million to

more than $450 million.  (PSR at ¶ 25.)   The increase from $6 million in losses and $10

million in investments to more than $350 million in losses and $450 million in

investments is completely and solely attributable to Israel and Marino.  These facts are

critical.  While the Bayou collapse was serious and investors were hurt, it is vital that

Jim's brief tenure and limited role vis-à-vis Israel and Marino is fully comprehended so

he is not lumped together with the crimes of Israel and Marino.  In determining an

appropriate sentence, Jim's role in the offense must be placed in some perspective.

    In addition to Israel and Marino carrying out the deception for many more years

than Jim, transforming a $6 million loss to a loss of $350 - $450 million, Jim's role in the

fraud was substantially less significant compared to that of Israel and Marino, even

during the period when Jim was still with Bayou.  For example, Israel took the lead in

recruiting new investors and misrepresenting performance numbers in order to recruit

them.  Marino took the lead in forming the fictitious accounting firm and in preparing

documents that misrepresented investment returns and transmitting those documents to

Bayou clients.  On the other hand, Jim mostly continued his work as portfolio manager

trying to earn money for the funds' investors and had little role in carrying out the fraud.

(Ex. 6 at p. 3; Objections to PSR set forth in letter from Stanley A. Twardy to Johnny

Kim dated February 23, 2007, attached as Ex. 13, at pp. 1 – 2.)

A Solution to Recoup Investor Losses

Even after it was apparent that Jim no longer had any involvement with Bayou's operations, Jim continued to feel responsible for recouping investors' losses and was determined to make them whole. He proposed a solution to Israel and Marino that involved KFx stock. A start-up company focused upon clean energy resources, KFx had retained HMR to assist it with raising money. Jim had closed HMR to outside investors in 1995, but HMR continued as a viable business and provided consulting services. Although in need of capital, KFx was positioned for growth based upon its superior technology, the expanding and sizable market that it targeted, and a surge in recent orders from large energy companies. Jim offered to Israel and Marino the opportunity for Bayou to invest in KFx as a means to recoup losses for its investors. (Ex. 12.) In July 2001, Bayou chose to purchase one million shares for a total purchase price of $3.65 million. Jim had correctly forecast KFx's success, which led to the stock greatly increasing in value. In 2003 or 2004, Israel and Marino directed the sale of the one million shares of KFx stock at an average of $16 per share for a total of $16 million. (Ex. 1 at p. 4.) Bayou thus earned more than $12 million from the KFx transaction, double the $6 million of investor losses that accrued during Jim's tenure with Bayou. The $12 million profit from the KFx transaction amounted to more than the total investor contributions of $10 million during Jim's tenure with Bayou.

Although these actions do not excuse his failure to affirmatively stop what was occurring during his tenure with Bayou, Jim did take significant steps in an attempt to right the wrong of which he had been a part.

Jim's Failure to Notify the Authorities

Even after achieving a clean break from Bayou, Jim remained troubled by the deceit of investors.  He struggled with whether to take action to bring the truth to light, but a series of events persuaded Jim to maintain his silence.  In February 2002, Israel visited Jim's office at 27 Signal Road and said words to the effect that "the problem has been solved."  Israel attempted to repair their relationship, going so far as to invite Jim to accompany him on a trip to New Orleans to celebrate Mardi Gras, an invitation that Jim declined.  That was the last time Jim spoke with Israel.

In December, 2002, Israel closed the two Bayou Funds with which Jim had been associated and in January 2003, opened four new Bayou Funds.  Jim assumed that the closing of the two original Bayou Funds in December 2002 had been accompanied by a complete accounting, which reflected the solution that Israel had communicated to Jim that past February.

After Jim's departure, Bayou also gave the appearance that things had turned around and that the company was making enormous profits.  Mariella, who worked together with Jim down the street from Bayou's offices, writes:

> While we were at 27 Signal Road, it was apparent to us that Bayou was doing fabulously well.  Limousines always waiting in the driveway; new big-reputation fund managers with large money contracts were being hired.  We heard stories about how great they were doing.

(Ex. 8 at p. 1.)  Apparently, Bayou leased a private jet, ran restaurant tabs of $4,000 each month, and even employed the services of a counterespionage consultant.  (Ex. 3.)  While Jim and his wife were living in a rental apartment in 2002 trying to save their money so that they could purchase a house, the homes of Israel and Marino reflected what appeared

to be wild success.  Israel paid $32,000 a month to rent a mansion in Westchester owned

by Donald Trump.  Marino purchased a $3 million, six-bedroom home with a pool.

Marino also purchased a Ferrari, Bentley, and Audi.  (*Id*.; Ex 2.)  Meanwhile, Jim drove a

Dodge pickup truck.  (Letter from Italo Passante, attached as Ex. 14.)  One of Jim's close

friends, after learning of the Bayou fraud from the newspapers, writes:

> I knew that Jim Marquez was not living in the kind of
> palatial mansion described as the residence for other Bayou
> managers.  I had been to Jim's house, met his wife and his
> children.  I had no indication that he had run off with other
> people's money.

(Letter from Carl Sangree, attached as Ex. 15.)


Jim's Admission of Wrongdoing and Expression of Genuine Remorse

The Bayou fraud was exposed in August 2005, when Israel and Marino informed

investors that the Bayou Funds would be closed, but redemption checks bounced.  It was

also in August 2005 that authorities discovered Marino's suicide note where he detailed

his role in carrying out the fraud.  Israel and Marino, the major players, were the first to

plead guilty in September 2005.  Jim pled guilty on December 14, 2006, expressing

responsibility and deep remorse for his actions:

> I am deeply and genuinely sorry for my own actions and
> for my failure to stop others from acting.  I know that I
> have caused a [in]calculable hardship to Bayou investors
> and irreparable sorrow and harm to my own family.  And I
> apologize with all my heart to those I have hurt.

(December 14, 2006 Plea, attached as Ex. 16, at p. 20.)

Jim has admitted his guilt and accepted responsibility for his conduct, not only by

his guilty plea but in heartfelt apologies to friends, family, and colleagues:

> [R]ather than blame others for his transgressions or rely on
> excuses or extenuating circumstances, Jim looked
> me squarely in the eyes and admitted he made a serious
> mistake while at Bayou many years ago.  He expressed
> profound regret and sorrow over his transgressions and
> apologized to me, as a client, for violating the trust he had
> earned from me for the work he had done, even though
> Bayou had nothing to do with me.

(Letter from David Bunzel, attached as Ex. 17.)

