Bradley D. Simon (BS 3406)
Brian D. Waller (BW 7163)
Jeremy M. Weintraub (JW 4483)
SIMON & PARTNERS LLP
30 Rockefeller Plaza, 42nd Floor
New York, New York 10112
(212) 332-8900

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA                    :

                              v.                    :         06-cr-1138

JAMES MARQUEZ                               :         (J. McMahon)

------------------------------------------------------X

**Reply Memorandum on Behalf of James G. Marquez in Connection with Sentencing**

## <u>TABLE OF CONTENTS</u>

**Preliminary Statement**................................................................................................- 1 -

**I.    Israel and Marino Are Significantly More Culpable than Jim** ...................- 2 -

    A.    Jim Was Never Israel's Equal Partner ...........................................................- 2 -

    B.    The Government Exaggerates Jim's Limited Involvement with Recruitment of
Investors ......................................................................................................................- 9 -

    C.    The Government Falsely Portrays the Financial Connection between Jim and
Bayou that Followed Jim's Separation from Israel and Marino ...........................- 12 -

**II.    The Abuse of Trust Enhancement Should Not Apply** ............................- 15 -

**III.    The Court Should Not Impose a Guideline Sentence** ..............................- 17 -

    A.    Jim's Mental Illness Warrants a Downward Departure ................................- 17 -

    B.    Nature and Circumstances of the Offense and History and Characteristics of the
Defendant ..................................................................................................................- 18 -

    C.    The Court Should Consider Jim's Genuine Efforts to Provide Cooperation - 20 -

**Conclusion** .............................................................................................................- 22 -

**Preliminary Statement**

In its 63 page memorandum dated October 16, 2007, the government clings to its fanciful notion that defendant James Marquez ("Jim") was as culpable as Sam Israel and Dan Marino for the Bayou collapse. Despite the numerous mitigating factors set forth in Jim's sentencing memorandum dated September 12, 2007, and in particular that Jim's involvement with Bayou fully ended by 2001, when the losses amounted to only about 2% of the total loss, the government refuses to concede that Jim was significantly less culpable than Israel and Marino for the Bayou debacle. The government refuses to make this concession even though it now admits that several exhibits upon which it relied to rebut Jim's arguments contained clear forgeries of Jim's signature. What is worse, some if not all of the forgeries were made by their own cooperator, Dan Marino. This troubling situation underscores what the defense has contended throughout; that the government has relied upon Israel and Marino, the most culpable perpetrators of the fraud, in an effort to magnify Marquez's role in the Bayou collapse. There is a cardinal rule in law enforcement that defendants lower in the pecking order should be utilized to help make cases against more culpable defendants, not the reverse. The government has turned this principle on its head by utilizing Israel and Marino as cooperators against Jim. While Jim was involved with Bayou, losses to investors were in the $6 million to $10 million dollar range. After he left, Israel and Marino went on to engage in years of colossal plundering that resulted in a total fraud of $450 million. In other words, during the time that Marquez was at Bayou, only about 2% of the total Bayou loss occurred. While this does not excuse Jim's conduct, it does serve to put it in perspective. In painting Jim as equally

culpable as Israel and more culpable than Marino, the government has diminished its

credibility.  Rather than argue for a just sentence, the government advances conclusory

allegations, mischaracterizes the documents attached to their sentencing memorandum,

relies upon documents containing Jim's forged signature, and blatantly ignores evidence

that demonstrates Jim's relatively lesser role when compared to his co-defendants.

### <u>Argument</u>

I.    <u>Israel and Marino Are Significantly More Culpable than Jim</u>

Relying upon half-truths gleaned from Marino and Israel, the government argues

that Jim was as culpable as Israel for the Bayou debacle.  That argument is belied by the

fact that during Jim's tenure at Bayou, Israel was the sole owner and the losses incurred

amounted to only about 2% of the eventual total loss.