> While at first Jim could not face up to his actions he has
> over the past years expressed to me on several occasions
> how sorry he is for his actions and how disgraced he feels
> for the shame he has brought upon his family and friends.  I
> have noted a marked difference in Jim during his ordeal,
> while he and his wife have dealt with the trials and
> tribulations his actions have brought upon them.  It is the
> difference one sees in an individual who has come to
> sorrowfully accept responsibility for actions they thought
> they were never capable of being part of in the first place.  .
> . . It is said that redemption, acceptance and honesty are the
> hallmarks of rehabilitation.  Over these past years Jim has
> borne the cross of his responsibility across each of these
> thresholds and has come to accept the responsibility of his
> actions and the hurt these actions have had on the family
> and friends he holds so dear.

(Letter from Madorie O'Hara, attached as Ex. 18.)


**IV.    Jim's History of Serious Mental Illness**

The Marquez family has a long history of mental illness and Jim is no exception.

Jim's mother was socially isolated and withdrawn.  His eldest brother, Vernon, suffered a

life of emotional problems that led to four marriages and three bankruptcies.[4]  (Ex. 4 at

pp. 4 – 5.)

---

[4]  Notably, from 1972 to 1990, despite his personal and financial difficulties, Vernon owned a farm where
as a foster parent he cared for more than 100 children during those 18 years.

The Marquez family's history of mental illness reached beyond Jim's immediate family. Jim's maternal grandfather committed suicide and his maternal grandmother was diagnosed as clinically depressed. His paternal grandmother had a volatile personality. A maternal cousin suffers from a history of depression and another maternal cousin suffers from borderline intellectual functioning. (*Id*. at p. 5.)

Mental illness has even surfaced in Jim's older sons, who have both been treated for panic attacks, bipolar disorder, and depression. (Dr. Steven Roth's Notes dated March 2, 2007, attached as Ex. 19.)

Jim first experienced behavioral fluctuations associated with seasonal mood disorder while in college. During the winters, he would experience a severe manic period during which he would frequently lose a significant amount of weight, sleep little, and often stay up all night. He would typically regain the weight during a lethargic period in the summertime. (Ex. 4 at p. 3; PSR at ¶ 64(a).)

Although Jim's young adulthood was marked at times by signs of mental illness – erratic behavior, substantial weight fluctuations, alternating periods of manic energy and bouts of depression and isolation – it was not until after his first marriage began falling apart in 1991 that Jim, for the first time, sought treatment for his mental illness. Dr. Jacob Kirman treated Jim from 1991 through 1996. The first three years of treatment consisted of individual therapy sessions one to three times per week. The second two years of treatment involved group therapy. (PSR at ¶ 64(b); Ex. 4 at p. 3.) Dr. Kirman, unlike later doctors, failed to formally diagnose Jim with mental illness or treat him with any medication.

- 21 -

During this time, Jim's eldest son Russell lived with Jim and witnessed first-hand Jim's episodes of withdrawal and isolation.  Jim experienced cathartic meltdowns, which included crying and lying on the floor in a fetal position.  (Ex. 4 at pp. 3 – 4.)  Jim was depressed, occasionally lashed out in anger, and was despondent.

In November 1999, Jim began therapy sessions with a clinical social worker, Elvira Franco.  The therapy focused upon management of Jim's worsening mood cycles and also the stress of defending against a civil lawsuit brought by his ex-wife for more money.  (PSR at ¶ 64(c); Ex. 4 at p. 3.)  Consistent with his later diagnosis for bipolar disorder, Jim initially complained of irritability and insomnia (a manic period) during the previous two winters and complained that his sleep was troubled by his thoughts.  He also complained of excessive sleeping in the summertime (depressed period).  In January 2000, Jim reported that he was concerned about his decreasing need for sleep and feelings of arrogance (another manic period).  As a social worker, Ms. Franco could not prescribe him medication.

The pressure and stress on Jim greatly intensified after his separation from Bayou in August 2000 and he told Ms. Franco at that time that he felt a "constant sense of dread, lack of self-worth, hopelessness [and] sense of failure."  (Elvira Franco's handwritten notes, attached as Ex. 20.)  She also noted that he was visibly upset.

At that point, Ms. Franco referred Jim to a psychiatrist, Dr. Mark Tobak, for a medical consultation (discussed below).  Jim began treating with Dr. Tobak in September 2000, but also continued his regular sessions with Ms. Franco.  Ms. Franco's progress notes show that Jim's condition continued to worsen over the next several months and that Jim felt he was "pushed to the sidelines [at Bayou]," was "being put out to pasture,"

- 22 -

was feeling "banished and upset," and felt "responsible for 'destroying' his business and hurting everyone." (Ex. 20.)

On April 2, 2001, after returning from a trip to New Orleans, Jim was tearful and expressed feeling that he "ruined his family" and "lost everybody's money." (Ex. 20.)

During his initial evaluation by Dr. Tobak in September 2000, Jim reported significant seasonal mood swings and external stresses. Dr. Tobak diagnosed Jim with Bipolar Disorder Type II and prescribed the anticonvulsants Neurontin and Trileptal, and an anti-depressant, Wellbutrin. (PSR at ¶ 64(d); Ex. 4 at p. 3.)

In January and April 2006, at the request of Jim's previous counsel, Jim was evaluated by Dr. Justin O. Schechter, who confirmed that Jim suffered from Bipolar Type II Mixed Disorder, characterized by cycles of depression and hypomania. (Ex. 4 at p. 2.) Jim's depression was typically experienced from July to December and was characterized by withdrawal, isolation, and "a markedly diminished capacity to complete tasks or make decisions." (*Id*. at p. 6.) The period of hypomania generally lasted from January to June and resulted in erratic and impulsive behavior. (*Id*.)

Dr. Schechter determined that Jim's condition had been ineffectively treated by Dr. Kirman, Elvira Franco, and Dr. Tobak and that his symptoms, including severe mood cycles, had been more acute for at least the previous five years or more. (*Id*. at p. 2.)

Dr. Schechter also confirmed Jim's "strong family history of psychiatric illness" (*Id*. at p. 4.), which included a suicide, several relatives suffering from depression, and a brother who has filed for bankruptcy three times, married four times, and at one point was caring for over 100 foster children. (*Supra* at pp. 21 – 22.)

Significantly, Dr. Schechter concluded that during the Bayou fraud period, Jim's condition "impaired his ability to express the power of reason and to control his behavior."  (Ex. 4 at p. 2.)