A.    <u>Jim Was Never Israel's Equal Partner</u>

The government ignores and mischaracterizes key evidence claiming that Jim and

Israel "were equal partners" at Bayou. (*See, e.g.,* Government's Memorandum in

Connection with Sentencing ("Govt. Memo") at 6.)  First, the government ignores

statements from several former Bayou employees, who uniformly identify Israel as the

undisputed head of Bayou.  Those former employees also attest that Israel and Marino

shut Jim out of Bayou management and operations.  For example, David Hayslip, a

former Bayou employee, commented that:

> [O]ne defining event stands out in my mind:  [In November
> 1998] while at Bayou I was speaking with Sam Israel in his
> work area (Jim was away from the office) when Dan
> Marino entered with a package of financial information
> pertaining to Bayou.  Sam's immediate instruction to

> Marino was that Jim Marquez was not to see the
> information.  When I looked somewhat perplexed, Sam
> explained that "Marquez is not an owner or partner of any
> of the Bayou entities and this is none of his business."
> Marino made several comments concurring with Israel's
> statement.  Later the same week, I was working late at the
> firm and struck up a conversation with the building
> manager Tom Atkinson.  Atkinson indicated that he was
> working on Bayou's commission runs and had been hired
> by Israel for that and other tasks.  He also indicated
> "Marquez is not to know" per instructions from Israel.

(Sentencing Memorandum of James Marquez dated September 12, 2007 ("Sentencing

Memo") at Ex. 7 (Letter from David Hayslip).)  These former employees, including

David Hayslip, were never interviewed by the government.  Instead, the government is

content to rely solely on information gathered from Israel and Marino, even though it is

contrary to the accounts of several non-culpable Bayou employees.

The government bristles that Jim "is now attempting to depict himself as a

'portfolio manager' with no ownership interest and little or no input into the running of

the Fund." (Govt. Memo at 13).  The government ignores that this has been Jim's

consistent position all along.  In his plea allocution, Jim stated,

> Your Honor, during the period of time alleged in the
> information, I acted in the position of a portfolio manager
> for Bayou Fund where I helped formulate the trading
> strategy for the fund.  I had general knowledge of the
> financial status of the fund and became aware, after a
> period of time, that the fund was sustaining losses.

(Sentencing Memo at Ex. 16, 20:3-8.)  The government then indicated their assent to

Jim's allocution:

> The Court:   All right.
>
> Let me ask, are both counsel satisfied with the
> state of the record?

- 3 -

Ms. Feinzig?

Ms. Feinzig: Yes, your Honor.

(*Id*. at Ex. 16, 21:9-13.)  It is not Jim, but the government that has now reinvented its

position.  The government previously acquiesced to Jim's position that he acted as

Bayou's portfolio manager, but now attempts to dispute this claim and elevate Jim to the

position of an equal partner and owner of Bayou for the purposes of sentencing.

The government ignores the inconsistency between the fact that Israel and Marino

forced Jim out of Bayou with their claim that Jim was an "equal partner."  In a

partnership, one equal partner can not force out another.  Moreover, that Israel and

Marino wanted Jim gone and that Jim allowed himself to be banished shows the

diverging interests of Jim, who was deeply troubled by the shifting of investor losses into

future quarters, and Israel and Marino, who wanted to and did progress from shifting

losses into misappropriating hundreds of millions of dollars.  Jim, who had recommended

closing Bayou as one option to deal with the investor losses, in some ways acted as

Bayou's conscience.  Israel and Marino needed to remove him in order to push ahead

unchecked with their greater fraudulent scheme.

The government also ignores its own documentary evidence, such as financial

statements created by Marino.  Those financial statements reveal that there was only one

owner of the Bayou entities, Sam Israel:

> The Fund's [Bayou Fund, LLC] manager (the "Manager"),
> Bayou Management, LLC, is 100% owned by a member
> who acts as the General Member.  . . . The Manager of the
> Fund is primarily responsible for the management of the
> Fund.  . . .
>
> The sole shareholder of the Fund's Manager is also the sole
> owner of Bayou Securities LLC.

(Govt. Memo at Ex. E., p. 85.)  Moreover, there are no corporate documents signifying that Jim actually had a partnership or ownership interest in Bayou.

The government further asserts that Jim was Israel's equal because Jim was a signator on Bayou's bank accounts.  However, the very documents that the government cites as support include documents on which Jim's signature was forged.  For example, the government cites a Citibank, N.A. Facsimile/Telephone Funds Transfer Agreement Partnership, but a comparison of Jim's purported signature on that document with Jim's actual signature readily shows that Jim's signature was forged on the funds transfer agreement.  (*Compare* Govt. Memo at Ex. A, pp. 6 – 7 (Jim's actual signature) *with* Govt. Memo at Ex. A, p. 14 (forged signature on funds transfer agreement).)  The government also includes a trading authorization purportedly bearing Jim's signature, but that signature is also an obvious forgery.  (*Compare* Govt. Memo at Ex. A, pp. 6 – 7 (Jim's actual signature) *with* Govt. Memo at Ex. A, p. 16 (forged signature).)