Beginning in March 2007, Jim began treatment with Dr. Steven D. Roth at New York Presbyterian Hospital-Weill Medical College of Cornell University.  Dr. Roth diagnosed Jim with Bipolar Disorder and depression.  Dr. Roth prescribed Lithium and Depakote for Jim's illness.  (Ex. 19.)  Dr. Roth consistently re-evaluates and monitors Jim's medication, changing the dosage as needed and considering alternate medications that may better treat the disease.  For the first time, Jim has responded positively to treatment for his mental illness and has made some progress towards controlling it.

Jim was evaluated by Dr. Lawrence A. Siegel at the government's request.  Dr. Siegel examined Jim on February 23, 2007 and July 10, 2007 for a total of almost four hours.  Dr. Siegel reviewed Jim's extensive psychological records from the various professionals that have treated and evaluated him.  He also administered a psychological test to Jim known as the Minnesota Multiphasic Personality Inventory – 2 ("MMPI").

Significantly, the government's own psychiatrist determined that Jim suffers from a serious mental disorder that may have left him powerless to challenge Israel and Marino.  The government's psychiatrist found that Jim's mental condition significantly impairs his ability to reason and correspondingly impacts his behavior and actions.  Dr. Siegel concedes that Jim's passivity in relation to Israel and Marino can be explained by Jim's bipolar disorder.

For example, the government's psychiatrist determined that Jim "suffers from a serious mental disorder, Bipolar I Disorder."  (Evaluation by Lawrence A. Siegel, M.D.,

attached as Ex. 21, at p. 2.)  Dr. Siegel described that the results of Jim's psychological

testing produced a profile that "is frequently found among hospitalized psychiatric

patients" and that individuals with similar profiles "have great problems controlling their

behavior."  (*Id*. at p. 12.)  Dr. Siegel conceded that at times, Jim's mental disorder

"significantly impairs his ability to reason" and that "aspects of his behavior appear to

have been influenced by his mental disorder."  (*Id*. at p. 14.)  He further acknowledged

that during the time of the conspiracy, when Jim was experiencing his manic or

depressive episodes, it was "probable that there was a significant influence upon his

ability to reason."  (*Id*. at p. 13.)

        According to Dr. Siegel, Jim reported that when he started down the path of

joining the deception initiated by Israel and Marino in the summer of 1998, he was

feeling depressed and did not have the fight in him to force the issue and dissuade them

from following that path.  (*Id*. at p. 13.)  Dr. Siegel admitted that "[i]n light of the

defendant's history of mood swings, it is not implausible that his having been in a down

phase made [Jim] less able to actively object to and intervene in a scheme that his two

partners generated on their own."  (*Id*. at p. 13.)

        Dr. Siegel further explained that "[p]sychotropic medication is often the most

effective means of producing symptom relief for patients [with similar symptoms to

Jim]" and that "[e]xternalization of blame, hostility, mistrust, and lack of introspective

abilities make these patients generally unresponsive to insight-oriented psychotherapy."

(*Id*. at p. 12.)

        Thus it is not merely Jim's doctors who recognize that he suffers from bipolar

disorder as even the government's psychiatrist determined that Jim has a serious mental

disorder which impairs his ability to reason. The government's psychiatrist concedes that

Jim's illness may explain Jim's inability to challenge Israel and Marino.

       Jim's mental illness was not only recognized by his mental health professionals.

His severe mood cycles were readily apparent to his friends and colleagues:

> I am also personally aware of the medical condition that
> Jim suffers from . . . I know from my own experience that
> there were long periods of time, during the year, where he
> suffered intensely. This greatly affected his work and his
> judgment. There were long stretches where I could not get
> in touch with him when the disease was at its peak and he
> was unable to perform like he could at other times of the
> year.

(Ex. 17.)

> Though he is understandably private about it, many of
> Jim's close friends and colleagues are aware of his medical
> condition. . . . To me it appeared as a sort of seasonal
> affective disorder . . . when late June/early July comes, his
> activity starts to slow considerably—and then mostly
> grinds to a halt in August. This period is characterized by a
> kind of lethargy and a deep melancholy—during the worst
> of it Jim is mentally "checked out". . . . I mention his
> medical condition because it is a definite obstacle for
> him—and when we were working together there were
> projects that did not get completed because Jim had
> transformed from his hyper-productive self into the much
> more timid and self-conscious shadow he becomes.

(Letter from Luke Pustejovsky, attached as Ex. 22.)

> [W]e were in almost daily contact for the first half of 2004 .
> . . And then, surprise. He just disappeared. My phone calls
> and e-mails went unanswered. Mutual friends told me that
> as far as they knew he had not dropped dead, but they did
> not know where he was or what he was doing. . . . Just as
> abruptly, he re-emerged in the fall . . . Only months later
> did he tell me about his seasonal mood swings, the kind of
> contra-seasonal affective disorder with which he is
> afflicted. I have some familiarity with bi-polar disorder in

> my own extended family, so this made sense to me.  I know
> how debilitating depression can be, and how irrational it
> can look to outside observers.

(Ex. 15.)

> I also know Jim as a person wrestling with the highly
> disruptive impacts of an obvious mental health disorder. . .
> . The effects on his personality are obvious – sleeping little
> in the winter, a fountain of creative ideas, unbelievably
> productive, occasionally combative and "over the top."  In
> summer, Jim tends to retreat – underconfident, lethargic,
> tentative.

(Letter from Joshua Tosteson, attached as Ex. 23.)


## V.     Jim's Contributions to Society:  the "Instant Volunteer"

Jim has demonstrated a longstanding commitment and generosity toward helping

others.  As the letters from his supporters describe, Jim contributes in ways big and small,

from teaching English as a second language and hosting a friend's wedding at his home

to leading a youth group and traveling to New Orleans to help rebuild after Hurricane

Katrina.

Jim is devoted to helping rebuild his hometown of New Orleans.  He has lent his

voice, leadership, time, and sweat to this cause.  Jim has traveled to New Orleans on

several occasions to help rebuild, including assisting "disadvantaged families in clearing

debris from their flooded homes."  (Letter from Robert Monsted, attached as Ex. 24.)

Jim has spoken at his church of the need for parishioners "to commit their time and

resources to help bring persons' homes back to a livable condition and to build

replacement homes for those who had lost everything in the devastation."  (Letter from

Joseph Zang, attached as Ex. 25; *see also* Letter from William Mahone, attached as Ex.

26.)   As a result of Jim's efforts, several people have accompanied Jim on his trips to New Orleans "to do this humane and generous work."  (Ex. 25.)