In response to our October 24, 2007 letter informing the government that Jim did not sign these particular documents, the government tried to salvage its claim by arguing that Marino might have signed the documents with Jim's authorization.  (Exs. 48, 49, attached hereto.)  That belated explanation is not true and is simply another example of the government's cooperators offering false information in an attempt to minimize their wrongdoing at Jim's expense.  As his personal accountant, Jim had once granted Marino power of attorney signing authority with respect to certain personal matters, which was later revoked.  Jim never authorized Marino to sign Bayou related documents on his behalf.

The fact that Marino forged Jim's signature on banking records dating back to 1996 is evidence not that Jim and Israel were equal partners, but that Jim occupied a lower position in the Bayou hierarchy since the very inception of Bayou. Jim's signature was forged on other documents as well, including a March 20, 1996 letter sent to a potential investor. (*Compare* Govt. Memo at Ex. A, pp. 6 – 7 (Jim's actual signature) *with* Govt. Memo at Ex. B, p. 1 (forged signature).) After we informed the government that the March 20, 1996 letter was a forgery of Jim's signature, the government asked the Court to disregard that letter. (Ex. 49.) However, that letter, like the forged bank documents, is further proof that even before any deception of investors, Israel and Marino were already deceiving Jim by forging his signature on documents and shutting him out of the business. Those forged documents also show that the government's evidence is simply unreliable.

The government's evidence of Jim's signature on certain bank documentation reflects the half-truths told by Marino and Israel. The government omits the critical fact that whatever signing authority Jim may have had early on was short-lived. Although Jim did sign certain of the documents submitted by the government, Bayou moved its bank accounts from the White Plains branch of Citibank to another Citibank branch. This move required execution of new banking documents, none of which were signed by Jim. Despite the government's attempt to pin signing authority upon Jim, the government attaches not a single Bayou check signed by Jim or any other funds transfers made pursuant to Jim's purported signing authority.

The government further claims that Jim "was quoted as the 'head' of Bayou Securities." (Govt. Memo at 9.) This claim is absurd. The government cites as support

an article in which the author characterizes, not quotes, Jim as the head of Bayou
Securities.  (*Id*. at Ex. E, p. 12.)  As is the government's pattern, it ignores other evidence
that contradicts its claim, including a news article that describes Jim as Bayou's "money
manager" (*Id*. at Ex. E, p. 14) and another news article it attaches as an exhibit, which
states that Israel alone "ran the firm" (*Id*. at Ex. P).

        The government cites to various Bayou marketing materials that claim that Israel
formed Bayou with Jim.  These marketing materials are not proof that Jim formed Bayou,
much less that Jim was Israel's equal partner.  Rather, the documents are consistent with
the fact that Israel formed Bayou but realized he did not have the experience,
qualifications, or name recognition to build a successful hedge fund.  Therefore, Israel
enlisted Jim for the very purpose of touting Jim's resume to potential investors.  Israel
created the marketing materials that hyped Jim as a co-founder of Bayou because Jim's
reputation as an honest, skilled portfolio manager was needed to make up for Israel's
shortcomings.  Israel knew that by advertising Jim as a co-founder, Bayou would gain
instant credibility.

        After Jim was forced out of Bayou, he wrote three letters to Marino and Israel
where he sought to be compensated for the ownership interest that had been promised
him by Israel but never delivered.  The government claims that these letters are proof that
Jim was an owner and principal of Bayou.  To the contrary, the letters prove only that Jim
had been promised that he would be an owner and partner, but that Israel and Marino
never delivered on that promise.  Israel and Marino promised a piece of ownership in
Bayou to others as well and then never delivered on those promises either.  For example,
one of the government's exhibits references a lawsuit involving Paul Westervelt.  In that

lawsuit, Westervelt alleges that Marino and Israel promised him a 25% ownership interest in Bayou, but then failed to make good on that promise.  (*See* Ex. 50 attached hereto.)