Jim is also a valued contributor to his church:

> I am the minister at Saint Saviour's Church where Jim is a very active and well-respected parishioner.  In the five years I have been at Saint Saviour's, Jim has regularly assisted in worship (serving as a reader and as a chalice-bearer, recommended by the vestry and licensed by the diocese); and he [has] been a generous and consistent contributor of his time, talents, and resources.  He is someone whose advice I seek and value and someone whose presence here is important to the church community. He has, over a period of many years, taken a leadership role in various areas of parish life, including serving on the parish vestry (an elected office), organizing and implementing outreach to the wider community; and, with his wife, Mariella, running the parish's youth group (a challenging and much valued contribution).

(Letter from Reverend Victoria Miller, attached as Ex. 27.)

> Jim and his wife, Mariella, volunteered to head up the Saint Saviour's youth group.  For at least two years, Jim and Mariella held regular meetings for our parish teenagers, sponsoring such events as discussion groups, pizza dinners and ski trips.  My daughter . . . was part of that youth group and Jim and Mariella were very important to her at that formative stage in her life.

(Ex. 26.)

Jim volunteers his time to teach English to non-native speakers.  (Ex. 25; Ex. 26.) He does much more than just teach, however.  For example, at the christening party for his daughter Katherine, Jim invited not just family and old friends, but also the students from his class, who had become new friends.  (Letter from David McNamara, attached as Ex. 28.)

Jim's contributions to the community, big and small, are so frequent and varied that he has been referred to as the "instant volunteer":

> We also called him "the instant volunteer". . . . The magic of Jimmy was he would do it for others, many of whom he hardly knew. Jimmy was the first guy you'd call if you needed a house to hold an event for the kids. The first guy you thought of to give someone a ride to a school event on a snowy night. The first guy you'd call to host the fund-raiser. The first one to volunteer when you needed to pester that difficult contributor to an alumni fund or a kid's scholarship program. You could count on Jimmy to raise his hand when everyone else was wondering how to get out of it and then manage to plunge in and pull it off with a charm and a smile that fooled you into thinking he didn't have to get up at four-thirty the next morning to get down to the station.

(Letter from John Connolly, attached as Ex. 29.)

Specific examples are perhaps the best way to illustrate Jim's generous spirit and concern for others:

> In 1985, I was basically broke . . . My fiancé, who'd never been married, had always dreamed of a wedding where our families and friends would come and celebrate the day with us but I knew that given our financial situation that we just couldn't swing it. Enter Jimmy Marquez. He began by offering his home for our wedding reception. And then . . . he wound up paying for the entire wedding out of his own pocket. When I tried to repay him later, he wouldn't hear of it.
>
> Another story comes to mind which typifies the man. A parent at the school where our kids went was a polio victim in his youth, left crippled and misshapen. His name was Frank Leonetti. It was tough to deal with the stark reality of Frank's paralysis and appearance in the context of little kids in a play-school. They asked questions all the time but there were no easy answers. Yet I will always remember Jimmy and the extraordinary effort he made with Frank. I can still hear him saying – What are we doing for Frank at the Fair? How's he gonna get there? Where's he gonna sit? Let's have him over afterward. Make sure his kids

> know where the car is.  Very simply, Jimmy made a man
> whose presence made many people uncomfortable feel like
> part of the community.

(Ex. 29.)

Jim is particularly passionate about protecting the environment.  He has combined

this passion with his Wall Street acumen to become a leader in advising and raising

capital for companies that are developing environmentally friendly energy resources.  His

contributions have touched many companies, many people, and have already made a

difference for the environment.  As the following testimonials demonstrate, Jim's

contributions have created jobs, he has often worked without pay, and if Jim is

incarcerated, it would be a loss for the environment and for forward looking energy

companies:

> [Jim] was an 'enabler' of some of the brightest
> entrepreneurs in the sustainable technology field—
> connecting them with capital, industrial partners,
> customers, top executive talent, etc.  In many cases, Jim has
> been the catalyst that entrepreneurs need in order to fully
> commercialize their life's work.  He impressed me with his
> limitless creativity and his commitment to using 30+ years
> of Wall Street experience to focus on the most pressing
> problems of our time: access to clean and renewable
> energy, access to clean drinking water, and protecting our
> natural inheritance for succeeding generations.  Jim is an
> environmentalist with investor and capitalist *bona fides*,
> and his access to decision-makers, his spectral knowledge,
> his agile mind, and his sheer will put him in a very special
> position to affect change.

(Ex. 22.)

> Within six months of meeting Jim, the company had
> attracted the first in a series of financings from top-quality
> investors.  By mid-2005, HydroGen had become a public
> company, and had raised over $18 million in one year.
> Now our company employs over 70 full-time people, plus
> numerous additional consultants and contractors.  We are

poised to take a leadership position in the fuel cell and sustainable energy industry. And it is no exaggeration to say that without Jim, it just would not have happened. . . . I respectfully submit that Jim's catalytic, ethical, socially and environmentally appropriate, and economically productive contributions – such as described herein – should be fully considered as you paint a picture of the man whose fate you are deciding.

(Ex. 23.)

As for our company, and thanks to Jim, there are seventy people who are gainfully employed in an exciting technology field. Without Jim's efforts on our behalf, these jobs would not exist. If given a chance, each of these folks would convey a hearty thank you to Jim for making this possible.

(Letter from Scott Wilshire, attached as Ex. 30.)

Jim can make great contributions to the national debate on alternative energy, an issue that is emerging as a central challenge to our economy. At the risk of being over dramatic, there are few people as qualified or as informed as Jim on the subject, and the sooner he can re engage on the topic, and lend his voice to finding a solution, I believe, we will all be better off.

(Ex. 17.)

I know that Jim had a positive impact on my daughter. I am proud to say that she is now a Peace Corps volunteer in Nicaragua, teaching environmental science, and I believe her work with Jim in the summer of 2005 helped solidify [her] decision to pursue her interests in environmental science and the service of others.

(Ex. 26.)

As I got to know Jim, the next thing that struck me was his generosity. He was generous with his time and his money. He was working around the clock on behalf of companies where he had no formal contract but he believed in the business . . . Public broadcasting works something like this, but I did not know what to make of it in the realm of investing and finance.

> In my opinion, society cannot afford to sideline Jim
> Marquez for long.  His knowledge, skills and experience
> finding and developing key energy and environmental
> technologies, and his generous nurturing style are needed
> more and more with each passing day.

(Ex. 15.)