The government's argument also suffers from its inconsistent treatment toward Jim as compared to cooperating witness Marino.  The government quotes from one of Jim's letters indicating that Israel promised an ownership interest not only to Jim, but also to Marino.  (Govt. Memo at 13.)  However, the government alleges that Marino was not a principal of Bayou during Jim's tenure.  (*Id*. at 47.)  Thus, concerning Marino, the government concedes that a promise by Israel to share ownership did not equate to actual ownership.  The same should be true for Jim.  Although Israel promised to share ownership with Jim, he never delivered on that promise.  Throughout Jim's tenure at Bayou, Israel remained in control of Bayou and never allowed Jim to become an owner or principal of Bayou.  The fact that Jim sought to be compensated for a broken promise does not make Jim an owner or principal of Bayou.

In addition to ignoring and mischaracterizing evidence, the government advances unsupported and untrue allegations.  For example, the government claims that for "the entire time" that Jim was involved with Bayou, "bank records and Bayou records" prove that Jim and Israel drew the same cash distributions.  (Govt. Memo at 5.)  However, the government does not bother to include the bank records and Bayou records that it claims support this allegation.  Moreover, it is simply not true.

Jim was never Israel's equal partner.  That the government ignores and mischaracterizes compelling evidence to the contrary speaks volumes to the government's motivation.  The government attributes an inordinate amount of blame for

the Bayou situation to Jim because only he, not Israel or Marino, is recognizable as a success on Wall Street. It was Jim, not Israel or Marino, that was regularly quoted in periodicals from the Wall Street Journal to BusinessWeek for his investment savvy. The government's attempt to shift blame to Jim, the most recognizable participant, instead of to Israel and Marino, the more responsible wrongdoers, is transparent and should not be countenanced by this Court.

> B.    The Government Exaggerates Jim's Limited Involvement with
> Recruitment of Investors

The government admits that Israel was "primarily responsible for recruiting potential investors and maintaining Bayou's relationships with investors." (Govt. Memo at 9.) However, the government then exaggerates the limited role that Jim did play with respect to investors. For example, the government includes as an exhibit a letter to a potential investor on which Jim's signature is forged. (*Id*. at Ex. B, p. 1.) The government also includes as exhibits two letters dated April 14, 1999 and July 10, 1999 that misstated the fund's performance and were sent to investors purportedly from Israel and Jim. (*Id*. at Ex. E, pp. 20 – 22.) However, Jim did not sign either letter. (*Id*. at Ex. E, pp. 21, 22.) Moreover, the content of the letters demonstrates that Israel authored both letters. The April 14 letter states, "Jim and I are very excited about this situation." (*Id*. at Ex. E, p. 21.) The July 10 letter states, ". . . which as most of you know is Jim's favorite." (*Id*. at Ex. E, p. 22.) Both letters are clearly written by Israel and from Israel's point of view. Jim had no involvement whatsoever with those letters.

The April 14 and July 10 letters, though, are proof of how Israel used Jim's name without Jim's consent to peddle the fund to investors. Such was Israel's pattern throughout Jim's tenure at Bayou. For example, the government claims that Jim

participated in sending to potential investors a brochure entitled "Synopsis of Fund" that described false rates of return. The government includes a copy of that brochure as an exhibit. (*Id*. at Ex. E, p. 40.) Although Jim's name appears below Israel's name on the cover of the brochure, more important is the photocopy of Israel's business card that also appears on the cover and was apparently attached to the brochure. As demonstrated by the business card, Israel, not Jim, disseminated the brochure. The business card lists Israel's e-mail address as SamIsrael@bayougroup.com. Jim did not even have a Bayou e-mail account. The government does not cite to any correspondence, such as a document with Jim's signature, which tends to show that Jim was responsible for disseminating the investment brochure.

The government includes as exhibits several letters signed by Jim in June of 1997 to potential Bayou investors. (Govt. Memo at Ex. B, pp. 6 – 28.) It should be noted that not one of those letters resulted in an investment. However, the performance numbers described in those letters were accurate as they were written well before the formation of Richmond-Fairfield and the creation of false performance numbers. Those letters are not evidence of any wrongdoing, but merely show that Jim communicated accurate information to potential investors.

The government claims that between 1996 and the end of 1999, six investors "met" with Jim. The government, though, does not provide the names of those six investors, does not claim that Jim arranged any of those meetings, and does not argue that Jim propagated any false performance numbers to those investors. The government's omissions are telling. A handshake in the hallway, a general discussion of the markets, or

similar "meetings" does not amount to falsely misrepresenting investment performance for the purpose of inducing an investor to invest in Bayou.