Jim has also arranged investor forums to raise money for companies focused on

clean energy or clean water.  A CEO of one such company writes:

> Without reservation I can say that I benefited, my company
> benefited, and all of the other CEOs I talked with benefited
> from Mr. Marquez's mentoring, wisdom and business
> acumen.  All of these businesses are involved in enterprises
> that will clearly benefit our nation and our environment.
> Jim Marquez was both a driving force and a guiding light
> for entrepreneurs struggling to obtain private equity
> funding and commercial success in this important
> technology sector.

(Letter from Randolph Bernard, attached as Ex. 31.)


**VI.     <u>Jim's Devotion to His Family and His Faith</u>**

If Jim is sent to prison, it is his young children, ages eight and five, who will

suffer the most.  Jim's dedication to being a loving, involved father is not a new

development.  He was the same way with his oldest two boys, Russell and Webster, from

his first marriage.  A former employer, John Burns, recalls that Jim was always eager to

leave work at a reasonable hour to spend time with Russell and Webster: Jim "had a

young family . . . and was always avid to make the next train to get home – an admirable

trait in my opinion."  (Ex. 5.)

Jim's involvement and crucial role in raising his young children is evident to

everyone who knows him:

> I can tell you that Jimmy, as long as I have known him, has
> been an individual committed to both family and friends.
> He has worked tirelessly to raise his two sons by his first
> marriage, a very significant undertaking that is not without
> major challenges, even today.  He also has two young
> children with his present wife and spends as much time
> with them as humanly possible. . . . Irrespective of Jimmy's
> sentencing outcome, his wife, children and extended family
> will suffer the cost of his separation.

(Ex. 24.)

> Jim is an exemplary husband and father, taking great pains
> to make sure that everyone around him is treated with love
> and consideration.  He opens his home and his heart to all
> he holds dear and is always willing to share the blessings
> that were bestowed upon him.  He is a dedicated Dad and
> his children adore him.  All he has ever wanted was to
> make a good life for himself and his family.

(Letter from Lisa Russo Letter, attached as Ex. 32.)

> Since the Marquez' moved their offices into their personal
> home, I have gone to Cos Cob several times to work on
> their [tax] returns.  If we had worked only on their taxes,
> my visits would have been extremely short.  But with every
> visit came interruptions by the children to "ask Daddy or
> Mommy this or that."  I was impressed at how "hands on"
> both parents were and especially how interactive and loving
> Jim Marquez was with his children.  It was very apparent to
> me that his family depends heavily upon his presence and
> his children in particular look for his guidance, support, and
> affection.  His absence from his children would certainly
> have a measurable and lasting emotional and psychological
> effect on his children.

(Ex. 10.)

Jim is also deeply spiritual, a tireless contributor to the church, and is guided by

his religion:

> I am the minister at Saint Saviour's Church where Jim is a
> very active and well-respected parishioner.  In the five
> years I have been at Saint Saviour's, Jim has regularly
> assisted in worship (serving as a reader and as a chalice-

> bearer, recommended by the vestry and licensed by the diocese); and he [has] been a generous and consistent contributor of his time, talents, and resources.  He is someone whose advice I seek and value and someone whose presence here is important to the church community. He has, over a period of many years, taken a leadership role in various areas of parish life, including serving on the parish vestry (an elected office), organizing and implementing outreach to the wider community; and, with his wife, Mariella, running the parish's youth group (a challenging and much valued contribution).

(Ex. 27.)

> For many many years Jim has served as an acolyte, lector and chalice bearer at the 8:00 am service at Saint Saviour's. The 8:00 am service is generally very quiet and sparsely attended, and when he's on duty at this service, Jim covers tasks that are generally spread among four or five people at the busier services.

(Ex. 26.)

## VII.   The Sentencing Guidelines

Although the Supreme Court declared the Guidelines advisory, we recognize that the Court is obligated to compute the relevant sentencing range under the Guidelines when completing its sentencing analysis.

The Pre-Sentence Investigation Report ("PSR") calculates Jim's total offense level to be 24.  (PSR ¶¶ 36 – 48.)  Further, the PSR states Jim's criminal history as a category I.  (PSR ¶¶ 49 – 51.)  This translates into a sentencing range of 51 to 63 months incarceration, but based on the statutory maximum term of imprisonment results in a guideline range of 51 to 60 months.  (PSR ¶ 101.)  For the reasons set forth below, we believe that the Probation Department's application of a two-point sentencing enhancement for abusing a position of trust was erroneous and that Jim's appropriate

guideline range, therefore, is actually 22 equating to a sentencing range of 41 to 51.

months imprisonment.  (*See* Ex. 13 at p. 3.)

    We further believe that there are several grounds that would justify a downward

departure from the applicable Guideline level such as Jim's significant mental illness and

the aberrant nature of his conduct (discussed below).


## VIII.    Applicablility of Abuse of Trust Enhancement

    The Court should not impose a breach of trust enhancement because Jim's

position as portfolio manager did not enable the crime and Jim occupied no other position

of trust vis-à-vis Bayou's investors.  A breach of trust enhancement may be appropriate

where "the victim entrusted the defendant with discretionary authority that enabled the

defendant either to commit a crime or evade detection."  *United States  v. Thorn*, 446

F.3d 378, 388 (2d Cir. 2006); *see also United States v. Santoro*, 302 F.3d 76, 79 (2d Cir.

2002) ("to warrant the enhancement, the defendant must abuse a relationship of trust and

confidence with the victim that enabled the defendant to commit the crime or escape

detection").  A breach of trust enhancement is not permitted solely because a defendant

violated a legal obligation to be truthful.  *Santoro*, 302 F.3d at 79.

    A breach of trust enhancement may be appropriate only if a position of trust

between Jim and Bayou's investors enabled Jim to commit the criminal conduct or

conceal his conduct.  Although Jim had minimal direct contact with Bayou's clients,

those clients may have entrusted Jim, as the portfolio manager, to invest their money in

what Jim thought were good investments.  Jim did exactly that.  Jim did not steal,

misappropriate or otherwise divert any client monies.  Admittedly, the Bayou portfolio

performed poorly and resulted in losses.  However, making poor investment decisions does not constitute criminal conduct.  As portfolio manager, Jim did not abuse any client's trust because he did exactly what he was supposed to do; Jim put money from clients into investments that he thought would prove profitable.  His position as portfolio manager did not enable the criminal conduct.  The subsequent deception of investors cannot warrant a breach of trust enhancement because such enhancement cannot be based upon a violation of a legal obligation to be truthful.  *Santoro*, 302 F.3d at 79.