Desperate to expand the scope of Jim's activities, the government discusses one meeting that occurred in 1999 involving Jim, Israel, and a potential investor, Custom Strategy. (Govt. Memo at 39 – 40.) The government claims that Jim contacted Custom Strategy in 1996 or 1997, which, significantly, was prior to the formation of Richmond-Fairfield. Further, it demonstrates that Jim's contact was initially unsuccessful as there was no meeting until October 8, 1999. Moreover, the evidence shows that Israel was the primary contact with Custom Strategy and primarily responsible for inducing Custom Strategy to invest. Internal Bayou documents that are in the government's possession detail who was responsible for bringing in each new investor. Such documents, which the government failed to include as an exhibit, demonstrate that Israel was attributed with bringing in Custom Strategy as an investor. (Ex. 51 attached hereto.) Moreover, the meeting notes cited by the government indicate that Custom Strategy had concerns regarding Jim's past investment performance, but that Israel allayed those concerns by advertising that his proprietary trading model corrected those problems. (*Govt. Memo* at Ex. E, p. 1.) Most telling is that about eight weeks after the October meeting, Custom Strategy had still not invested and instead sent Bayou a list of ten "questions and issues which need to be clarified prior to making a decision." (*Id*. at Ex. E, p. 89.) Israel alone responded to that inquiry. (*Id*. at Ex. E, pp. 90 – 92.) Jim's limited appearance at an initial meeting with Custom Strategy where Israel pushed his proprietary trading model as an improvement upon Jim's performance as portfolio manager, does not amount to Jim being responsible for the recruitment of Custom Strategy as an investor.

C.    The Government Falsely Portrays the Financial Connection between Jim
      and Bayou that Followed Jim's Separation from Israel and Marino

The credible evidence demonstrates that Jim genuinely believed investors had

been made whole because: (i) Israel told him that the problem had been solved; (ii) in

December 2002, Israel closed the two then existing Bayou funds and opened four new

Bayou funds, a process normally accompanied by a complete accounting; (iii) after Jim's

separation from Bayou, Israel and Marino spent money like they never had before on

luxury items such as a private jet, limousines, and the services of a counterespionage

consultant, which indicated to Jim that Bayou had recouped its earlier losses and was

now quite profitable; and (iv) in comparison to Jim living in a rental apartment with his

wife in 2002, Israel and Marino each lived in magnificent mansions reflecting enormous

success.

The government alleges that Jim's "financial future depended on the Fund's

staying open and the fraud remaining undetected." (Govt. Memo at 46.) The

government further argues that Jim's claim that he thought the losses to investors had

been restored "does not hold water." (*Id.* at 48.) The single piece of evidence offered by

the government as support is a confirmation letter purportedly signed by Jim in 2003

showing that Israel and Marino were continuing to deceive investors through the use of

Richmond-Fairfield Associates. (*Id*. at Ex. O.) The government has now conceded that

this signature of Jim's was, in fact, a forgery made by Marino. Not only did Marino,

unbeknownst to Jim, forge Jim's signature, he also took the elaborate and scheming step

of mailing the forged letter to himself as if it had been mailed to him by Jim.

Government Exhibit O includes a photocopy of the envelope and postmark in which the confirmation letter was mailed.

The government's claim that Jim was financially dependent upon Bayou is also based on more half-truths and mischaracterizations of documents. For instance, the government claims that Jim received a $125,000 check from Bayou as a severance payment. (Govt. Memo at 17.) The check, though, is not from Bayou, but a personal check from Marino. (*Id*. at Ex. K.) And it was not a severance payment but a payment from Marino for damages he caused in connection with Jim's divorce from his first wife. The alimony agreement between Jim and his first wife included an income earning formula drafted by Marino. Due to a flaw in that formula, Jim's first wife took him to court and received a second financial settlement in the fall of 2001 in the amount of $280,000. Jim was justifiably upset with Marino's malpractice that resulted in the second financial settlement. Marino agreed to pay for part of his mistake, writing a personal check to Jim in the amount of $125,000.