Jim's conduct in legitimately investing client funds distinguishes his conduct from the typical investment advisor fraud where the criminal conduct is either embodied in the purchase and sale of securities or arises from misappropriation of investor funds.  For example, in *Santoro*, the defendant recommended a particular stock to his clients because he received a substantial commission whenever a client purchased that stock, but the defendant did not disclose the commission arrangement.  *Id*. at 78 – 79.  The recommendation and subsequent purchase of securities without adequate disclosure to the client constituted the criminal conduct.  In *Hirsch*, the defendant operated two ponzi schemes where instead of investing clients' money as promised, he misappropriated the funds to pay obligations owed by himself or his business and to pay returns to earlier investors.  *United States v. Hirsch*, 239 F.3d 221, 223 – 24 (2d Cir. 2001).  The misappropriation of funds constituted the criminal conduct.  In contrast to both *Santoro* and *Hirsch*, Jim legitimately invested client funds in what Jim thought were good investments.  As portfolio manager, he did not abuse any trust placed in him.

Apart from acting as Bayou's portfolio manager, Jim had no other personal relationship with Bayou investors that could qualify as a position of trust and therefore no

abuse of trust enhance is warranted.  As opposed to Israel, who actively solicited investors, or Marino, who fielded questions from investors, Jim had little direct contact with Bayou investors.  An abuse of trust enhancement requires a personal relationship between Jim and the Bayou investors.  *Thorn*, 446 F.3d at 388 ("Arms-length commercial dealings do not give rise to the type of fiduciary relationship contemplated by § 3B1.3"); *Hirsch*, 239 F.3d at 228 (holding that defendant investment advisor held position of trust because defendant "had a fiduciary and personal relationship (rather than an arms-length relationship) with his investors").

That Jim was associated with Israel and Marino, who used the "Jim Marquez" name in their efforts to recruit investors, does not place Jim in a position of trust with investors.  *United States v. Morris*, 286 F.3d 1291, 1295 (11th Cir. 2002).  In *Morris*, the co-conspirators had represented to investors that the defendant-attorney was a professional trader and licensed attorney.  The court held that the defendant-attorney did not occupy a position of trust vis-à-vis the investors and that enhancement was not appropriate because "[b]y their very nature, the role in the offense adjustments cannot be based upon the actions of co-conspirators.  . . . The language and structure of the Guidelines prevents application of the §3B1.3 enhancement to [defendant] based upon the representation of others."  *Id*. at 1296.

Here, Jim had little interaction with investors.  That Israel and Marino touted Jim's portfolio management skills, including his experience working with Soros and Steinhardt, did not establish any personal relationship between Jim and the investors in the Bayou Funds.

Therefore, no abuse of trust enhancement is warranted because Jim's position as portfolio manager did not enable the crime and Jim occupied no other position of trust vis-à-vis Bayou's investors.

Accordingly, the defense maintains that Jim's appropriate guideline level should be 22 equating to a sentencing range of 41 to 51 months.

IX.    **The Court Should Grant a Downward Departure From the Applicable Guideline Range**

In accordance with U.S.S.G. § 5K2.0 and the Supreme Court's opinion in *United States v. Koon*, a court may depart from the Guidelines if it finds that mitigating factors, not otherwise prohibited by the Guidelines, are "present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor[s are] present."  518 U.S. 81, 96 (1996).  In this case, there are several mitigating factors that are present to such a significant degree to warrant a downward departure: (1) Jim's history of mental illness and (2) the aberrant nature of his conduct.

These factors may form the grounds for a departure when they are present to an exceptional degree, as they were in this case.  *See Koon*, 518 U.S. at 96; U.S.S.G. § 5K2.0(a)(4).  Even if these factors are not truly exceptional in their own right, their totality may nonetheless remove the case from the "heartland" of typical guideline cases. *See* U.S.S.G. § 5K2.0(c).

A.    Jim's Bipolar Disorder Warrants a Downward Departure

Diminished mental capacity is grounds for a sentence below the applicable guideline range.  U.S.S.G. 5K2.13.  Diminished mental capacity includes a failure "to (A)

understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." *Id.* at (West Appl. Note 1 2004).

Bipolar disorder may constitute diminished mental capacity warranting a downward departure. *See United States v. Silleg*, 311 F.3d 557, 562 – 64 (2d Cir. 2002) (vacating and remanding sentence for consideration of whether defendant should receive downward departure based on bipolar disorder); *United States v. Hoffenberg*, No. 94 Cr. 213 (RWS), 95 Cr. 321 (RWS), 1997 WL 96563, *10, 12 (S.D.N.Y. March 5, 1997) (recognizing that defendant's bipolar disorder provided grounds for downward departure).

Jim's struggle with bi-polar disorder has been well-documented.  It is also undeniable that at the time he reluctantly joined Israel's and Marino's plan to fraudulently hide Bayou's losses from its investors, Jim was going through a particularly severe bout of depression, making him far more susceptible to engaging in criminal conduct.

Significantly, as Dr. Schechter explained, Jim's illness "impaired his ability to express the power of reason and to control his behavior." (Ex. 4 at p. 2.)  The government's psychiatrist, Dr. Siegel, concurred that Jim suffers with a "serious mental disorder" that "significantly impairs his ability to reason." (Ex. 21 at pp. 2, 14.)  Dr. Siegel also determined that Jim's condition can explain Jim's feeling of helplessness in failing to prevent Israel and Marino from spearheading the deception of investors. (*See id.* at p. 13.) Without question, Jim's bipolar disorder impaired his ability to appreciate

the harm that was caused by the Bayou fraud or to take steps to prevent continuance of the fraud.

We ask the Court to recognize the link between Jim's illness and his poor decisions at the time that he went along with Israel and Marino in deceiving investors in the Bayou Funds. The Court should also recognize the link between Jim's illness, which was not properly treated prior to Dr. Roth's involvement in 2007, and Jim's failure to blow the whistle on the fraud even after his separation from Israel, Marino, and Bayou. Finally, the Court should consider the need for constant expert medical care to monitor Jim's condition and make adjustments in the treatment regimen, particularly the dosage and type of prescription medicine he receives. For all of these reasons, the Court should grant a downward departure.

    B.    Jim's Participation in the Bayou Fraud Was Clearly Aberrant Conduct

A defendant is eligible for a downward departure when the crimes for which he was convicted represent a single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation from an otherwise law-abiding life. U.S.S.G. § 5K2.20. When measured against the totality of Jim's life, his conduct with respect to Bayou was certainly an aberration, a single mistake that spiraled out of control. It is significant that not only prior to Jim's involvement with Bayou, but in the seven years since, he has been a model citizen.