The government also makes much ado about Bayou's payment of a $12,500 monthly consulting fee to HMR and payment of certain HMR expenses. The government, however, omits all discussion of the income that HMR generated for Bayou, which far exceeded the payments from Bayou to HMR. HMR traded its brokerage accounts through Bayou Securities resulting in commissions paid from HMR's many clients, including institutional investors Vernon Marquez and Mariella Marquez to Bayou in excess of $1 million. That figure is much greater than the payments from Bayou to HMR and demonstrates that Bayou was far more dependent on income from HMR than vice-versa.

The government tries to reduce the KFx transaction to Jim greedily capitalizing upon an "opportunity to hand KFx an investor."  (Govt. Memo at 46.)  The government misses the point that Jim could have brought the opportunity to invest in KFx to any number of investors.  Jim could have arranged the exact same transaction terms with a different investor and made himself the exact same earnings without involving Bayou.  Despite his fractured relationship with Israel and Marino, Jim presented the opportunity to Bayou as a means of making up for the investment losses that occurred during his tenure at Bayou.  The KFx transaction netted Bayou a $12 million profit, which exceeded not only the loss amount during Jim's tenure, but the total amount invested in Bayou during Jim's tenure.

Further, the terms of the written agreement between HMR and Bayou concerning the KFx transaction precluded Jim from making any profit upon the KFx warrants unless Bayou first earned millions of dollars.  Bayou paid $3.65 million for one million shares of KFx and 500,000 warrants.  Jim was entitled to receive 250,000 warrants only if and when KFx's stock price hit $6.65 or higher, at which point Bayou's one million shares would be worth at least $6.65 million, almost double Bayou's initial investment.  Jim was entitled to receive the remaining 250,000 warrants only if and when KFx's stock price hit $9.95 or higher, at which point Bayou's one million shares would be worth at least $9.95 million.  Israel and Bayou then opted to breach the terms of the written agreement, which ultimately resulted in a settlement agreement whereby Jim paid $25,000 for the 500,000 warrants.  At that time, KFx was trading at $2.99 per share and despite Jim's enthusiasm for the stock, it remained a distinct possibility that the stock price would never reach $3.65, the exercise price pursuant to the warrants, and that the warrants might prove

worthless.  Moreover, the $25,000 represented the maximum amount that Jim could pay at that time, a reflection of the relatively modest earnings he had made in the several preceding years while associated with Bayou.

The government's attempts to misdirect attention to the irrelevant matter of Jim's earnings cannot undo certain important facts: (i) under the terms of the written agreement between Bayou and HMR, Jim stood to profit upon the warrants only if Bayou first earned many millions of dollars; (ii) the KFx transaction made a $12 million profit for Bayou; (iii) the $12 million profit far exceeded all losses that occurred during Jim's tenure at Bayou; and (iv) Jim could have brought the opportunity to any investor but chose to offer it to Bayou to make up for past losses.

Jim was not financially dependent upon Bayou and did not know that Israel and Marino were continuing to deceive investors.  Jim never thought that Israel and Marino had exponentially expanded the initial losses to several hundreds of millions of dollars as Jim thought the losses had been recouped.  The Court should not adopt the government's mischaracterizations of the facts.


## II.    The Abuse of Trust Enhancement Should Not Apply

The government argues that the two-level abuse of trust sentencing enhancement applies "because Marquez's crime involved fraudulently inducing people to invest in Bayou on the basis of false information."  (*Govt. Memo* at 37.)  This argument is contrary to Second Circuit precedent: "An abuse of trust enhancement may not be imposed on a defendant convicted of fraud solely because of a violation of a legal obligation to be truthful and a victim's reliance on a misrepresentation."  *United States v. Hirsch*, 239

F.3d 221, 227 (2d Cir. 2001); *United States v. Santoro*, 302 F.3d 76, 79 (2d Cir. 2002)

(breach of trust enhancement not permitted solely because a defendant violated a legal

obligation to be truthful).

The government's argument not only fails as a matter of law, but also because it is

built upon a false foundation.  As demonstrated above, Jim was below Israel in the Bayou

hierarchy.  Ultimately, Bayou was Israel's fund.  Israel was primarily responsible for

recruiting potential investors.  Although Israel touted Jim's name in printed materials

because Israel's own background could not match Jim's professional success, that is not

equivalent to Jim actively recruiting investors.  Jim had a minimal role in investor

recruitment.