> The Jim Marquez that I know is nothing like the portrayal
> I've read about in the newspapers. The only Jim Marquez
> I've ever experienced is a fine human being and an
> enormously valuable friend and confidante; he's
> empathetic, progressive, decent, courageous, witty, kind,
> exceedingly smart, committed, and deeply concerned with

the well-being of his fellow man.  He treats strangers and friends with authentic respect and he has an enormous generosity of spirit.  There is nothing false about the man—and I felt thankful for every day we were able to work together.  The Jim that I know loves his work intensely, loves his family completely, has a strong sense of self and a keen understanding of justice.  He is a very, very good person—even one of the best.

(Ex. 22.)

I have been with him [Jim] in person periodically, and engaged in thousands of phone conversations and business meetings.  During those thirty years I have never experienced any behavior that might be judged to be inappropriate or questionable.  . . . he was always honorable and honest.  From my experience, that which brings Mr. Marquez before you, must be viewed as an aberration in what has been a distinguished career and life.

(Letter from Neil Berlant, attached as Ex. 33.)

[Jim is] a man of the highest integrity, not afraid to admit his mistakes, and always straight forward with his opinions and recommendations, a true rarity on Wall Street these days.  . . . I thought for sure that there was no way he could have participated in the crimes and terrible fraud the papers were describing.  It ran completely counter to everything I had come to know about him.

(Ex. 17.)

[T]he crimes which Jimmy has acknowledged are so anomalous and out of character that I thought at first it must be someone else with the same name.  The man who will stand before you in judgement has broken the law but these acts cut against the grain of his entire life.

(Ex. 29.)

I know his [Jim's] life story and as shocking as these present events may appear to be, I believe they are an aberration in an otherwise exemplary life of a loving, caring and compassionate husband, father and friend to many.

(Letter from Samuel Logan, attached as Ex. 34.)

> Over the years that I have known him I have found Jim
> Marquez a fundamentally honest, kind and generous
> person, and it is these qualities that for me solidifies the
> friendship that I have felt and continue to feel for this man
> as the years go by.  I am aware that Jim has pled guilty to
> improprieties some years ago in connection with the Bayou
> Fund.  It was shocking to learn that my friend Jim would
> intentionally do anything dishonest or illegal.  I can only
> say that it was entirely out of character for him and,
> knowing Jim as well as I do, I am confident that such
> actions will never happen again on Jim's part.

(Ex. 25.)

In making its determination whether to depart under § 5K2.20, the Court may consider Jim's (A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense.  *See* U.S.S.G. § 5K2.20 (West Appl. Note 3 2003). When considering these factors in the instant matter, it should be even more apparent that Jim's conduct was aberrational.  Here, Jim had an impeccable employment history for his whole career up to the time of the instant offense.  During that time, and subsequent to leaving Bayou, Jim conducted himself with integrity and honesty.  Jim succumbed to the pressures of engaging in illegal conduct only after a string of devastating financial failures and disappointments, coupled with a deteriorating mental illness that diminished his capacity to resist the pressures to engage in such conduct and fully comprehend the impact of his actions.

Even if the Court does not find that the above factors warrant a downward departure from the applicable Guideline level, they are powerful evidence to justify a non-guideline alternative sentence pursuant to §3553(a).

## X.    Attempts at Cooperation

Offer of Cooperation

Although by the time he was arrested in this matter, there was no one else involved in the Bayou fraud for Jim to cooperate against, he made his best attempt to provide substantial assistance to the United States Attorney's Office, the S.E.C., and the F.B.I. in any and all matters that he could.  Jim offered his general expertise regarding Wall Street and hedge funds and areas particularly susceptible to fraud.  Additionally, Jim proffered with the government for several hours regarding specific information concerning Aegis Industries, Inc., a start-up company involved in designing and providing non-lethal weapons for law enforcement and military personnel.  Jim was an unpaid advisor to that business and informed the government about fraud in connection with attempts to acquire the company and bring it public.  In fact, the information that Jim offered mirrors the substance of a later filed civil complaint in which Aegis and its investors are suing multiple defendants for fraud, RICO, conversion, and conspiracy. (Complaint in *Aegis Indus. v. Fortified Holdings Corp.*, 07 civ. 01304, attached as Ex. 35.)  Despite Jim's proffer of significant and specific fraudulent activity, the government opted not pursue Jim's cooperation.


Jim Could Not Cooperate Against Israel and Marino Because They Were Arrested First

In sentencing Jim, we respectfully ask the Court to consider the fact that Israel and Marino were used by the government to cooperate against Jim.  This was true despite the fact that Israel and Marino were far more culpable figures in the offense than Jim.  As

set forth above, when Jim left Bayou there were approximately $6 million in total investor losses. After that, however, Israel and Marino continued the fraud, without Jim's participation and when the fraud was ultimately exposed years later, the amount of the losses to investors had dramatically increased to $350 - $450 million. Thus, the conduct of Israel and Marino was substantially more egregious, yet they will receive the enormous benefit of a cooperation agreement whereas Jim will not. This seemingly unjust result occurred because Jim was arrested well after Israel and Marino and was therefore unable to offer his assistance in the prosecution of his more culpable co-defendants.

## XI.     A Non-Incarceratory Sentence Would Satisfy the Requirements of Section 3553(a)(2)

Title 18 U.S.C. section 3553(a)(2)(A)-(D) instructs courts to seek the following goals through sentencing: (i) to reflect the seriousness of the offense, to promote respect for the law, and to provide justice for the offense; (ii) to afford adequate deterrence to criminal conduct; (iii) to protect the public from further crimes of the defendant; and (iv) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D). *See generally, United States v. Blarek II*, 7 F.Supp.2d 192 (E.D.N.Y. 1998).

Additionally, 18 U.S.C. § 3553(a) expressly provides for a sentence "not greater than necessary" to achieve the above mentioned purposes. *United States v. Johnson*, 964 F.2d 124, 125 (2d Cir. 1992) ("the United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom" *cited in Blarek II*, 7 F.Supp.2d at 210.) This statutory mandate takes on a new meaning in light of

*Booker/Fanfan* for the obvious reason that judges are now permitted to appropriately weigh factors, which were previously severely limited by the Guidelines. The objective of imposing a sentence "not greater than necessary" is the one that most coincides with the notion of doing justice as set forth in the statutory scheme of the Sentencing Reform Act.