The government claims that the abuse of trust enhancement is particularly

appropriate because Bayou was an unregulated hedge fund.  The government is again not

entirely correct.  The NASD regulated Bayou Securities, which was a broker-dealer, and

should have regulated all the Bayou entities as businesses associated with Bayou

Securities.  The government's exhibits show that Bayou had been regulated by the

Connecticut Department of Banking at least as early as 2003.  (Govt. Memo at Ex. P.)

Nevertheless, even if it was true that Bayou was unregulated, the fact that Bayou was a

hedge fund argues against application of the enhancement because, as with most hedge

funds, only wealthy, sophisticated individuals and entities were permitted to invest in

Bayou.  Such investors typically employ financial advisors.  Thus it is doubtful that such

sophisticated, wealthy investors simply relinquished all oversight of their money when

making an investment in Bayou.  If an abuse of trust enhancement is premised upon

Bayou as a hedge fund, the practical effect is that sophisticated hedge fund investors are

being given greater protection than investors of modest means who lack the enormous wealth necessary to invest in hedge funds.

Here, Jim was Bayou's portfolio manager. To the extent investors entrusted Jim to invest their money, Jim did not abuse that trust because he did in fact invest their money in what he thought were good investments. Well intentioned, but unsuccessful investment decisions do not constitute an abuse of trust. For that simple reason, the Court should not impose a breach of trust enhancement.


**III.    The Court Should Not Impose a Guideline Sentence**

      A.    Jim's Mental Illness Warrants a Downward Departure

The government argues that Jim's bipolar disorder does not warrant a downward departure because there is "no evidence" that Jim had a significantly reduced mental capacity and "no evidence whatsoever" that Jim's bipolar disorder was in any way linked to his wrongdoing. (Govt. Memo at 55.)

Diminished mental capacity includes a failure to exercise the power of reason or to control behavior. U.S.S.G. § 5K2.13 (Application Note). Dr. Schechter concluded that Jim's illness "impaired his ability to express the power of reason and to control his behavior." (Sentencing Memo at Ex. 4, p. 2.) Dr. Siegel, the government's psychiatrist, agreed that Jim suffers a "serious mental disorder" that "significantly impairs his ability to reason." (*Id*. at Ex. 21, pp. 2, 14.) It is undisputed that Jim's mental illness developed as early as the late 1960s and was not properly treated until 2007. (*See* Sentencing Memo. at 21.) The government's Dr. Siegel concluded that "[i]t is likely that, during the

time of the ongoing conspiracy, the defendant had periods of mood instability," which

was inarguably the primary symptom of Jim's disease. (*Id.* at Ex. 21, p. 13.)

Likewise, the government ignores the abundant evidence that Jim's mental illness

contributed to his conduct.  Clearly, if Jim's bipolar disorder impaired his ability to

reason and control his behavior, then it impacted upon Jim's actions in connection with

Bayou.  Dr. Siegel reported that:

> when he started down the path in 1998 (of shifting
> investors' losses into the future) it was the summer and
> [Jim] was feeling down.  He says he did not have the fight
> in him to force the issue and tell his partners not to go
> down the path on which they were headed. . . . When asked
> if he thought he could recoup the losses when he was in his
> manic phase, he agrees that he thought so.

(*Id.* at Ex. 21, pp. 10 – 11.)  Similarly, Dr. Siegel determined that

> In light of the defendant's history of mood swings, it is not
> implausible that his having been in a down phase made him
> less able to actively object to and intervene in a scheme that
> his two partners generated on their own.  One can also
> envision the defendant being more optimistic about
> recouping the losses through his investing during periods
> when his mood was elevated.

(*Id.* at Ex. 21, p. 13.)

The government's claim that "no evidence" exists as to reduced mental capacity

being a contributing factor of Jim's conduct is devoid of merit.

> B.    Nature and Circumstances of the Offense and
>       <u>History and Characteristics of the Defendant</u>

Based upon the fiction that Jim was Israel's equal partner and a principal of

Bayou, the government argues for a sentence of 51 – 60 months.  However, as

demonstrated above, the government's facts ignore key evidence, including accounts of

former Bayou employees that uniformly describe Bayou as Israel's fund and that Jim was

not treated as Israel's equal.  The government also mischaracterizes certain documentary evidence and elsewhere relies upon forged signatures to support its position.  The sources of the obvious misinformation are Israel and Marino, both of whom have a large incentive to blame Jim for what happened in order to minimize their own wrongdoing.