Additionally, both § 3553(a) and the Second Circuit recognize mercy as a legitimate consideration for this Court, even though it is seldom on the list of traditional rationales for sentencing.

A.    <u>The Seriousness of the Offense</u>

Jim Marquez is a 59 year old man who has no previous contacts with the criminal justice system. Jim was raised in a middle-class setting and through hard-work and determination rose to the highest ranks of Wall Street investing. Through both his numerous successes and failures in the industry, Jim always maintained a high degree of integrity and never "cheated" to get ahead. Consequently, Jim gained the deep respect and trust of his peers.

But Jim also suffered from a serious mental illness, which went mostly untreated for many years and grew considerably worse. Without question, Jim's condition was grossly exacerbated by a string of business failures. Jim, a one-time prince of Wall Street and shrewd investment manager, had lost much of his self-esteem and confidence after his own investment fund failed miserably. Not long afterwards, he was approached by Sam Israel and asked to become the portfolio manager for the Bayou Funds.

As portfolio manager for Bayou, Jim's valiant efforts were again met with failure. The funds' investments were accruing substantial losses and Jim, who for so long knew only success, was becoming frustrated and despondent with yet another failure. Although Jim pushed Israel to close the Bayou Funds, Israel adamantly refused. Jim then reluctantly agreed to go along with Israel's and Marino's scheme to hide the losses from their investors. Whereas in the past, when faced with failure, Jim acted properly and with integrity by acknowledging his losses and closing down his failed fund, this time Jim acquiesced and stood by while a fraudulent scheme was hatched. Jim's worsening mental illness left him feeling powerless and  prevented him from doing the right thing. This was a terrible mistake that Jim has fully admitted and will haunt Jim for the rest of his life.

Jim's uncharacteristic conduct in the instant offense was aberrational in his otherwise law-abiding life. Those who know Jim best, in both his professional and personal life, have consistently echoed this sentiment and described Jim as a devoted and caring family-man and someone who is unfailing and relentless in his desire to help others.

Since his arrest, Jim has completely devoted his efforts to his family and to tirelessly pursuing altruistic causes – particularly causes to help the environment and his devastated hometown of New Orleans. He has also finally begun receiving the proper treatment for his mental illness, which went untreated for so many years.

Jim has done his best to get past this dark period of his life and his conduct since his arrest has been truly exemplary. His expressions of remorse have been plentiful and genuine and he is still highly regarded, as a man, by those who knew him well before his

- 46 -

troubles with the law.  This is plainly evident from reading the myriad thoughtful letters submitted on Jim's behalf.  And even though his effort to cooperate ultimately did not prove helpful to the government, he was truthful and forthcoming.

In determining a just sentence for Jim, it is worth consideration that Jim has been largely punished already and continues to suffer as his reputation as an honest and upright businessman is gone and he will forever be a convicted felon.  Jim and his family are also in near financial ruin as a result of the substantial forfeiture of his assets.  Jim has learned his lesson and his life will never be the same.  He is a desperately broken man.  He has certainly already paid a dear price for his involvement.  It is respectfully urged that a sentence of probation, or in the alternative, home detention, would be an appropriate and just sentence in this matter.


B.    A Non-Incarceratory Sentence Will Adequately Deter Future Criminal Conduct and Promote Respect For the Law

In addition to reflecting the seriousness of the offense, providing respect for the law, providing a just punishment for the offense, and providing general societal deterrence discussed above, the Court must also consider specific deterrence and the potential rehabilitation of the defendant in § 3553(a)(2)(D).  Given Jim's personal history, character, and vital contributions to his family and society at large, a sentence of probation would provide sufficient but "not greater than necessary" punishment to prevent the defendant from resuming criminal conduct upon release.  Jim has shown genuine remorse for his actions and has completely removed himself from the business activities that spawned his illegal conduct.  It is extremely improbable that Jim would ever engage in such conduct again.

As for "general deterrence," which aims to deter *others* from crime, in recently sentencing the president of a public company for securities fraud, Judge Jed S. Rakoff, found that "there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective offenders." *United States v. Adelson,* 05-CR-325, (S.D.N.Y. July 20, 2006) (Sentencing Order) (citing Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998); United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing*, 56 (2004) (the Sentencing Guidelines were written, in part, to "ensure a *short but definite* period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence"); see also D. Weisburd & E. Waring, White Collar Crime and Criminal Careers at 151 (2001). *See also* The "Merrill Lynch / Enron Nigerian Barge" Sentencings, *United States v. Bailey*, No. H-CR-03-363 (S.D.Tx Apr. 21, 2005) (the "ignominy of conviction" and "to go to prison *at all* is a deterrent"). In short, the risk of indictment and conviction alone fosters general deterrence in cases like this.

C.    Jim Marquez Poses No Threat To Society

Jim Marquez is a 59 year old man who has no prior criminal history and has led an otherwise upstanding, exemplary life. In the seven years since Jim's involvement with Bayou, Jim has been a model citizen. He has since participated in numerous business activities, focusing primarily upon his interest in clean, renewable energy resources, and has acted ethically and honorably while helping many companies. There is therefore no

basis to conclude that he is likely to commit any offenses in the future and the public does not need to be protected from him.

## Conclusion

As Scott Wilshire, a graduate of the United States Merchant Marine Academy and Jim's friend, wrote in his letter to the Court, "while Jim made a serious mistake, this should not be the defining event and overshadow the other contributions that he has made during his lifetime." (Ex. 30.)

Jim has already been severely punished in myriad ways. His arrest, indictment and conviction were quite public and will ensure that he and his family carry the stigma of being a convicted felon forever. The emotional and financial impact of his conviction on himself and his family is profound and devastating. It will continue to be so, regardless of the sentence imposed.

There is no denying the seriousness of Jim's offense. At the same time, there is no denying the kind of person Jim is and the contributions he has made to his family, his friends and society generally. In light of these factors and the goals of § 3553(a), a prison sentence for Jim would undoubtedly be "greater than necessary" punishment in this case. A non-incarceratory sentence, perhaps coupled with community service and/or home detention, would allow Jim to continue contributing to society and receiving treatment for his mental illness while still promoting respect for the law.

Dated:  New York, New York
        September 12, 2007

                                        Respectfully submitted,


                                        _____
                                        Bradley D. Simon (BDS-3406)
                                        Brian D. Waller (BDW-7163)
                                        Jeremy M. Weintraub (JMW-4483)
                                        Simon & Partners LLP
                                        30 Rockefeller Plaza, 42nd Floor
                                        New York, NY 10112
                                        (212) 332-8900