Jim was never Israel's equal at Bayou.  Jim was never a principal.  Jim never had an ownership interest, although Israel had promised him one.  Jim was Bayou's portfolio manager and had a background of Wall Street success that Israel used to promote Bayou and lure investors.

Jim was deeply troubled by the events at Bayou and sincerely wanted to help recoup investors' losses.  Jim offered Bayou the opportunity to invest in KFx.  Whether Jim profited from the KFx transaction is beside the point as Jim could have offered the opportunity to anybody.  Jim didn't offer it to anybody; he offered it to Bayou as a way to recoup losses for Bayou's investors.  Bayou made a profit of $12 million from the KFx transaction, which well-exceeded the amount of losses incurred during Jim's entire tenure with Bayou.

As he averred in his plea allocution, Jim was Bayou's portfolio manager and admits to participating in an ill-conceived plan to shift investment losses into the future. Unlike Marino and Israel, however, Jim did not misappropriate contributions from investors to lead a life of excess.  Unlike Marino and Israel, Jim did not transform investment losses from $6 - $10 million into $450 million.  Unlike Marino and Israel, Jim made efforts to recoup investors' losses by offering Bayou the opportunity to invest in KFx.  Israel and Marino on the other hand, continued defrauding investors for many years.

C.     <u>The Court Should Consider Jim's Genuine Efforts to Provide Cooperation</u>

The government also attempts to minimize Jim's efforts to provide cooperation. In March 2007, Jim replaced his former attorneys and after retaining current counsel immediately sought to meet with the government to cooperate. It was agreed that the initial meeting would focus upon only one subject, Jim's knowledge and involvement with an entity known as Aegis Industries. Jim answered all questions asked by the prosecutor, agents and attorney for the SEC. It was understood that subsequent proffer sessions would be scheduled. After several weeks, with no news from the government, the undersigned inquired and was informed that the government was not going to pursue cooperation from Jim. The government has the power and discretion to decide who it will enlist as cooperators. Nonetheless, the government's effort to belittle Jim's genuine effort to cooperate is unbecoming. Jim spent many long days with counsel preparing for the proffer session and reviewing voluminous documents. He was very disappointed in the government's decision and continues to believe he could have been useful. His efforts at cooperation were genuine and should not be disparaged.

The government faults Marquez for not cooperating immediately after a Wall Street Journal article clearly "implicated" Jim in the Bayou fraud. (Govt. Memo at 53.) However, that article nowhere implicated Jim. (*Id*. at Ex. P.) The article mentioned Jim only once, describing him as a co-founder of Bayou Securities. (*Id*.) In contrast, the article mentioned Israel's name at least eight times and said that Israel "ran the firm, Bayou Securities." (*Id*.) At the time of that article, Jim had not been associated with Bayou for four years. It was Jim's belief that the earlier problem of shifting investors'

losses had been resolved.  Therefore, contrary to the government's assertion, that article was not an incentive for Jim to contact the government as he was neither clearly implicated nor aware of the state of affairs at Bayou in August 2005 when the trouble there first became public.  Therefore, there is no reason to fault Jim for not cooperating at that time.

The fact remains that by the time Jim learned he was being implicated in the Bayou scandal, the government had already accepted cooperation from Israel and Marino, the principal wrongdoers.  Jim never had an opportunity to provide cooperation against Israel and Marino, and the government's arguments to the contrary are without merit.

## Conclusion

We respectfully urge the Court to place Jim's role in the Bayou offense in perspective. Jim has taken full responsibility for his role in the offense and is genuinely remorseful for his actions. However, a sentence in the range of 51 to 60 months is greater than necessary to achieve the sentencing goals of punishment and deterrence. Jim contributes to society in myriad ways and he poses no threat of future criminal conduct. Imposition of a non-incarceratory sentence, perhaps coupled with community service and/or home detention, is warranted under the circumstances and would allow Jim to continue contributing to society and receiving treatment for his mental illness while still promoting respect for the law.

Dated: New York, New York
      November 9, 2007

                                     Respectfully submitted,

                                     /s Bradley D. Simon_____
                                     Bradley D. Simon (BDS-3406)
                                     Brian D. Waller (BDW-7163)
                                     Jeremy M. Weintraub (JMW-4483)
                                     Simon & Partners LLP
                                     30 Rockefeller Plaza, 42nd Floor
                                     New York, NY 10112
                                     (212) 332-8900